No. 2024-2191

# United States Court of Appeals for the Federal Circuit

TOP BRAND LLC, SKY CREATIONS LLC, E STAR LLC, FLYING STAR LLC,

*Plaintiff/Counter-Defendants-Appellant,*

JOHN NGAN,

*Counter-Defendant/Counter-Claimant-Appellant*

v.

COZY COMFORT COMPANY LLC,

*Defendant/Counter-Claimant-Appellee,*

BRIAN SPECIALE, MICHAEL SPECIALE,

*Defendants/Counter-Defendants-Appellees.*

---

**Appeal from the United States District Court for the District of Arizona in No. 2:21-cv-00597-SPL, Judge Steven P. Logan**

---

## OPENING BRIEF FOR APPELLANTS

---

Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939

John C. Evans
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

---

*Counsel for Appellants Top Brand LLC, Sky Creations LLC, E Star LLC, Flying Star LLC, and John Ngan*
*[Additional counsel on inside cover]*

Marlee R. Hartenstein
JONES DAY
500 Grant Street, Ste. 4500
Pittsburgh, PA 15219
(412) 391-3939

Eric M. Fraser
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 640-9000

## <u>CLAIMS AT ISSUE</u>

This appeal concerns the single claim of U.S. Design Patent No. D859,788:

> The ornamental design for an enlarged over-garment with an elevated marsupial pocket, as shown and described.



<u>**CERTIFICATE OF INTEREST**</u>

**Case Number:**     2024-2191

**Short Case Caption:** *Top Brand LLC v. Cozy Comfort Company LLC*

**Filing Party/Entity:** Top Brand LLC, Sky Creations LLC, E Star LLC, Flying Star LLC, John Ngan

I certify the following information and any attached sheets is accurate and complete to the best of my knowledge.

Date: October 4, 2024          Signature:   <u>*/s/ Gregory A. Castanias*</u>
                                                        Gregory A. Castanias

1. **Represented Entities:** Provide the full names of all entities represented by undersigned counsel in this case.  Fed. Cir. R. 47.4(a)(1).

    Top Brand LLC;
    Sky Creations LLC;
    E Star LLC;
    Flying Star LLC; and
    John Ngan

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  Fed. Cir. R. 47.4(a)(2).

    None.

3. **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  Fed. Cir. R. 47.4(a)(3).

    None.

4. **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

    Aronberg Goldgehn David & Garmisa
    Christopher W. Niro

Matthew L. De Preter
William L. Niro
Phillip W. Londen

5. **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

*Cozy Comfort Company LLC v. The Individuals, Corporations Limited Liability Companies, Partnerships, and Unincorporated Associations Identified in Schedule A to Complaint*, No. 1:23-cv-16563 (N.D. Ill.)

*Cozy Comfort Company LLC v. Larger Than Average LLC et al.*, No. 2:24-cv-00185 (D. Ariz) (transferred to W.D. Mo. June 12, 2024 but not yet docketed there)

*Cozy Comfort Company LLC v. ABC Company*, No. 2:24-cv-00184 (D. Ariz.)

6. **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None/Not Applicable.

# TABLE OF CONTENTS

**Page**

CLAIMS AT ISSUE ................................................................................. i

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF AUTHORITIES ....................................................................vi

TABLE OF ABBREVIATIONS .............................................................xiv

STATEMENT OF RELATED CASES ....................................................xv

STATEMENT OF JURISDICTION........................................................1

INTRODUCTION ....................................................................................2

STATEMENT OF THE ISSUES...............................................................4

STATEMENT OF THE CASE...................................................................5

    A.    The Parties ..............................................................................5

    B.    The '788 Patent .......................................................................7

    C.    This Lawsuit ...........................................................................11

    D.    Claim Construction and Summary Judgment ....................13

    E.    Trial .......................................................................................15

    F.    Jury Instructions ....................................................................25

    G.    The Verdict..............................................................................26

    H.    Post-Trial Motions.................................................................27

SUMMARY OF ARGUMENT ................................................................29

STANDARDS OF REVIEW ...................................................................32

ARGUMENT ...........................................................................................33

I.    THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF
NO INFRINGEMENT OF THE '788 PATENT.........................................33

    A.    The district court shirked its duty to construe the '788 patent in
light of its prosecution history............................................................34

    B.    The '788 patent prosecution history narrows its scope according
to Cozy Comfort's representations to the examiner about
marsupial pocket size and location, armhole location, and
bottom-hem orientation and appearance ...........................................36

# TABLE OF CONTENTS
(continued)

Page

C. Under the correct construction of the '788 patent, no reasonable jury could find infringement ................................................................38

II. THE DISTRICT COURT SHOULD HAVE GRANTED A NEW TRIAL BECAUSE OF AN INTERVENING CHANGE IN CONTROLLING LAW ................................................................42

III. THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF NO TRADEMARK INFRINGEMENT OR DAMAGES ..........................45

A. Top Brand never used the marks for "THE COMFY" ......................45

B. Top Brand never profited from its alleged use of the marks ............47

IV. THE DISTRICT COURT SHOULD HAVE ISSUED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO EQUITABLE DISGORGEMENT REMEDIES ................................................................48

A. Disgorgement is an equitable remedy for the court, and only the court ................................................................49

B. No disgorged profits were appropriate as a matter of equity ............52

C. It was inequitable to disgorge gross profits for design-patent infringement ................................................................57

D. The trademark-infringement disgorgement awards were double recoveries ................................................................59

V. THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF NO ALTER-EGO LIABILITY ................................................................62

CONCLUSION ................................................................68

# TABLE OF AUTHORITIES

**Page**

CASES

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
933 F.3d 202 (2d Cir. 2019) .................................................53, 55, 56

*Activator Methods Int'l, Ltd. v. Future Health, Inc.*,
No. CV-11-1379-PHX-GMS, 2012 WL 715629 (D. Ariz. Mar. 6,
2012) ......................................................................................67

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
466 F.3d 1000 (Fed. Cir. 2006) ...................................................60, 61

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
616 F.2d 440 (9th Cir. 1980) ......................................................47

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
501 F.3d 1314 (Fed. Cir. 2007) ...................................................34

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
750 F.2d 903 (Fed. Cir. 1984) ....................................................54, 55

*Bass v. Shutan*,
259 F.2d 561 (9th Cir. 1958) ......................................................67

*Bischofshausen, Vasbinder, & Luckie v. D.W. Jaquays Mining &
Equip. Contractors Co.*,
145 Ariz. 204, 700 P.2d 902 (Ct. App. 1985)....................................65

*Bowers v. Baystate Techs., Inc.*,
320 F.3d 1317 (Fed. Cir. 2003) ...................................................61

*Braun Inc. v. Dynamics Corp. of Am.*,
975 F.2d 815 (Fed. Cir. 1992) ....................................................32

# TABLE OF AUTHORITIES

(continued)

**Page**

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
   150 F.3d 1354 (Fed. Cir. 1998) ..........................................................61

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999)...........................................................................49

*CommScope, Techs. LLC v. Dali Wireless Inc.*,
   10 F.4th 1289 (Fed. Cir. 2021) ..........................................................41

*Cozy Comfort Co. LLC v. Individuals, et al. Identified on Schedule A
   to Complaint*,
   No. 23-CV-16563, 2024 WL 2722625 (N.D. Ill. May 28, 2024) ......................37

*Deutsche Credit Corp. v. Case Power Equipment Co.*,
   876 P.2d 1190 (Ariz. Ct. App. 1994)..................................................67

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
   543 F.3d 665 (Fed. Cir. 2008) (en banc) ................................34, 35, 41

*Eko Brands, LLC v. Adrian Rivera Maynez Enters.*,
   Nos. 20-35369, -35556, 2021 WL 3630225 (9th Cir. Aug. 17,
   2021) ...................................................................................................54

*Elmer v. ICC Fabricating, Inc.*,
   67 F.3d 1571 (Fed. Cir. 1995) .......................................35, 36, 38, 41

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ...........................................................47

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
   64 F.3d 1553 (Fed. Cir. 1995) .....................................................36, 37

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)...........................................................................41

# TABLE OF AUTHORITIES
(continued)

**Page**

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015) ......................................................50, 52

*Gatecliff v. Great Republic Life Ins. Co.*,
    170 Ariz. 34, 821 P.2d 725 (1991) (in banc).................................65, 67

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*,
    162 F.3d 1113 (Fed. Cir. 1998) ...........................................................34

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966)...................................................................................43

*Hartco Eng'g, Inc. v. Wangs Int'l, Inc.*,
    142 F. App'x 455 (Fed. Cir. 2005) .......................................................38

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) ..............................................................35

*Ize Nantan Bagowa, Ltd. v. Scalia*,
    577 P.2d 725 (Ariz. Ct. App. 1978).................................................66, 67

*Jes Solar Co., v. Matinee Energy Inc.*,
    823 F. App'x 545 (9th Cir. 2020) .........................................................33

*Junker v. Eddings*,
    396 F.3d 1359 (Fed. Cir. 2005) ............................................................61

*Kars 4 Kids Inc. v. Am. Can!*,
    8 F.4th 209 (3d Cir. 2021) ....................................................................53

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998) ..............................................................47

# TABLE OF AUTHORITIES

(continued)

**Page**

*KeyBank Nat'l Ass'n v. Neumann Dermatology LLC*,
  No. CV-21-00133-PHX-JJT, 2022 WL 16635372 (D. Ariz. Nov. 2,
  2022) ........................................................................................................67

*KSR International Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................................43

*Leroy's Horse & Sports Place v. Racusin*,
  21 F. App'x 716 (9th Cir. 2001) ..............................................................33

*Liu v. SEC*,
  59 U.S. 71 (2020) ...............................................................................49, 57

*LKQ Corp. v. GM Glob. Tech. Operations LLC*,
  102 F.4th 1280 (Fed. Cir. 2024) (en banc) .....................................passim

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).....................35

*McClaran v. Plastic Indus., Inc.*,
  97 F.3d 347 (9th Cir. 1996) .....................................................................48

*McDowell v. Calderon*,
  197 F.3d 1253 (9th Cir. 1999) .................................................................32

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993).................................................................................57

*MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*,
  622 F.3d 361 (5th Cir. 2010) ...................................................................58

*Mid America Title Co. v. Transnation Title Ins. Co.*,
  332 F.3d 494 (7th Cir. 2003) .............................................................65, 66

## TABLE OF AUTHORITIES

(continued)

**Page**

*Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*,
41 F.3d 1242 (8th Cir. 1994) ............................................................53

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) ............................................................32

*Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*,
372 F.3d 1330 (Fed. Cir. 2004) ........................................................33

*Nordock, Inc. v. Sys. Inc.*,
803 F.3d 1344 (Fed. Cir. 2015), *vacated on other grounds*, 580
U.S. 1028 (2016).................................................................................57

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ..................................................35, 36

*Parsons v. Bedford*,
28 U.S. (3 Pet.) 433 (1830).................................................................49

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................35

*Precor Inc. v. Life Fitness*,
13 F. App'x 913 (Fed. Cir. 2001) ......................................................38

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) ..................................................42, 45

*Progressive Int'l Corp. v. AMGTM LLC*,
No. C17-448 RAJ, 2018 WL 4091694 (W.D. Wash. Aug. 21,
2018) ...................................................................................................58

*Quick Techs., Inc. v. Sage Grp. PLC*,
313 F.3d 338 (5th Cir. 2002) ............................................................52

# TABLE OF AUTHORITIES
(continued)

**Page**

*Red Carpet Studios v. Midwest Trading Grp., Inc.*,
No. 1:12cv501, 2021 WL 1172218 (S.D. Ohio Mar. 29, 2021)..........................50

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
919 F.3d 869 (5th Cir. 2019) ...........................................................53, 54

*Schnadig Corp. v. Gaines Mfg. Co., Inc.*,
620 F.2d 1166 (6th Cir. 1980) .................................................................57

*SEC v. Blatt*,
583 F.2d 1325 (5th Cir. 1978) .................................................................58

*Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*,
888 F.2d 815 (Fed. Cir. 1989) .................................................................35

*Shure Inc. v. ClearOne, Inc.*,
No. 19-1343-RGA, 2021 WL 4991083 (D. Del. Oct. 27, 2021)......................50

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) .................................................................41

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
808 F. App'x 459 (9th Cir. 2020).......................................................52, 55

*Synergistic Int'l, LLC v. Korman*,
470 F.3d 162 (4th Cir. 2006) ...................................................................53

*Tegal Corp. v. Tokyo Electron Am., Inc.*,
257 F.3d 1331 (Fed. Cir. 2001) ..........................................................29, 51

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) .................................................................32

*Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*,
951 F.2d 684 (5th Cir. 1992) ...........................................................54, 55

# TABLE OF AUTHORITIES
(continued)

**Page**

*Texas Advanced Optoelectronic Sols, Inc. v. Renesas Elecs. Am., Inc.*,
  895 F.3d 1304 (Fed. Cir. 2018) ............................................49, 50, 51

*Transgo v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) ............................................33

*Wechsler v. Macke Int'l Trade, Inc.*,
  486 F.3d 1286 (Fed. Cir. 2007) ............................................32, 58, 59

*White v. Dunbar*,
  119 U.S. 47 (1886) ............................................35

*White v. Ford Motor Co.*,
  312 F.3d 998 (9th Cir. 2002) ............................................32

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ............................................32

*Youngren v. Rezzonico*,
  543 P.2d 142 (Ariz. 1975) ............................................67, 68

*Zimmerman v. City of Oakland*,
  255 F.3d 734 (9th Cir. 2001) ............................................42, 45

**STATUTES**

15 U.S.C. § 1117 ............................................5, 52

35 U.S.C. § 102 ............................................8

35 U.S.C. § 289 ............................................passim

**OTHER AUTHORITIES**

37 CFR § 2.85 ............................................passim

# TABLE OF AUTHORITIES

(continued)

**Page**

Conor Murray, *Co-Creator of The Comfy, A 'Shark Tank' Hit, Fights To Keep Company Afloat*, Forbes (Dec. 23, 2022), *available at* https://tinyurl.com/2dykk8n2 ................................................................. 7

Fed. R. Civ. P. 52 ............................................................................. passim

Fed. R. Civ. P. 59 .......................................................................... 27, 32, 42

## <u>TABLE OF ABBREVIATIONS</u>

The following abbreviations are used in this brief.  Emphasis throughout the brief is added unless otherwise noted.

| Abbreviation | Term |
|---|---|
| (__:__) | patent column and line numbers |
| '788 patent | U.S. Design Patent No. D859,788 |
| '416 patent | U.S. Design Patent No. D886,416 |
| '237 patent | U.S. Design Patent No. D903,237 |
| '380 patent | U.S. Design Patent No. D905,380 |
| '431 patent | U.S. Patent No. 10,420,431 |
| '347 mark | U.S. Trademark Registration No. 5,608,347 for "THE COMFY" |
| '456 mark | U.S. Trademark Registration No. 5,712,456 for "THE COMFY" ("'456 mark") |
| court, or district court | United States District Court for the District of Arizona |
| Court | United States Court of Appeals for the Federal Circuit |
| Top Brand | Plaintiff /Counter-Defendants-Appellant Top Brand LLC, Sky Creations LLC, E Star LLC, Flying Star LLC, and Counter-Defendant/Counter-Claimant-Appellant John Ngan, collectively |
| Top Brand Companies | Plaintiff /Counter-Defendants-Appellant Top Brand LLC, Sky Creations LLC, E Star LLC, and Flying Star LLC |
| JMOL | judgment as a matter of law |
| POSA | person of ordinary skill in the art |
| Cozy Comfort | Cozy Comfort Company LLC |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff /Counter-Defendants-

Appellant Top Brand LLC, Sky Creations LLC, E Star LLC, Flying Star LLC, and

Counter-Defendant/Counter-Claimant-Appellant John Ngan, are aware of the

following cases pending in this or any other court or agency that will directly affect

or be directly affected by the Court's decision in this case:

- *Cozy Comfort Company LLC v. The Individuals, Corporations Limited Liability Companies, Partnerships, and Unincorporated Associations Identified in Schedule A to Complaint*, No. 1:23-cv-16563 (N.D. Ill.)

- *Cozy Comfort Company LLC v. Larger Than Average LLC et al.*, No. 2:24-cv-00185 (D. Ariz) (transferred to W.D. Mo. June 12, 2024 but not yet docketed there)

- *Cozy Comfort Company LLC v. ABC Company*, No. 2:24-cv-00184 (D. Ariz.)

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367. On April 29, 2024, the court entered judgment on the jury's verdict. On June 5, 2024, the court entered an amended judgment after granting Cozy Comfort's motion to alter or amend judgment. On July 30, 2024, after denying Top Brand's timely filed post-trial motions under Fed. R. Civ. P. 50, 52, and 59, the court entered a second amended judgment to reflect its prejudgment-interest award. Top Brand timely filed its notice of appeal on July 31, 2024. Appx15068–15069.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

# INTRODUCTION

This dispute between competitors never should have seen the inside of a federal courtroom.  It became a federal case only because the owners of certain design-patent and trademark rights—Cozy Comfort and its principals, the Speciale brothers—were allowed to stretch those rights far beyond their permissible limits and stifle legitimate competitors, the Top Brand Companies (and one of their members, Mr. John Ngan).  This Court's intercession is now needed to restore balance and fairness to the competitive landscape between the parties.

The story of this appeal is a familiar one of intellectual-property overreach.  That overreach came about via a combination of sharp business practices, likely driven by the *Shark Tank* TV-show investors who funded the Speciale brothers' sweatshirt business, and the aggressive litigation strategies that followed.  These tactics should have been reined in, but were not.  Each issue presented by Top Brand's appeal reflects Cozy Comfort's unconstrained overreach:

- Cozy Comfort was able to obtain a design patent for its "hoodie" sweatshirt with a front pocket only by making multiple narrowing representations during prosecution about the size and location of the "marsupial pocket" on the front, the precise location of the armholes, and the shape of the bottom hemline.  Despite repeated promises from the district court that it would address these narrowing representations of claim scope as a matter of construction, it never did, and so the jury, in determining infringement, was never constrained by Cozy Comfort's prior representations.  No ordinary observer could have concluded that Top Brand's products infringed Cozy Comfort's design patent under a correct construction that honors Cozy Comfort's prosecution representations.

- Cozy Comfort was able to repel Top Brand's obviousness defense only by arguing that Top Brand had failed to satisfy the now-overruled *Rosen-Durling* test, which the court's jury instruction commanded the jury it "must" follow. Despite this Court's en banc decision in *LKQ v. GM* issuing after the verdict but before post-trial motions, the district court refused to order a new trial.

- Cozy Comfort's two trademarks, for the use of "THE COMFY" as a mark for a wearable blanket, were successfully asserted against sporadic adjectival descriptions of Top Brand's sweatshirts as being "comfy," and the jury awarded millions of dollars in trademark disgorgement that Cozy Comfort never proved.

- Disgorgement is limited by statute and precedent to *net* profits, yet the jury's disgorgement award gave Cozy Comfort 100% of Top Brand's *gross* sweatshirt profits for design-patent infringement, and a further 20% of those exact same profits for trademark infringement, when the jury's equitable disgorgement verdict should have been advisory only and decided by the court.

- Finally, Cozy Comfort was permitted to pierce the corporate veil and hold one of the Top Brand Companies' members, Mr. John Ngan, personally liable, despite no evidence that the companies were a sham or fraud, and where the only evidence of transferred monies was Mr. Ngan moving his own money *into* one of the companies.

The Top Brand Companies' products are fundamentally different from what Cozy Comfort's design patent claims—especially once Cozy Comfort's prosecution-history representations are given their proper due. And there should have been nothing whatsoever actionable under trademark laws about calling a comfortable sweatshirt "comfy." In all events, the jury's disgorgement award of well over 100% of Top Brand's gross profits was an inequitable windfall to Cozy Comfort. This Court should reverse and allow the parties to compete in the marketplace, not the courtroom.

## STATEMENT OF THE ISSUES

1.    Where the district court failed to resolve the parties' dispute regarding the '788 patent's prosecution history and its impact on claim scope, should the court have granted JMOL of no design-patent infringement where, under the correct construction that would have accounted for the patent owner's narrowing of claim scope during prosecution, no reasonable jury could have concluded that the overall visual appearance of the claimed sweatshirt design is substantially similar to the accused sweatshirts, as properly construed?

2.    Should the district court have granted a new trial based on the post-verdict change in governing law, *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280 (Fed. Cir. 2024) (en banc), when the jury was instructed that it "must" assess design-patent obviousness using the now-overruled *Rosen-Durling* standard?

3.    Should the district court have granted JMOL of no trademark infringement where the registered marks were for "THE COMFY," but the accused infringing use wasthe descriptive adjective "comfy," without the definite article "the," to describe the qualities of Top Brand's sweatshirts?

4.    Did the district court err in its treatment of the remedial aspects of this case by refusing to make findings and conclusions on the equitable remedial issue of disgorgement, or, alternatively, by refusing to grant a new trial or remittitur on

that issue, where the jury's design-patent-infringement awards under 35 U.S.C.

§ 289 and trademark infringement under 15 U.S.C. § 1117 totaled over 100% of

Top Brand's gross (not net) profits?

5.    Should the district court have granted JMOL of no alter-ego liability

for Mr. John Ngan under Arizona law where no evidence showed that Mr. Ngan

"made [those companies] an instrument to conduct his own personal affairs"

(Appx14551), or that any of the Top Brand Companies were shell corporations

created for the purposes of sham or fraud, and the evidence presented by Cozy

Comfort showed only that Mr. Ngan was putting his own money into the

corporations, not extracting it for personal gain?

## STATEMENT OF THE CASE

### A.    The Parties

This is a dispute between competitors.  Top Brand filed this suit as a

declaratory-judgment plaintiff; it eventually became a counterclaim defendant, too.

There are four Top Brand Companies, each of which is a limited liability company:

Top Brand LLC; Sky Creations, LLC; E Star LLC; and Flying Star LLC.  Top

Brand LLC and E Star LLC are California LLCs with principal places of business

in Carson, California.  Sky Creations LLC and Flying Star LLC are Illinois LLCs

with principal places of business in Chicago and Elgin, Illinois, respectively.  Mr.

John Ngan, also a counterclaim defendant, is a California resident and a Member

of each of the Top Brand Companies.  He was named as a counterclaim defendant because Cozy Comfort sought to hold him personally liable for the Top Brand Companies' acts.

The Top Brand Companies make and sell clothing, including hooded sweatshirts and wearable blankets, through online retailers.  Cozy Comfort accused two lines of Top Brand sweatshirts of infringing the '788 patent—the Tirrinia® and Catalonia® sweatshirts pictured below:





Tirrinia®                                    Catalonia®

Cozy Comfort, the defendant and counterclaim plaintiff below, is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona. Cozy Comfort makes a sweatshirt called "THE COMFY."  Originally, it had two members, Messrs. Brian and Michael Speciale, the named inventors of the '788 patent.  In April 2017, the Speciale brothers formed Cozy Comfort Company, LLC.  Later that year, they appeared on the ABC reality television program *Shark*

*Tank* to seek investments in their sweatshirt company.  *See, e.g.*, Conor Murray,

*Co-Creator of The Comfy, A 'Shark Tank' Hit, Fights To Keep Company Afloat*,

Forbes (Dec. 23, 2022), *available at* https://tinyurl.com/2dykk8n2.  Their

sweatshirt (shown below) was ultimately marketed as "THE COMFY":



THE COMFY

### B.    The '788 Patent

Cozy Comfort applied for the '788 patent on September 13, 2017.

Appx00028–00037.  The '788 patent is titled "Enlarged over-garment with an

elevated marsupial pocket," and it describes and claims a hooded sweatshirt or

"hoodie" design as shown, for example, in Figure 1:



FIG. 1

Appx00030.  Of course, the '788 patent was hardly the first hooded sweatshirt.

Nor was it even the first large hooded sweatshirt with a marsupial pocket on the

torso front.  So, during prosecution, the examiner rejected the design as anticipated

under 35 U.S.C. § 102 by U.S. Patent No. D728,900 to White:



Appx15121.  Invoking the *Gorham v. White* ordinary-observer standard, the

examiner concluded that "the appearance of U.S. Patent No. D728900 is

*substantially the same* as that of the claimed design."  *Id.*

Cozy Comfort responded by offering multiple distinctions of its sweatshirt design from the features of White's sweatshirt. Appx15105–15111. In so doing, Cozy Comfort made important, consequential representations narrowing the scope of its claimed design:

***The marsupial pocket.*** Cozy Comfort told the examiner that the claimed "marsupial pocket – the pocket located on the front of the torso"—differed from White and, "[f]or this alone, the claimed design is allowable." Appx15107. Unlike White's wide pocket covering most of the torso (Fig. 3, from White, in yellow, below), "the pocket in the inventive design [Fig. 4, in blue, below] is approximately one-third of the width of the torso[,]" as shown in the following annotated figures:



**White**                    **Cozy Comfort**

Appx15108 (colored highlighting added; annotations in original). Cozy Comfort also told the examiner that White's more angular and trapezoidal pocket differed from the claimed pocket's shape. Appx15109. These claimed features were,

quoting Cozy Comfort, "more than small[:] they are numerous, they are significant, and they are disposed right on the front of the design where a consumer is immediately confronted by them." *Id.*

  *Armholes.*  Cozy Comfort also emphasized other claimed features as significant differences it believed the ordinary observer would appreciate as distinctions from White.  It informed the examiner that the claimed armscyes (i.e., armholes) in its design (Fig. 4 on the right) dipped "below the top of the marsupial pocket," in contrast to White's much higher armholes (Fig. 3 on the left):



|          White          |      Cozy Comfort      |

Appx15109 (annotations in original).

  *Bottom hem.*  Finally, Cozy Comfort urged the examiner that its design's downward-sloping hem (Fig. 6 on the right) differed from White's hem (Fig. 5 on the left), and would likewise be viewed as distinct by the ordinary observer:



**White**                    **Cozy Comfort**

Appx15110 (annotations in original).  Cozy Comfort concluded by arguing that its

design's pocket, armholes, and hemline features "are in fact significant differences

that an ordinary observer would see, appreciate, and rely on to distinguish the two

designs." *Id.*

The examiner was persuaded by the narrowing distinctions, and allowed the

claim that became the '788 patent on June 5, 2019.  Appx15088.  The '788 patent

issued on September 17, 2019.  Appx00028.

### C.    This Lawsuit

Promptly after the '788 patent issued, Cozy Comfort launched an extensive

campaign to weaponize that patent (and other intellectual property) to have

competitors' products removed from various third-party websites such as

Amazon.com and Walmart.com.

Top Brand was among Cozy Comfort's first targets. Cozy Comfort immediately sought to have Top Brand's products de-listed on the Amazon.com website, premised on accusations of design-patent infringement. Among other things, Cozy Comfort emailed Amazon.com in early November 2019, accusing Top Brand's products of infringing the '788 patent and asking Amazon to take down at least 15 products. Cozy Comfort then went after other competitors for allegedly infringing the '788 patent, filing four additional suits between February 19 and July 30, 2021: *Cozy Comfort Co. LLC v. Davie Clothing Proprietary Ltd. et al.*, No. 2:21-cv-310 (D. Ariz.); *Cozy Comfort Co. LLC v. The Hoodex Ltd. et al.*, No. 2:21-cv-967 (D. Ariz.); *Cozy Comfort Co. LLC v. The Coozzy*, No. 3:21-cv-981 (D. Or.); and *Cozy Comfort Co. LLC v. Bedabox LLC*, No. 5:21-cv-1286 (C.D. Cal.). Other suits against other competitors followed.

By early 2020, Top Brand had had enough. It sought to clear its good name through a declaratory judgment. On February 20, 2020, Top Brand LLC and Sky Creations LLC filed this action in the Northern District of Illinois against Cozy Comfort and the Speciale brothers, seeking a declaration of noninfringement and invalidity of the '788 patent and for other relief, including affirmative claims for unfair competition and intentional interference with contract. Appx00173–00188. The case was transferred to the District of Arizona on April 8, 2021. Appx00632–00633.

The pleadings did not close until October 25, 2021, due to several rounds of motion practice. Top Brand filed amended complaints on June 18, 2020 (Appx00342–00376), May 21, 2021 (Appx01911–01963), and October 11, 2021 (Appx04092–04154). Cozy Comfort filed counterclaims in its April 8, 2021 answer to the first amended complaint (Appx00634–00711) and there named Mr. John Ngan as a counterclaim defendant, accusing him of using the Top Brand Companies as his alter egos. *See* Appx00657–00658. In its operative answer to Top Brand's third amended complaint, filed October 25, 2021 (Appx05031–05114), Cozy Comfort counterclaimed for infringement of the '788 patent and three other related design patents (none of which are at issue in this appeal). Appx05101–05102, Appx05109–05111. Cozy Comfort also asserted claims for trade-dress and trademark infringement under the Lanham Act. Appx05103–05104, Appx05107.

### D.    Claim Construction and Summary Judgment

Top Brand urged the court to adopt a construction of the '788 patent reflecting Cozy Comfort's narrowing representations about pocket size, pocket shape, armhole location, and hemline features that it made to distinguish the prior-art White reference and obtain allowance. Appx05272–05274. Cozy Comfort disputed that construction. Appx06680. The court issued its *Markman* order on August 8, 2022, announcing that the claims of all the patents then in dispute

(including the '788 patent) would be "construed as they are presently written," Appx06991, while noting that the representations made about the '788 patent during prosecution presented "a clear dispute" as to that patent.  Appx06990.  The court accordingly "decline[d] to decide" at that stage of the case the dispute about how the "prosecution history [is] relevant and narrow[s] the scope of [Cozy Comfort's] design claims."  *Id.*  It viewed that dispute as "premature" and "better addressed at a later point"—"the summary judgment or jury instruction stage, rather than the claim construction stage."  Appx06990–06991 (quotation omitted).

When Top Brand again raised the issue at summary judgment, the court again left it unresolved.  The court acknowledged that its *Markman* Order "did not hold that the '788 patent claim has been constructed [*sic*] once and for all." Appx10945.  It even "repeat[ed] its claim construction holding" to warn the parties not to treat its *Markman* Order "as an absolute and unalterable resolution on the scope and construction of [Cozy Comfort's] design patents" (*id.*), noting that "claim construction is an ongoing process that can be revisited if necessary." Appx10946.  The court further acknowledged "disputes remaining related to the scope of the '788 patent," including "prosecution history," when it denied summary judgment.  Appx10950.

The court missed a last pre-trial opportunity to resolve the dispute at the final pretrial conference that concluded on November 9, 2023.  Appx23418.  Top

- 14 -

Brand proffered a design-patent-prosecution expert, Mr. Richard Stockton, to
describe what happened during prosecution of the '788 patent and the impact of the
representations to the USPTO about the design.  Appx23429 (12:5–9).  Cozy
Comfort objected, insisting that the district court should *not* address claim scope in
jury instructions, urging that "you're going to get competing instructions on how to
interpret a patent … and that's improper.  That's your guidance to the jury."
Appx23432 (15:8–11).  Cozy Comfort also sought to exclude Mr. Stockton's
testimony on *Daubert* grounds, arguing, that "everything [Mr. Stockton] talks
about is going to claim construction .…  He's talking about telling the jury how to
interpret the claim. … [The] proper interpretation of claims cannot be testified to
by a patent attorney."  Appx23437 (20:12–20) (cleaned up).  The district court
agreed with Cozy Comfort, and held that Mr. Stockton "may not testify about
issues of patent infringement related to this case."  Appx23438 (21:23–24).

### E.    Trial

Trial proceeded from April 9 to April 26, 2024.

***'788 patent infringement.***  At trial, Top Brand showed how the accused
sweatshirts differ from the '788 patent.  The jury evaluated the following lines of
Top Brand sweatshirts:



HD100-line (Appx17048)



HD100S-line (Appx17059)



HD101-line (Appx17050)



HD120-line (Appx17062)



HD200-line (Appx17035)



HD201-line (Appx17064)



HD210-line (Appx17065)



HD250-line (Appx17028)

The jury found that the HD101-line did not infringe the '788 patent, but that the other seven models did. Appx14524. For purposes of this appeal, the HD250 sweatshirt (Appx17028) may be considered representative of all sweatshirts that were found to infringe the '788 patent (except as otherwise indicated).

- 16 -

Top Brand's sweatshirts differ from the '788 patent design. For example, like the prior-art White hoodie, all the accused sweatshirts' pockets are wide—they occupy about two-thirds of the torso front—and are distinctly trapezoidal in shape:



|  |  |
|---|---|
| HD250 Sweatshirt (background removed and featuring larger pocket) | HD250 Sweatshirt (background removed) |

Appx17028.

Further, the bottom hems of the accused sweatshirts differ from the backward-sloping hems of the claimed design. They are straight, and not downward-sloping toward the back. Appx17028; *see* Appx24087 (50:18–25), Appx24092 (55:4–5). They flare outward at the hemline, giving the accused sweatshirts an overall bell-shaped profile, unlike the claimed design and its barrel shape:



HD250 Sweatshirt
(background removed)

'788, Fig. 4

Appx17028; Appx00033.

Lastly, all but two of the Top Brand sweatshirts have pockets placed low on the torso, near the wearer's belly, with armholes aligned with the top of the pocket (unlike the '788 patent's higher pocket position that Cozy Comfort stressed during prosecution when distinguishing White):



HD250 Sweatshirt
(background removed)

HD250 Sweatshirt
(background removed,
featuring armholes and pocket)

Appx17028. (The original HD200 (Appx18693) and HD210 (Appx17043) sweatshirts had pockets placed higher up toward the wearer's chest, but otherwise

had the same distinguishing features discussed above.)

***'788 patent invalidity.*** Top Brand presented evidence and testimony that the

'788 patent was obvious based on a combination of prior-art references. For

example, Top Brand featured several prior-art references disclosing oversized

sweatshirts like the '788 patent, particularly in terms of the shape of the torso,

sleeves, and cuff, such as the prior-art Blue Sweatshirt (Trial Exhibit 99):



Appx16698 (cropped); Appx24103-24104 (66:22–67:4). Top Brand's expert, Ms.

Melissa Gamble, showed how the Blue Sweatshirt had a similar overall appearance

to Cozy Comfort's allegedly patented Comfy Jr. sweatshirt. Appx16698;

Appx18374; Appx18377; Appx24104–24107 (67:15–70:2); Appx24112–24113

(75:12–76:16). She testified that simply adding commonplace features of well-

known sweatshirts, *e.g.*, a smaller pocket, would have resulted in the '788 patent

design, and would have been within the ordinary designer's abilities. Appx24117–

24121 (80:2–84:7), Appx24123–24124 (86:17–87:15).

Cozy Comfort aggressively framed its defense to Top Brand's invalidity challenge around *Rosen-Durling* and its now-scuttled rule "that the primary reference" used by a party challenging a design patent as obvious "must be 'basically the same' as the challenged design claim, and that any secondary references must be 'so related' to the primary reference that features in one would suggest application of those features to the other." *LKQ*, 102 F.4th at 1287. It cross-examined Ms. Gamble on her failure to "select one primary reference and do [her] analysis based on that," Appx24160 (123:22–25), and weaponized that concession against her in closing arguments, telling the jury (with reference to the jury instructions) that a "primary reference is supposed to create the same [*sic*] overall visual impression as the claimed design as a whole," Appx25117 (171:8–10), and that Ms. Gamble's testimony about prior art should be entirely disregarded as "not relevant to the '788 design patent because it *does not create the same overall visual impression* as the claimed design as a whole." Appx25117 (171:13–15). Cozy Comfort argued to the jury that Ms. Gamble "admits that the sweatshirt is *not the primary reference* and that she *does not rely on one primary reference* when conducting her analysis." Appx25117 (171:17–19). Cozy Comfort concluded by arguing: "This is improper, as you can see by *the test* which leads to Ms. Gamble's analysis being flawed and the wrong conclusion." Appx25118 (172:5–7).

***Infringement of the '347 and '456 trademarks.*** The registered trademarks are for "THE COMFY," and only when used for "blanket throws." Appx18557 ("THE COMFY," Reg. No. 5608347, in Class 24 for "Blanket throws, namely, whole body blankets."); Appx18627 ("THE COMFY," Reg. No. 5712456, in Class 35 for "online retail store services featuring blanket throws, namely, whole body blankets"); *see* 37 CFR § 2.85 ("Classification schedules" for the USPTO's "classification for goods and services, which applies for all statutory purposes to" applications filed since September 1973 "and resulting registrations").

Top Brand never used the registered marks for "THE COMFY." Rather, it used "comfy" as an "adjective" to "describe the product, how soft." Appx23771 (199:7–10). Even then, Top Brand only used the word "comfy" briefly in 2021 (Appx20492) on its Catalonia website to describe its product as "very comfortable." Appx23773 (201:11–15). Mr. Michael Speciale admitted that "the word comfy means comfortable" and "describes a feature" of a sweatshirt. Appx24274 (67:10–14). Cozy Comfort's expert, Dr. Robert Frank, agreed that "comfy" could be descriptive and even generic, affording no trademark protection. Appx24678–24679 (110:25–111:9). He testified that the product name is "THE COMFY"—not simply "comfy" without the definite article "the"—and that the word "comfy" means "comfortable." Appx24677 (109:16–24). This is how Cozy Comfort uses its registered marks: "[I]f it doesn't say *The* Comfy, it's not a

Comfy."  Appx24275 (68:23–25 (emphasis added)); Appx16491.  In its brief,

single use of the adjective "comfy," Top Brand never used the definite article "the"

to accompany it.  Appx20492.

   ***Disgorgement remedies.***  Top Brand showed that its net profits from sales of

the accused sweatshirts found to infringe after the '788 patent issued in September

2019 were $3,818,678.95, after subtracting overhead expenses like shipping and

handling, warehouse rent, utilities, and the like that Mr. Ngan himself allocated

based on sales.  *See* Appx23120–23127; Appx23827–23828 (24:10–25:8).

   Cozy Comfort's expert did not calculate net profits.  He showed the jury a

summary of calculations for design-patent and trade-dress-infringement remedies

(but nothing for trademark infringement) based solely on Top Brand's *gross*

profits.  On the design-patent remedy, he offered the conclusion that "the gross

profit number there of $15.4 million would be the amount of profit earned on

selling these infringing products."  Appx24848 (108:16–21).  His conclusion

regarding gross profits was supported by no financial records or other evidence of

record; he merely presented the jury with unadmitted demonstrative exhibits

displaying tables of calculations.  *Id.*  He presented separate conclusions regarding

the alleged trade-dress infringement remedy.  *Id.*  Yet he presented neither

testimony nor damages calculations for the trademark-infringement claims—

neither "trademark" nor the two trademarks at issue (both for "THE COMFY") were even mentioned during his testimony.  *See* Appx24838–24885 (98:8–145:21).

*Alter ego.*  Cozy Comfort's damages expert, Mr. Cook, testified that a "shell company" is one that "doesn't really serve a business purpose or function and doesn't have real business transactions," and, using that definition, he concluded that the Top Brand Companies *were not* "*shell companies*."  Appx24883–24884 (143:6–144:4 (emphasis added)).

There was evidence of just one financial transaction between Mr. Ngan individually and one of the Top Brand Companies—an August 2022 deposit of $1 million *from* Mr. Ngan *into* Flying Star LLC to fund its operations.  Appx22610. Cozy Comfort did not show that Mr. Ngan ever took money *from* the Top Brand Companies for his own use.  He never received a salary or other monetary distribution from any of the companies.  *See* Appx23170; Appx23171; Appx23172; Appx23885–23886 (82:23–83:18).  The annual profits of each company were reinvested to build equity and acquire assets.  *See* Appx23170; Appx23171; Appx23172; Appx23885–23886 (82:23–83:18).  The evidence showed, without dispute, that the Top Brand Companies were separate entities, legally formed, and in good standing (Appx23692); that Top Brand's general ledger accounted for each company (Appx23170; Appx23171; Appx23172); and

that the Top Brand Companies filed separate tax returns (Appx22671–22728; Appx22729–22776; Appx22777–22825).

*Cozy Comfort's bad-faith unfair competition.* In November 2019, Cozy Comfort used its '431 patent to effect takedowns of Top Brand's products. *See* Appx16319. It celebrated with thumbs-up and fist-bump emojis after receiving a letter from Top Brand's attorney explaining non-infringement in detail. *Id.* Then, entering 2020, Cozy Comfort escalated its use of the '431 patent as an anticompetitive tool. Appx16349; Appx24297–24298 (90:10–91:4). Among other things, in January 2020, it tapped a third party (Mr. Ryan Meehan) to complain to Amazon about alleged infringement by E Star. Appx24296 (89:2–15); Appx24306 (99:9–100:20). In February 2020, Cozy Comfort ignored Plaintiffs' requests for justification, and congratulated itself by quoting Queen lyrics ("another one bites the dust"). Appx16196–16198.

Cozy Comfort persisted in its campaign even after this lawsuit began. In November 2021, it used yet another third-party (Redpoints) to persuade Walmart to take more competing products down—netting it $7.2 million in "Enforced Economic Value." Appx23780–23782 (208:8–210:11); Appx23177. Those efforts swept up non-infringing products (*e.g.*, the HD101) and products it never accused of infringement (*e.g.*, HD201UNI, HD201CAT, HD201BEA, and HD300). *See* Appx18733–18735; Appx18741–18745; Appx24608–24610 (40:24–42:3). Cozy

Comfort had "no regrets" and was "unapologetic" for its conduct.  Appx24519 (145:16–17, 21–23); Appx24530 (156:3–19).

## F.    Jury Instructions

Despite its repeated promises to address how Cozy Comfort's statements during prosecution of the '788 patent affected claim scope as a matter of law, the district court never did that—not at *Markman*, or summary judgment, or in jury instructions.  Appx06990–06991; Appx23432 (15:8–11); Appx23437 (20:11–20); Appx23438 (21:23–24).  Thus, the jury received no guidance from the court (or any witness) on that critical issue.  *See* Appx14539–14582.  The jury was simply instructed that it "must determine whether or not there is infringement by comparing the accused products to the design defined in the '788 patent."  Appx14554.  The court never provided that "design defined in the '788 patent" to the jury other than giving the patent itself to the jury.  *See id.*

As to obviousness, the jury was instructed that it "must" apply the *Rosen-Durling* standards when it rendered its verdict on obviousness of the '788 patent:

> In order to be a proper primary reference, it *must* teach a specific design (not a design concept) which looks *basically the same* as the claimed design. Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be shown by considering more than one item of prior art. However, in order to combine two prior art references, they *must* be *so related* that the appearance of certain ornamental features in one would suggest the application of those features to the other.

- 25 -

Appx14571 (emphases added).

In the district court's only remedy-related instruction, the court told the jury that if it found liability for either design-patent or trademark infringement, it could award Top Brand's "profits" as the measure of its damages, "determined by deducting all expenses from gross revenue." Appx14576–14577; Appx25182 (39:3–5); Appx25184–25186 (41:23–43:1).

## G.    The Verdict

On April 26, 2024, the jury returned a verdict finding, among other things: that Top Brand's accused HD101-line sweatshirts did not infringe the '788 patent but all other accused sweatshirts did (HD100, HD100S1, HD120, HD200, HD210, and HD250); that the '788 patent was not invalid; that all $15,394,978.00 of Top Brand's gross profits should be disgorged and paid to Cozy Comfort for infringement of the '788 patent; that Top Brand also infringed the '416 patent (though for that infringement, the jury awarded nominal damages of $1); that Top Brand infringed the '347 and '456 trademarks; that Cozy Comfort should be given two separate disgorgement awards of $1,539,497.80 each for the trademark-infringement claims; and that Top Brand LLC, E-Star LLC, and Flying Star LLC were alter egos of Mr. Ngan; and that Cozy Comfort engaged in unfair competition against Top Brand, that Cozy Comfort acted in bad faith, and that Cozy Comfort

should pay Top Brand $596,520.00 in damages for its unfair competition.

Appx14523–14538.

### H.    Post-Trial Motions

After trial, Top Brand filed a renewed motion for JMOL.  That motion

included a motion for judgment of no infringement of the '788 patent, which

pointed out that "[a]t this stage, this Court now has an obligation to resolve th[e

parties'] dispute of claim scope as a matter of law," and that, under a correct

assessment of claim scope, "Cozy Comfort failed to adduce sufficient evidence for

a jury to find infringement."  Appx14814.  Top Brand's JMOL motion also sought

judgment of no trademark infringement and no alter ego.  Appx14815–14824.  Top

Brand also filed a Rule 59 motion for a new trial or remittitur, in light of the May

21, 2024 *LKQ* decision that changed the controlling law of design-patent

invalidity, and the improper and excessive disgorgement awards (Appx14826–

14837), and a Rule 52 motion for findings of fact and conclusions of law regarding

the disgorgement remedies, since the jury's verdict had been advisory on that

equitable issue (Appx14839–14867).

Cozy Comfort moved to alter or amend the judgment to remove the jury's

damages award of about $600,000 for unfair competition as unavailable under the

relevant Illinois statute, though it did not challenge the jury's underlying unfair-

competition and bad-faith findings; the district court subsequently granted that motion. Appx14626–14631; Appx14924–14925.

Just three days after briefing closed on Top Brand's post-trial motions, the district court denied them all in a terse 5-page opinion. Appx00001–00005. In denying Top Brand's motion for JMOL of no infringement of the '788 patent, the court once again declined Top Brand's request to construe the claims in light of Cozy Comfort's prosecution disclaimers, instead merely referring back to its conclusory bench ruling—a ruling that, like previous ones, failed to resolve the parties' dispute about how the prosecution history narrowed claim scope. *See* Appx00002–00003. In denying Top Brand's motion for a new trial on obviousness because of this Court's intervening decision in *LKQ*, the court surmised that the jury "was not instructed to stop if the initial *Rosen* 'basically the same' requirement was not met," but was also invited to consider factors that "mirror" those of *Graham* and *LKQ*. Appx00003. The court denied Top Brand's post-trial request for relief as to disgorgement of gross profits, stating that "Plaintiffs' competing calculation of Defendants' [*sic*] net profits [*sic*] was a question of fact for the jury which this Court will not now overturn." Appx00004. Finally, the court disposed of Top Brand's motion for findings and conclusions on the equitable disgorgement remedy in one sentence that did not engage with Top Brand's arguments:

> The Court also declines to provide further findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) as the jury was not advisory on the issue of infringement. *See Tegal Corp. v. Tokyo Electron Am., Inc*., 257 F.3d 1331, 1339 (Fed. Cir. 2001) (holding that the Seventh Amendment right to jury trial applies in patent infringement actions for damages).

Appx00005.

## SUMMARY OF ARGUMENT

The judgment should be reversed, or at minimum vacated and a new trial granted, based on these errors:

I.     The court should have granted JMOL of no infringement of the '788 patent.  The court repeatedly refused to construe the '788 patent in light of Cozy Comfort's representations made during prosecution, which narrowed the '788 patent's scope by focusing on precise features of the design and calling them out as "more than small," but "numerous," "significant," and "disposed right on the front of the design where a consumer is immediately confronted by them."  Those "significant" features were cast aside at trial, where the jury was charged only to "determine whether or not there is infringement by comparing the accused products to the design defined in the '788 patent," with no further "definition" of that design.  Cozy Comfort was thereby permitted to accuse Top Brand sweatshirts that had those same (and more) "significant" design differences that persuaded the examiner to allow its patent in the first place.  No substantial evidence supports the

jury's infringement finding under a correct construction of this design-patent claim.

II.    The district court also should have granted Top Brand a new trial because of the change in the law of design-patent obviousness worked by this Court's decision in *LKQ*, which issued after the verdict but before post-trial-motion briefing.  The jury was instructed that it must apply the now-overruled *Rosen-Durling* standards, and Cozy Comfort made *Rosen-Durling*'s now-incorrect standard a centerpiece of its cross-examination of Top Brand's expert and of its closing argument.  The intervening change in the law is ample ground for a new trial under the precedents of this Court and the Ninth Circuit; the prejudice caused by Cozy Comfort's use of that incorrect standard at trial only cements the need for a new trial.

III.    The district court also should have granted JMOL of no trademark infringement of the two registered marks for "*THE* COMFY."  No evidence suggests that Top Brand ever used the registered marks; all Top Brand ever did was accurately describe comfortable sweatshirts as "comfy."  Even aside from the absence of infringement liability, the jury's twin multi-million-dollar awards for describing sweatshirts in this fashion were supported by no record evidence; they could only have been the product of jury speculation, as Cozy Comfort's damages witness gave no testimony whatsoever about trademark-infringement damages.

IV.    Likewise, the court should have made its own findings and conclusions under Rule 52 concerning equitable disgorgement of profits. Disgorgement is an equitable issue for courts, not juries.  The jury's advisory verdict, which purported to give Cozy Comfort 120% of Top Brand's gross profits, illustrates precisely how ill-equipped juries are to calibrate disgorgement awards as equitable remedies.  The court should have refused to award disgorged profits altogether, as Cozy Comfort was adjudged to have acted in bad faith.  In all events, the jury's award of over 100% of Top Brand's gross profits is inequitable double-counting.  At minimum, the court should have granted a new trial.

V.    Finally, the district court should have granted JMOL of no alter ego liability.  The Top Brand Companies are not alter egos of Mr. Ngan, and even Cozy Comfort's own expert admitted that they are not shell companies created to perpetrate a fraud or sham.  Arizona alter-ego law respects the corporate form when companies, like the Top Brand Companies, are formally separate, maintain their own financial records, do not commingle personal and corporate funds, file their own corporate income tax returns; and are not undercapitalized.  The jury's verdict is based on no substantial evidence that could possibly support piercing the corporate veil and holding Mr. Ngan personally liable under Arizona law.

## STANDARDS OF REVIEW

This Court reviews denials of JMOL and new-trial motions under regional circuit law. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc*., 920 F.3d 777, 783 (Fed. Cir. 2019). The Ninth Circuit reviews orders denying JMOL *de novo*. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1290 (Fed. Cir. 2007) (applying Ninth Circuit law). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co*., 312 F.3d 998, 1010 (9th Cir. 2002) (internal quotation marks omitted)

The Ninth Circuit reviews new-trial denials for abuse of discretion. *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 728 (9th Cir. 2007). A denial of a new trial must be reversed "where the District Court has made a mistake of law." *Id.* at 729 (quotation omitted). Rule 59 authorizes a new trial when, *inter alia*, "the district court is presented with … an intervening change in the controlling law." *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999).

Claim construction is a legal issue reviewed *de novo*. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015). Infringement determinations are reviewed for substantial evidence. *Braun Inc. v. Dynamics Corp. of Am*., 975 F.2d 815, 819 (Fed. Cir. 1992).

This Court applies regional circuit law in trademark cases, so Ninth Circuit law applies to trademark infringement and remedies. *Nautilus Grp., Inc. v. ICON Health & Fitness, Inc*., 372 F.3d 1330, 1334 (Fed. Cir. 2004). A jury's likelihood-of-confusion determination is reviewed for substantial evidence. *See, e.g.*, *Transgo v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014-16 (9th Cir. 1985).

Arizona state law governs the issue of corporate separateness. *See, e.g.*, *Jes Solar Co., v. Matinee Energy Inc*., 823 F. App'x 545, 546 (9th Cir. 2020) (applying "demanding standard" for finding alter ego under Arizona law). A jury's alter-ego finding is reviewed for substantial evidence. *See Leroy's Horse & Sports Place v. Racusin*, 21 F. App'x 716, 718 (9th Cir. 2001).

## **ARGUMENT**

## I. **THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF NO INFRINGEMENT OF THE '788 PATENT**

The district court should have granted JMOL of no infringement of the '788 patent under the proper construction of the '788 patent in light of representations made during prosecution. No reasonable jury could have found infringement of this design patent under the correct, narrow construction of its claim. This Court may, and should, do so on appeal.

- 33 -

### A.    The district court shirked its duty to construe the '788 patent in light of its prosecution history

"[T]rial courts have a duty to conduct claim construction in design patent cases, as in utility patent cases." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc).  Because "design patents 'typically are claimed as shown in drawings,' and that claim construction 'is adapted accordingly,'" *id.* (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007)), one of the most important adaptations of those drawings may come as a result of courts pronouncing "the effect of any representations that may have been made in the course of the prosecution history …." *Egyptian Goddess*, 543 F.3d at 680 (citing *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998)).

Here, as detailed at pp. 13–15, above, the district court repeatedly promised to provide that essential legal guidance, but never did.  Instead of receiving a jury charge that started with the '788 patent's drawings, and then "adapted accordingly" with Cozy Comfort's limiting prosecution-history statements—which limited the scope of the claimed sweatshirt with respect to its marsupial pocket's size and location, its armhole positioning, and the slope and appearance of its bottom hem—the jury was simply charged with "comparing the accused products to the design defined in the '788 patent." Appx14554.

That was wrong.  This Court has made clear that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008).  This duty applies with full force to design patents.  *Egyptian Goddess*, 543 F.3d at 679-80; *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

Just as with utility patents, claim scope is limited by what a patentee says during prosecution in order to gain allowance.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc); *Egyptian Goddess*, 543 F.3d at 680.  "[A]n inventor may not be heard to proffer an interpretation that would alter the undisputed public record (claim, specification, prosecution history) and treat the claim as a 'nose of wax.'"  *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.,* 888 F.2d 815, 819 n.8 (Fed. Cir. 1989) (quoting *White v. Dunbar*, 119 U.S. 47, 51-52 (1886)).  That is why courts must take the prosecution history into account in construing claims.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Prosecution history reveals, *inter alia*, "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317 (citing cases).  *See also, e.g.*, *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,

222 F.3d 951, 956 (Fed. Cir. 2000) (inventor used "drawings comparing the features of the claimed invention" to cited prior art, narrowing claim scope).

Here, to obtain issuance of the '788 patent, Cozy Comfort made multiple representations that narrowed the scope of its design patent from just its drawings to something with significantly less scope. But then, when the court was asked to enforce those narrowing representations through claim construction, it refused, and allowed Cozy Comfort to use the jury to enforce its patent as though those representations had never been made. The court neglected its "duty to resolve" the parties' fundamental dispute about claim scope, *O2 Micro*, 521 F.3d at 1362, to Top Brand's prejudice.

**B.  The '788 patent prosecution history narrows its scope according to Cozy Comfort's representations to the examiner about marsupial pocket size and location, armhole location, and bottom-hem orientation and appearance**

Because claim construction is a question of law, and because the issue was fully briefed and presented throughout the course of trial, the issue arrives at this Court fully briefed and ready to be decided correctly on appeal as a matter of law. *See, e.g.*, *Elmer*, 67 F.3d at 1574, 1578; *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995).

During prosecution, Cozy Comfort told the examiner that the claimed narrow pocket of its sweatshirt design took up less than half the width of the torso and, thus, distinctly differed from wider, more-trapezoidal pockets like White's

and "alone [made] the claimed design [] allowable." Appx15107. It insisted that these claimed features were "more than small[:] they are numerous, they are significant, and they are disposed right on the front of the design where a consumer is immediately confronted by them." Appx15109. It also insisted to the examiner that the top of the claimed pocket rises above the armholes. *Id.* And it pointed the examiner to the claimed downward-sloping hem. Appx15110.

The claimed pocket, armholes, and hemlines are—in Cozy Comfort's words—"significant differences that an ordinary observer would see, appreciate, and rely on to distinguish" one sweatshirt design from another. *Id.* As Judge Wood of the Northern District of Illinois found when denying Cozy Comfort's efforts to obtain a preliminary injunction against infringement of the '788 patent against ten of twelve defendants, "the minor differences Cozy Comfort now dismisses as unimportant mattered a great deal when Cozy Comfort sought to distinguish its design from the prior art." *Cozy Comfort Co. LLC v. Individuals, et al. Identified on Schedule A to Complaint*, No. 23-CV-16563, 2024 WL 2722625, at *5 (N.D. Ill. May 28, 2024).

As a matter of law, Cozy Comfort's reliance on the narrowly claimed features of its sweatshirt design during prosecution serves to narrow the scope of the '788 patent. And, as shown below, the same features that Cozy Comfort

persuaded the examiner were important to the ordinary observer also differentiate the '788 patent from Top Brand's accused sweatshirts.

### C. Under the correct construction of the '788 patent, no reasonable jury could find infringement

Where, as here, an accused product differs materially from a properly-construed design claim, there can be no infringement as a matter of law, and this Court may so rule. *See Elmer*, 67 F.3d at 1578; *see also Hartco Eng'g, Inc. v. Wangs Int'l, Inc.*, 142 F. App'x 455, 459 (Fed. Cir. 2005); *Precor Inc. v. Life Fitness*, 13 F. App'x 913, 920 (Fed. Cir. 2001). This Court should so rule here. Top Brand's accused sweatshirts differ in the same "numerous," "significant," and "not trivial" features of the '788 patent that "immediately confront[]" the ordinary observer that Cozy Comfort used to persuade the examiner to allow its patent over White. Appx15105–15111.

For starters, the narrow patented pocket (below left, blue) distinctly differs from the accused sweatshirts' wider, more-trapezoidal pockets, which predominate the sweatshirts' front (center and right):

  

'788 patent (file history) (highlighting added; annotations in original)      HD250 Sweatshirt (background removed and featuring larger pocket)      HD250 Sweatshirt (background removed)

- 38 -

Appx15108; Appx17028; *see* Appx24086–24087 (49:21–50:17), Appx24086–24087 (51:18–23), Appx24091–24092 (54:21–55:3) (Ms. Gamble testifying about wider accused sweatshirt pockets relative to narrower '788 patent claimed pocket); *see also* Appx18693; Appx23713–23714 (141:10–142:1) (Trial Ex. 287 has a pocket covering two-thirds the width of the sweatshirt); Appx23749 (177:11–15) (measurements of Trial Ex. 287 pocket dimensions). These wider pockets strongly resemble White's wide trapezoidal pocket, a key difference that Cozy Comfort distinguished to the examiner during prosecution:

  

|                                                            |                                                                        |
| :--------------------------------------------------------: | :--------------------------------------------------------------------: |
| HD250 Sweatshirt<br>(cropped and featuring larger<br>pocket) | '788 patent (file history)<br>(highlighting added; annotations in original) |

Appx17028; Appx15108.

The accused sweatshirts also differ from the other claimed features that Cozy Comfort told the examiner were critical aspects of its design. For example, the accused sweatshirts have a straight hem, not a "bottom hem [that] slopes downward" as Cozy Comfort stressed in prosecution. Appx15110; Appx17028; *see* Appx24087 (50:18–25), Appx24092 (55:4–5) (Ms. Gamble testifying about straight hems in accused sweatshirts). And they have a distinctly different overall

shape—they flare outward at the bottom hem, like a bell, unlike the '788 patent, which tapers inward to a narrower hemline:



HD250 Sweatshirt (cropped)                    '788 patent, Fig. 4

Appx17028; Appx00033; *see* Appx24088 (51:10–17) (Ms. Gamble testifying about "A-line angle" shape of accused sweatshirts as opposed to "barrel shape on a straighter torso" of '788 patent).

Lastly, in all but two accused sweatshirts, the top of the pocket is placed lower on the torso, and "not above" the armholes as required by the '788 patent:



HD250 Sweatshirt (background removed)

HD250 Sweatshirt (background removed, featuring armholes and pocket)

'788 patent (file history) (annotations original)

Appx17028; Appx15109.*

---

* After infringement accusations by Cozy Comfort, Top Brand redesigned the original HD200 (Appx18693) and HD210 (Appx17043) designs to lower the

Under a proper construction of the '788 patent, these differences compel JMOL of noninfringement. *See Egyptian Goddess*, 543 F.3d at 676 ("[W]hen the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer."). These features are the same ones Cozy Comfort told the examiner were apparent to the ordinary observer and distinctions over the prior-art White hoodie. Cozy Comfort cannot read the '788 patent one way during prosecution but then another for infringement litigation. *CommScope, Techs. LLC v. Dali Wireless Inc.,* 10 F.4th 1289, 1299 (Fed. Cir. 2021); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995). What is more, competitors like Top Brand are entitled to rely on those narrowing statements in good faith to understand what falls outside of the scope of the claims. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002). This Court should enter JMOL of no infringement of the '788 patent. *E.g.*, *Elmer*, 67 F.3d at 1578. At a bare minimum, it should order a new trial under a correct claim construction.

---

marsupial pocket in a good-faith effort to further avoid infringement. Appx23769-23770 (197:7-198:3). The original HD200 and HD210 had higher marsupial pockets than the other accused sweatshirts, but still do not infringe for the other reasons presented—the wide trapezoidal pocket, straight bottom hem, and bell shape. *Elmer*, 67 F.3d at 1578.

## II.    THE DISTRICT COURT SHOULD HAVE GRANTED A NEW TRIAL BECAUSE OF AN INTERVENING CHANGE IN CONTROLLING LAW

This Court's *LKQ* decision changed the law of design-patent obviousness before post-trial motions were filed.  This change rendered the jury charge erroneous—the jury had been instructed that it "must" apply the overruled *Rosen-Durling* factors, an instruction that Cozy Comfort made lethal in this case through its cross-examination of Top Brand's expert and in its closing argument.  Top Brand was prejudiced by this erroneous instruction.  A new trial is merited.

An intervening change in controlling law is by itself ample reason for a new trial under Rule 59(a), or to alter or amend a prior judgment under Rule 59(e).  *See* Fed. R. Civ. P. 59(a) & 59(e); *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1354 (Fed. Cir. 2012) (vacating judgment based on jury verdict due to intervening change in law).

This factor alone compels a new trial.  After the jury verdict, this Court overruled the *Rosen-Durling* standard for design-patent obviousness, which held "that the primary reference" used by a party challenging a design patent as obvious "must be 'basically the same' as the challenged design claim and that any secondary references must be 'so related' to the primary reference that features in one would suggest application of those features to the other."  *LKQ*, 102 F.4th at

1287.  *LKQ* pronounced a new, more-flexible, and expansive design-patent-obviousness framework under *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966) and *KSR International Co. v. Teleflex Inc*., 550 U.S. 398 (2007).  *See LKQ*, 102 F.4th at 1291 (quotations omitted).  Thus, this Court held that *Rosen-Durling*'s requirements "are improperly rigid."  *Id.* at 1293.  Nevertheless, in this case, the jury was instructed that it "must" apply those improperly rigid *Rosen-Durling* standards.  Appx14571.

Cozy Comfort maximized the prejudice of this error.  In cross-examining Top Brand's expert, Ms. Gamble, it criticized her for having used no single "primary reference" in her obviousness analysis.  Appx24160 (123:22–25).  And then, in closing argument, it impugned Ms. Gamble's credibility for the same reasons, and insisted—based on the instruction that the jury would soon be charged with—that the *Rosen-Durling* test for a "primary reference" won the day for it on the obviousness defense.  Appx25117 (171:8–19).  All of this, Cozy Comfort said, was improper under "*the test* which leads to [her] analysis being flawed and the wrong conclusion."  Appx25118 (172:5–7).

"The test" was, of course, the now-overruled, improperly rigid *Rosen-Durling* test.  That the jury was instructed to apply *Rosen-Durling*, and actively invited by Cozy Comfort to use *Rosen-Durling* to find the '788 design patent non-obvious, only underscores that the only proper outcome here is a new trial under

the correct *LKQ* standard.  Top Brand's validity challenges would have been

materially different under the "expansive and flexible" approach of *LKQ*, 102

F.4th at 1291 (quotation omitted).  Freed from the rigid constraints of *Rosen-*

*Durling*, Ms. Gamble would have been able to testify about a wider range of prior

art; she would have had more flexibility in considering prior-art references; she

would have had greater freedom in articulating the ways that the prior art would

have motivated an ordinary designer to achieve the claimed design from existing

designs; and she would have been able to expound on the prior art's teachings and

leveraged her experience and common sense to articulate all the reasons why the

claimed designs are obvious.  *See id*.

The court's basis for denying a new trial withers under even light scrutiny.

It surmised that the jury "was not instructed to stop if the initial *Rosen* 'basically

the same' requirement was not met," but was also allowed to consider factors that

"mirror" the *Graham* and *LKQ* factors.  Appx00003.  Yet that reasoning itself

shows why a new trial is compelled:  After *LKQ*, a jury should *never* use the rigid

*Rosen* test—not even "initial[ly]."  *Id.*  Besides, this jury was instructed that it

"must" follow both of the now-overruled *Rosen-Durling* "basically the same" and

"so related" standards in assessing obviousness.  Appx14571.

Top Brand was denied a fair chance to challenge the '788 patent under the

now-controlling, more-flexible *LKQ* standard.  This is why the Ninth Circuit and

this Court hold that intervening changes in controlling law alone are compelling grounds for a new trial. *See Presidio*, 702 F.3d at 1354; *Zimmerman*, 255 F.3d at 740. The prejudicial use that Cozy Comfort made of the now-overruled *Rosen-Durling* standard only confirms the need for a new trial. The district court erred by denying Top Brand's request for that new trial.

## III. THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF NO TRADEMARK INFRINGEMENT OR DAMAGES

Top Brand *never* used the two registered marks for "*THE* COMFY." No reasonable jury could find that using the word "comfy" to describe a comfortable sweatshirt infringes the registered marks for "*THE* COMFY." Describing a sweatshirt as "comfy" certainly never caused millions of dollars of harm to Cozy Comfort—indeed, Cozy Comfort put on no evidence whatsoever of trademark damages. This Court should order JMOL of no trademark infringement, and no trademark damages.

### A. Top Brand never used the marks for "THE COMFY"

Top Brand described its sweatshirts as "comfy"; it did not infringe the registered trademarks for "THE COMFY." Neither the '347 nor the '456 mark for "THE COMFY" endows Cozy Comfort with a legal monopoly in calling sweatshirts "comfy." Yet the only purported evidence of trademark infringement was using the word "comfy" as an adjective to describe sweatshirts on a website.

The registered trademarks are not the word "comfy," but rather the particular phrase "THE COMFY," and only then when used in the context of "blanket throws."  Appx18557; Appx18627; *see* 37 CFR § 2.85 (providing "Classification schedules" for the USPTO's "classification for goods and services, which applies for all statutory purposes to" applications filed since September 1973 "and resulting registrations").

Top Brand never used the '347 or '456 marks in *any* context.  It used the descriptive word "comfy" as an "adjective" to "describe the product, how soft." Appx23771 (199:7–10).  Even then, it used the word "comfy" only briefly in 2021 (Appx20492) on Top Brand's Catalonia website to describe that product as "very comfortable."  Appx23773 (201:11–15).  Mr. Speciale admitted that "the word comfy means comfortable" and "describes a feature" of a sweatshirt.  Appx24274 (67:10–14).  Cozy Comfort's expert, Dr. Frank, admitted that "comfy" can be descriptive and even generic, providing no trademark protection.  Appx24678– 24679 (110:25–111:9).  He also testified that the relevant marks are not "comfy" unmodified by the definite article, "the"—and that "comfy" means "comfortable." *Id.* (109:16–24).  This is how Cozy Comfort uses its registered marks in its advertising:  "[I]f it doesn't say *The* Comfy, it's not a Comfy."  Appx24275 (68:23–25 (emphasis added)); Appx16491.

No reasonable jury could have found Top Brand's use of "comfy" infringed the '347 or '456 marks for "THE COMFY."  The registered mark, *as a whole,* must be used for liability to arise, and that never occurred here.  *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc*., 616 F.2d 440, 444 (9th Cir. 1980) (affirming lack of similarity between registered trademark "ALPHA" and competitor's use of "ALPHA STEEL TUBE" or "ALPHA STEEL TUBE & SHAPES").

Further, the descriptor "comfy," as applied to sweatshirts, "describes the[ir] qualities or characteristics," and cannot be trademark infringement.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002) (collecting cases). "Descriptive marks define qualities or characteristics of a product in a straightforward way that requires *no exercise of the imagination to be understood*." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998) (emphasis added).  It defies logic, reason, and common sense to find liability for infringing the registered trademark "THE COMFY" by using the word "comfy" exactly how it is used in common parlance to describe sweatshirts.

## B.    Top Brand never profited from its alleged use of the marks

Cozy Comfort offered no evidence—none—suggesting that it was harmed in any way whatsoever by Top Brand describing sweatshirts as "comfy" in 2021 (but

not 2022 or later). Nevertheless, it insisted on disgorged profits as its trademark-infringement remedy. Appx14576.

Cozy Comfort presented no evidence to support a trademark-infringement remedy. It provided no evidence of any customer who used any online retail store service of Plaintiff in conjunction with the word "comfy" to make any purchase. Yet the jury awarded it a pair of million-dollar-plus disgorgement awards for the trademark-infringement claims, each reflecting an extra 10% of the design-patent-infringement disgorgement award. Appx14533, 14535.

Cozy Comfort offered no evidence, or even a rational reason, for these extra 10% awards. The jury's twin trademark-infringement awards rest on nothing but impermissible speculation and should be reversed. *See McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (reversing jury's damages award as "based on speculation").

## IV.    THE DISTRICT COURT SHOULD HAVE ISSUED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO EQUITABLE DISGORGEMENT REMEDIES

Disgorgement, the monetary remedy Cozy Comfort sought and ultimately obtained, is an equitable remedy. The district court was accordingly asked to carry out its obligation to sit in equity and make findings and conclusions after the jury's necessarily advisory verdict, but it refused to do so. Appx00005. The court thus erred by refusing to provide findings and conclusions under Fed. R. Civ. P.

52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

The inequitable result:  The court upheld an award of 120% of Top Brand's *gross* profits, in a case where at most 100% of *net* profits could be awarded, and where the jury adjudicated Cozy Comfort as an inequitable, bad-faith actor.  That was no remedy, but a baseless and punitive sanction.  This inequity illustrates why disgorgement is an equitable issue for courts, not juries.  *Liu v. SEC*, 59 U.S. 71, 79 (2020) ("[E]quity practice long authorized courts to strip wrongdoers of their ill-gotten gains" but "to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.").

No disgorged profits were proper as a matter of equity in this case, and in any event, the jury's disgorgement award cannot be sustained on equitable grounds.

## A.    Disgorgement is an equitable remedy for the court, and only the court

The jury's disgorgement verdict was necessarily advisory.  Disgorgement is equitable relief, so no jury trial right on that issue existed.  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709–11 (1999) (citing *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)); *Texas Advanced Optoelectronic Sols, Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1319–25 (Fed. Cir. 2018).

This rule applies to all three of the jury's disgorgement awards.  As for the two trademark-infringement awards, "[a] claim for disgorgement of profits under [the Lanham Act] is equitable, not legal." *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015).  The district court thus was required to make findings and conclusions as to the trademark-infringement awards—but it refused, giving no reason for its decision.  Appx00005.

The court also improperly refused to do that for the design-patent-infringement award.  Section 289 provides that a design-patent infringer "shall be liable to the owner to the extent of his total profit … ."  Courts have held that § 289 claims are for equitable relief—again, no jury trial right attaches.  *See, e.g.*, *Shure Inc. v. ClearOne, Inc.*, No. 19-1343-RGA, 2021 WL 4991083, at *1 (D. Del. Oct. 27, 2021) ("I find that disgorgement [under § 289] is an equitable remedy."); *Red Carpet Studios v. Midwest Trading Grp., Inc.*, No. 1:12cv501, 2021 WL 1172218, at *2 (S.D. Ohio Mar. 29, 2021) ("[T]here [is] ample support for the conclusion that a claim for damages under § 289 is one for equitable relief.").

This Court held that disgorged-profits claims are equitable in *Texas Advanced Optoelectronic Solutions*, 895 F.3d at 1319–25.  There, this Court addressed a jury's disgorgement award for trade-secret misappropriation under Texas law.  Although the jury was unquestionably entitled to adjudicate trade-secret liability, it was not so empowered for disgorgement relief, based on the

"appropriate analogues" of patent, copyright, and trademark-infringement claims. *Id.* at 1323–25. Notably, "for patent infringement, disgorgement of profits was not historically available at law." *Id.* at 1324 (emphasis added). Because a disgorgement remedy for trade-secret claims is equitable, not legal, this Court vacated the jury award and remanded for the district court to assess disgorgement under Rule 52. *Id.* at 1325.

In this case, however, the court denied Top Brand's Rule 52 motion for the single stated reason that "the jury was not advisory on the issue of infringement." Appx00005 (citing *Tegal*, 257 F.3d at 1339). The district court's conclusion was wrong. First, Top Brand never argued that the jury was advisory on *infringement*; rather, as in *Texas Advanced Optoelectronic Solutions*, where trade-secret liability was assessed by a jury but the disgorgement remedy was for the court sitting in equity, the jury was advisory on the equitable remedy of *disgorgement*. Second, the court's citation to *Tegal* only underscored Top Brand's point because the court cited it for the proposition that "the Seventh Amendment right to jury trial applies in patent infringement actions *for damages*," but the court never appreciated that disgorgement of Top Brand's gross profits was not Cozy Comfort's "damages." *See, e.g.*, *Texas Advanced Optoelectronic Solutions*, 895 F.3d at 1321.

Indeed, the court never acknowledged controlling precedent defining disgorgement as equitable relief, not legal "damages." As shown below, no

disgorgement remedy should have been awarded because of Cozy Comfort's

adjudged bad faith and unclean hands, but in all events, any equitable remedy

should be assessed by the court and should be drastically lower than the runaway

award reached by the jury.

**B.    No disgorged profits were appropriate as a matter of equity**

The court should first have determined whether *any* disgorged profits are

appropriate as an equitable matter.  In trademark-infringement cases, a court may

award a disgorgement remedy "in its discretion," "subject to the principles of

equity."  *See, e.g.*, 15 U.S.C. § 1117(a); *Fifty-Six Hope Rd. Music*, 778 F.3d at

1073; *see also Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 808 F. App'x 459,

460–61 (9th Cir. 2020) (declining to award disgorgement that "would amount to an

inequitable windfall").  "[T]he determination of profits under § 1117 is not

'fundamental, . . . inherent in and of the essence of the system of trial by jury.'"

*Fifty-Six Hope Rd.*, 778 F.3d at 1076 (quotation omitted).  The jury's trademark-

infringement-disgorgement award was necessarily advisory.  *See* Appx14623–

14624; Appx14533, Appx14535.

This Court has not yet articulated the equitable considerations that guide

whether and when disgorgement is available under § 289.  But, in the similar

context of trademark-infringement cases, courts survey evidence of diverted sales,

bad conduct by the plaintiff, and the like.  *See, e.g.*, *Quick Techs., Inc. v. Sage Grp.*

*PLC*, 313 F.3d 338, 349 (5th Cir. 2002) ("(1) [W]hether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."); *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 223 (3d Cir. 2021) (same); *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006) (same); *see also 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 214 (2d Cir. 2019) (similar).

Here, the court should have denied disgorgement as a matter of equity. Cozy Comfort presented no evidence of its own lost profits or diverted sales. Further, it sought injunctive remedies as alternative relief. So its business suffered no concrete or lasting injury, and other forms of relief could have adequately addressed its alleged harms. *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019) (affirming denial of disgorgement relief where claimant offered no proof of diverted sales and injunctive relief was available); *see also Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994) (denying disgorgement award "where an injunction will satisfy the equities of the case" (internal quotation marks omitted)). Where, as here, a permanent injunction can "remed[y] the complained-of infringement," awarding disgorgement "would be far from equitable—it would be a windfall."

*Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 696 (5th Cir. 1992); *see also Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 918 (Fed. Cir. 1984) (observing that "plaintiff is not … entitled to a windfall").

Besides, Cozy Comfort's bad-faith conduct and its weak claims weigh strongly against disgorgement. *Retractable Techs.*, 919 F.3d at 884 (affirming denial of disgorgement based on plaintiff's "meritless antitrust claim"); *see Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, Nos. 20-35369, -35556, 2021 WL 3630225, at *2 (9th Cir. Aug. 17, 2021) (evaluating "the relative weakness of plaintiff's [trademark]" and the "minimal similarity" of accused infringer's mark when determining disgorged profits under the Lanham Act). Here, Cozy Comfort's hands have been adjudicated unclean: The jury found that it engaged in bad faith, assigned liability for unfair competition, and assessed damages for those unfair acts. Appx14528–14529.

Other substantial record evidence of Cozy Comfort's bad-faith conduct abounds, too: In November 2019, it deployed its '431 patent to effect takedowns of Top Brand's products, celebrating with thumbs-up and fist-bump emojis after Top Brand's attorney showed there was no infringement. Appx16319. Cozy Comfort continued to weaponize the '431 patent after 2019, enlisting others to do its dirty work. Appx16349; Appx24297–24298 (90:10–91:4). In January 2020, it used a third-party intermediary (Mr. Ryan Meehan) to complain to Amazon about

alleged infringement of the '431 patent.  Appx24296 (89:2–15); Appx24306–24307 (99:9–100:20).  And after Amazon took down Top Brand's products, it ignored Plaintiffs' requests for justification, congratulating itself with Queen's "another one bites the dust."  Appx16196–16198.  In November 2021, it used another third-party (Redpoints) to have Walmart take products down—netting it $7.2 million in "Enforced Economic Value" despite the fact that many of the sweatshirts involved were noninfringing.  Appx23177; Appx23780–23782 (208:8–210:11); Appx24608–24610 (40:24–42:3).  Yet it had "no regrets" and was "unapologetic" for its orchestrated, bad-faith patent-infringement campaign.  Appx24519 (145:21–23); Appx24530 (156:3–19).  The jury's bad-faith finding and this welter of evidence all weighs heavily against giving Cozy Comfort a disgorgement windfall.  *See 4 Pillar Dynasty*, 933 F.3d at 214; *Stone Creek*, 808 F. App'x at 460–61; *Texas Pig Stands*, 951 F.2d at 696; *Bandag*, 750 F.2d at 918.

Cozy Comfort also pursued objectively meritless claims.  The jury rejected Cozy Comfort's trade-dress-infringement claim.  Appx14536.  The district court invalidated Cozy Comfort's '380 and '237 patents on summary judgment.  Appx10942.  The court further found that not only did Plaintiffs not infringe the '431 patent, but that Cozy Comfort "objectively knew that Plaintiffs' products did not infringe the '431 patent and that 'no cease-and-desist communications were supposed to be sent out [to Amazon] identifying the '431 patent' as a basis for

infringement." Appx10955. The jury thought so little of the '416 design-patent-infringement claim that it awarded $1 in damages. Appx14526. And in the end, the design-patent claims that were found infringed presented close questions—for example, the accused HD101 sweatshirt did not infringe any patent. Appx14524.

Cozy Comfort could not muster even a scintilla of evidence at trial to support trademark-infringement liability or damages. It merely pointed to a single web page from 2021 with a drop-down menu with the descriptor "comfy"—conspicuously lacking the asserted trademarks' definite article, "the." *See* Appx20492; Appx24283 (76:10–23) (Mr. Speciale admitting that "comfy" as a descriptor was permissible, but not "The Comfy"). "Comfy"—shorthand for "comfortable"—is a descriptive term; Mr. Ngan so testified, and Mr. Speciale admitted it. *See* Appx23771 (199:7–10); Appx24274 (67:7–18). Besides, "comfy" was gone from 2022 versions of the web page. *See* Appx23113–23116; Appx23117–23118; Appx23119. No evidence links the 2021 web page to any products or sales, in any event.

Cozy Comfort's bad-faith conduct, along with the overall weakness of its case, supports denying disgorgement relief *in toto*. *See 4 Pillar Dynasty*, 933 F.3d at 214 (district court properly factored weak evidence of willful conduct, the fact that claimant "introduced no evidence of actual consumer confusion" and

claimant's sales actually increased during infringement into its assessment of disgorged profits).

### C.    It was inequitable to disgorge gross profits for design-patent infringement

Even were a disgorgement award appropriate here (and it is not), it should be considerably less than the $15.4 million in gross profits disgorged by the jury for design-patent infringement.  "Total profit" is "based on gross revenue *after deducting certain allowable expenses*."  *Nordock, Inc. v. Sys. Inc.*, 803 F.3d 1344, 1354 (Fed. Cir. 2015) (emphasis added), *vacated on other grounds*, 580 U.S. 1028 (2016) (citation omitted).  In design-patent cases, courts look to analogous cases for "some guidance in the treatment of fixed expenses in an award of profits." *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166, 1172 (6th Cir. 1980).

Courts limit disgorgement "to the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'"  *Liu*, 591 U.S. at 83.  "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims" is permissible.  *Id.* at 71.  Disgorgement limited "to net profits from wrongdoing after deducting legitimate expenses[]" is a remedy that "fall[s] comfortably within 'those categories of relief that were typically available in equity.'"  *Id.* at 84–85 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)).

Net profits accurately reflect how a wrongdoer truly profited from its conduct. Net profits thus align with disgorgement's basic purpose, to "deprive the wrongdoer of his ill-gotten gain." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). Disgorgement is "remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *Id.*; *see also MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361 (5th Cir. 2010) (reversing a disgorgement award because the evidence only reflected gross profits, not net profits). Courts have awarded net profits, not gross, as "total profit" remedies under § 289. *See, e.g.*, *Progressive Int'l Corp. v. AMGTM LLC*, No. C17-448 RAJ, 2018 WL 4091694, at *4 (W.D. Wash. Aug. 21, 2018) (holding that evidence of "net profits from sales of the accused [product]" accurately "represents the total profits attributable to sales of the accused [product].").

The jury's award disgorging gross profits under § 289 gives Cozy Comfort a vast windfall and overstates Top Brand's infringement-related profits. Cozy Comfort's damages expert presented a "gross profit number … of [$]15.4 million" and testified that figure "would be the amount of profit earned on selling these infringing products." Appx24848 (108:19–21); *see also* Appx24875 (135:2–19). But that testimony was entirely conclusory—it was unsupported by any record evidence, and cannot support the verdict under any circumstance. *Wechsler*, 486

F.3d at 1294 (reversing denial of JMOL on damages for lack of substantial-evidence support, where patentee and its expert "presented little more than conclusory evidence on [damages] theories.").  In any event, he never calculated net profits, but testified that Top Brand "has the burden under the statutory law to prove its costs.  And if not adequately proven, then the jury is able to award the full gross profit, which is sales revenue."  Appx24858 (118:14–21).  The jury awarded his gross-profits figure, to the dollar, for infringement of the '788 patent.  Appx14524.

The district court denied Top Brand's post-trial request for relief with the cursory statement that Cozy Comfort's "competing calculation of [Top Brand's] net [*sic*] profits was a question of fact for the jury which this Court will not now overturn."  Appx00004.  But disgorgement is *always* an equitable issue for the court, not the jury.  The court also incorrectly referenced Cozy Comfort's purported "calculation of … net profits" (*id.*); it only presented "gross profit, which is sales revenue[]" and which is what the jury awarded.  Appx24858 (118:14–21).  The court thus erred in allowing the jury's award of 100% of Top Brand's gross profits to stand as a disgorged-profits award under § 289.

### D.    The trademark-infringement disgorgement awards were double recoveries

The district court also should have omitted the jury's two additional disgorgement awards (each reflecting 10% of Top Brand's gross profits) for

trademark infringement, over and above the award of 100% of Top Brand's gross profits for design-patent infringement. As noted at p. 48, above, Cozy Comfort presented zero evidence of appropriate trademark-infringement remedies, which alone should yield JMOL for Top Brand. But the twin trademark-infringement awards also fail because they are double recoveries. *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016–17 (Fed. Cir. 2006).

Cozy Comfort sought disgorged profits for the same sales of the same sweatshirts for both its design-patent- and trademark-infringement claims. The Court instructed the jury accordingly. Appx14574, 14576; Appx25182 (39:3–5); Appx25184–25186 (41:23–43:1). At trial, Cozy Comfort's damages expert testified that the "gross profit" of $15.4 million "would be the amount of profit earned on selling these infringing products." Appx24848 (108:16–21). But he presented *zero* testimony regarding trademark-infringement remedies. *See* Appx24838–24885 (98:8–145:21). The jury awarded to Cozy Comfort Top Brand's disgorged gross profits of approximately $15.4 million for design-patent infringement, and then tacked on two additional awards, each about $1.54 million, for trademark infringement. Thus, even though Cozy Comfort's expert testified that Top Brand's total gross profits were "$15.4 million," the jury awarded about $18.5 million resulting from accused sweatshirt sales, *i.e.*, about *120%* of Top Brand's total gross profits. Appx24848 (108:16–21).

When a jury awards a claimant separate damages arising from multiple claims, "the judge [should] make appropriate adjustments to avoid double recovery." *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1327 (Fed. Cir. 2003) (quotation omitted). Damages that "flow[] from the same operative facts," *e.g.*, "sales of the infringing [products]," compensate the claimant more than once for the same injury. *See Aero Prods.*, 466 F.3d at 1019; *Junker v. Eddings*, 396 F.3d 1359, 1368 (Fed. Cir. 2005); *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1362 (Fed. Cir. 1998). When a claimant is overcompensated for the harm arising from the same acts, the court should omit duplicative damages. *See Aero Prods.*, 466 F.3d at 1020; *Bowers*, 320 F.3d at 1327–28.

Nevertheless, the court denied Top Brand's motion for new trial or remittitur with respect to the duplicative trademark-infringement awards. Appx00004-00005. The court initially seemed to recognize the duplication in a post-trial order, Appx00005, but on Cozy Comfort's motion for clarification, removed the language acknowledging the duplication from its order. Appx00024. In its ultimate ruling, the court suggested that Cozy Comfort "presented evidence of damages for product lines, such as the HD130, which contained the disputed 'COMFY' [sic] trademark but did not involve any of the disputed patents." Appx00023. But the court cited no such evidence. None exists. A "HD130" product line wasn't mentioned once in the trial transcript—in fact, Top Brand never sold an "HD130" product.

Appx18707–18746.  The jury's award of about $15.4 million for design-patent

infringement reflected 100% of Top Brand's gross profits for sales of *all* accused

sweatshirts; the two extra 10% disgorgement awards, supposedly trademark-

infringement awards, were excess recovery.

This Court should thus, at minimum, order JMOL that the two trademark-

infringement awards of about $1.54 million each (*see* Appx14533, 14535) are

improper because they are unsupported and duplicative of the § 289 disgorgement

award (*see* Appx14524, 14526).

## V.    THE DISTRICT COURT SHOULD HAVE GRANTED JMOL OF NO ALTER-EGO LIABILITY

No reasonable jury could have concluded that the Top Brand Companies are

alter egos of Mr. Ngan.  Arizona alter-ego law respects the corporate form when

companies are formally separate, maintain separate financial records, separate

personal and corporate funds, file separate corporate income tax returns, and are

not undercapitalized—like the Top Brand Companies.  Wholly missing from the

record here is any showing that piercing the corporate veil here was necessary to

avoid fraud or injustice.  Quite the contrary, Defendants' own damages expert, Mr.

Cook, testified that the Top Brand Companies were not "shell companies."

Appx24883–24884 (143:6–144:4 (emphasis added)).  The district court should

have granted JMOL of no alter ego.

The jury was instructed on the strict standards for piercing the corporate veil under Arizona law, which requires "proof that the [individual] disregarded the corporate entity and made it an instrument to conduct his own personal affairs." Appx14551. Cozy Comfort presented no evidence of this. Not only was there no evidence of a sham or fraud; to the contrary, the record showed that Mr. Ngan *sacrificed* his own funds to ensure that the corporations would persevere, and so that suppliers and creditors would be timely paid. That is the polar opposite of the showing necessary for an alter ego finding. All the factors of Arizona alter-ego law weigh against the jury's finding, as outlined below.

**Separated personal and corporate funds**. There was only one transaction between Mr. Ngan individually and Flying Star in evidence—an August 2022 deposit of $1 million from Mr. Ngan *into* the company to fund operations. *See* Appx22610. Alter-ego liability only arises when shareholders do the opposite, i.e., take funds *out of* the company for personal use, leaving the company as a hollow shell that would defraud creditors and suppliers. Here, Flying Star's bank balances show it was no shell, ranging from $31,000 to $1,074,000 from May to October 2022. Appx22606–22620.

Zero evidence showed that Mr. Ngan ever diverted funds *from* any of the Top Brand Companies for his personal use. To the contrary, Mr. Ngan testified, and the accounting records show, that he took no salary nor any distributions of

money, at any time.  *See* Appx23170; Appx23171; Appx23172; Appx23885–23886 (82:23–83:18).  Rather, the annual profits for each company were regularly rolled back into the company to build equity and acquire inventory.  *See* Appx23170; Appx23171; Appx23172; Appx23885–23886 (82:23–83:18).  Again, Mr. Ngan's actions were those of an investor who respected the corporate form, not those of an alter ego hiding behind shell companies while siphoning out their profits.  The evidence is completely one-sided for Top Brand in this respect.

*Maintained formalities of separate corporate existence.*  The Top Brand Companies maintained separate corporate existence; each was legally formed in 2017, and remains in good standing in each state of incorporation.  *See* Appx23692.  Cozy Comfort presented no contrary evidence.

*Maintained separate corporate financial records.*  The Top Brand Companies kept their own general ledgers accounting for each company for a four-year period (Appx23170; Appx23171; Appx23172) and formal profit-and-loss statements.  Appx24877 (137:5–11).

*Filed separate income tax returns.*  The jury was shown four years of federal income-tax returns for each of the Top Brand Companies.  *See* Appx22671–22728; Appx22729–22776; Appx22777–22825.  Those returns were prepared by a reputable third-party CPA firm based on general ledger entries and profit-and-loss statements generated in the ordinary course of business.

*Adequately capitalized.*  Flying Star's 2017–21 federal tax returns showed an asset capitalization growth from $781,000 to $7.4 million, further showing the Top Brand Companies to be legitimate enterprises, not shells or instruments for Mr. Ngan's personal affairs.  Appx22671–22728.  Mr. Cook, Cozy Comfort's own damages expert, testified that none of the Top Brand Companies were "shell companies."  Appx24883–24884 (143:23–144:4).

This entirely one-sided record compels JMOL of no alter ego.  So does Arizona alter-ego law, as the Seventh Circuit recognizes:

> The rule in Arizona . . . that corporations are legally separate entities whose acts are not imputed to their officers, shareholders, or affiliates.  In rare cases Arizona courts will pierce the corporate veil and declare a corporation the alter ego of another entity, *see Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 821 P.2d 725, 729 (1991) (in banc), but mere common ownership is insufficient for piercing, *see, e.g.*, *Bischofshausen, Vasbinder, & Luckie v. D.W. Jaquays Mining & Equip. Contractors Co.*, 145 Ariz. 204, 700 P.2d 902, 907 (Ct. App. 1985) . . . and that observance of the corporate form would sanction a fraud or promote injustice.

*Mid America Title Co. v. Transnation Title Ins. Co.*, 332 F.3d 494, 495 (7th Cir. 2003) (cleaned up).  This, like *Mid America*, is not the "rare case" where the record shows that "observance of the corporate form would sanction a fraud or promote injustice."  *Id*.  In *Mid America*, the underwriters consolidated their operations and worked under a unified management team, as with the Top Brand Companies. More than common ownership was necessary for an alter-ego finding.  As the *Mid*

*America* court held, "much of the evidence Arizona courts typically rely on in piercing the corporate veils is absent from this case." *Id.* at 496. It is absent here, too.

No record evidence so much as hints that the Top Brand Companies are sham corporations formed to siphon off monies for the benefit of Mr. Ngan. In fact, all three companies reported profits in each reporting year (2018–21), and no record evidence suggests that even a dollar of those profits went to Mr. Ngan. Rather—and importantly—those profits were rolled back into the companies to build assets and acquire inventory. Flying Star's 2018–21 federal income tax returns show the corporation's asset growth from $750,000 to $7.4 million over that time. Appx22671–22728.

Arizona law respects the separateness of the corporate form. "[I]t is incumbent upon the one seeking to pierce the corporate veil to show by a preponderance of the evidence that the financial setup of the corporation is only a sham and causes an injustice." *Ize Nantan Bagowa, Ltd. v. Scalia*, 577 P.2d 725, 729 (Ariz. Ct. App. 1978). In *Ize Nantan Bagowa*, the Arizona Court of Appeals reversed a trial court's decision to pierce the corporate veil and impose personal liability on a medical doctor who was the sole officer and director of a professional corporation incorporated to operate medical practices. "[T]he mere fact that it is a

one-man corporation does not mean the corporation is the alter ego of that one

man." *Id.* at 728 (citing *Bass v. Shutan*, 259 F.2d 561 (9th Cir. 1958)).

Cozy Comfort put forth no proof of "sham" or "injustice." Nor could it

have. The Top Brand Companies are each robust, profitable, and fully capitalized

entities. They maintain separate accounting books; have separate bank accounts;

prepare separate financial statements; keep separate corporate records; and file

separate annual tax returns. Appx18130–18167; Appx18168–18208; Appx22671–

22728. *See Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 729 (Ariz.

1991); *Deutsche Credit Corp. v. Case Power Equipment Co.*, 876 P.2d 1190, 1195

(Ariz. Ct. App. 1994).

By contrast, Arizona courts require significantly more—*i.e.*, self-dealing by

an owner—before a finding of alter ego will be found and upheld. In *Activator

Methods Int'l, Ltd. v. Future Health, Inc.*, the plaintiff stated an alter-ego claim

when the owner-defendant did not deny: (1) that he commingled personal and

corporate funds; (2) that he used the company to carry out his personal business; or

(3) that he negotiated and signed the business agreement at issue. No. CV-11-

1379-PHX-GMS, 2012 WL 715629, at *4–5 (D. Ariz. Mar. 6, 2012). In *KeyBank

Nat'l Ass'n v. Neumann Dermatology LLC*, the owner abused her sole decision-

making authority to divert funds to herself. No. CV-21-00133-PHX-JJT, 2022 WL

16635372, at *4 (D. Ariz. Nov. 2, 2022). And, in *Youngren v. Rezzonico*, the jury

properly found alter ego when the sole shareholder commingled personal and corporate funds; used corporate vehicles for personal use; ignored corporate formalities; and personally owned the business property. 543 P.2d 142, 146 (Ariz. 1975). That evidence is wholly absent here.

This record cannot support the verdict: It shows Mr. Ngan invested his own money *into* these companies to build them up, not drain them dry for his own personal purposes. No reasonable juror, based on the evidence, could have concluded that any of the Top Brand Companies are the alter ego of Mr. Ngan consistent with the rigors of Arizona law.

The district court erred in denying JMOL of no alter ego.

## **CONCLUSION**

The judgment should be reversed as a matter of law. At minimum, it should be reversed, and the case remanded for further proceedings.

Dated:  October 4, 2024

Respectfully submitted,

*/s/  Gregory A. Castanias*

Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
gcastanias@jonesday.com

John C. Evans
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
jcevans@jonesday.com

Marlee Hartenstein
JONES DAY
500 Grant Street, Ste. 4500
Pittsburgh, PA 15219
(412) 391-3939
mhartenstein@jonesday.com

Eric M. Fraser
OSBORN MALEDON, P.A.
2929 North Central Ave., Suite 2000
Phoenix, AZ 85012
(602) 640-9000
efraser@omlaw.com


*Counsel for Appellants Top Brand
LLC, Sky Creations LLC, E Star LLC,
Flying Star LLC, and John Ngan*

# ADDENDUM

## ADDENDUM TO TOP BRAND'S OPENING BRIEF

### Table of Contents

| Dkt. | Date Filed | Description | Appx Begin | Appx End |
|------|-----------|-------------|------------|----------|
| **Orders and Judgments** | | | | |
| 426 | 06/28/2024 | ORDER that Top Brand's Renewed Motion for Judgment as a Matter of Law [Dkt. 406], Motion for New Trial [Dkt. 407], and Motion for Findings of Fact and Conclusions of Law [Dkt. 408] are denied. Signed by Judge Steven P. Logan on 06/28/2024. (Entered: 06/28/2024) | Appx00001 | Appx00005 |
| 428 | 07/01/2024 | ORDER that Cozy Comfort's Motion for Permanent Injunction [Dkt. 395] is granted. IT IS FURTHER ORDERED that John Ngan, on his own or through his companies, including his agents, servants, employees, and attorneys, and any other person or entity, acting in active concert with him or under his direction, with notice of this Order are hereby permanently enjoined... IT IS FURTHER ORDERED that this injunction does not apply to the "animal garments" products among the HD200 and HD 201 product lines which were not accused of infringement. These are encompassed by the following HD products: 200PAN, 200CAT-BK, 200BEA, 200CATDG, | Appx00006 | Appx00013 |

| | | 200UNZI, 201UNI, 201PAN, 201CAT-BK, 201CAT-DG, 201BEA. IT IS FURTHER ORDERED that this injunction shall only apply to 1. John Ngan; 2. any and all entities for which Mr. Ngan is an owner, director, or officer in which he possess control of the entity that manufactures, imports, or sells the product lines found to be infringing; and 3. any and all entities that are provided notice of the injunction that are importing, advertising, offering for sale, or selling the HD100, HD100S1, HD110, HD120, HD200, HD201, HD210 and HD250 product lines found to be infringing. IT IS FURTHER ORDERED that this injunction does not apply to any third-party companies which Mr. Ngan owns but over which Top Brand and Mr. Ngan have no control, such as where Mr. Ngan is a shareholder in a large publicly-traded company. IT IS FURTHER ORDERED that this injunction is limited in its territorial application to the United States. IT IS FURTHER ORDERED that for the patent claims only this injunction is limited in length to the terms of the 788 and 416 patent. Signed by Judge Steven P. Logan on 07/01/2024. (Entered: 07/01/2024) | | |
|---|---|---|---|---|

| 429 | 07/01/2024 | ORDER that Cozy Comfort's Motion for Pre-judgment and Post-judgment Interest [Dkt. 394] is granted in part and denied in part. IT IS FURTHER ORDERED that the jury's damage award for Claims I, II(1), (2), (4), (5), (6), (7), (8), and IV shall be increased by $2,966,415.51 to a total amount of $18,361,394.51 to reflect prejudgment interest on these claims. Signed by Judge Steven P. Logan on 07/01/2024. (Entered: 07/01/2024) | Appx00014 | Appx00017 |
| 432 | 07/03/2024 | ORDER that Top Brand's Motion for Clarification [Dkt. 427] is denied. IT IS FURTHER ORDERED that Top Brand's Motion for Clarification [Dkt. 431] is granted. The Court will issue an amended order in due course. Signed by Judge Steven P. Logan on 07/03/2024. (Entered: 07/03/2024) | Appx00018 | Appx00019 |
| 433 | 07/03/2024 | AMENDED ORDER: IT IS ORDERED that Top Brand's Renewed Motion for Judgment as a Matter of Law [Dkt. 406], Motion for New Trial [Dkt. 407], and Motion for Findings of Fact and Conclusions of Law [Dkt. 408] are denied. Signed by Judge Steven P. Logan on 07/03/2024. (Entered: 07/03/2024) | Appx00020 | Appx00024 |

| 436 | 07/30/2024 | ORDER that the Joint Motion for Entry of Amended Judgment [Dkt. 435] is granted. IT IS FURTHER ORDERED that the Clerk shall enter an Amended Judgement to reflect the Court's 07/01/2024 Order [Dkt. 429] awarding Cozy Comfort Pre-judgment and Post-judgment interest. Specifically the jury's damage award for Claims I, II(1), (2), (4), (5), (6), (7), (8), and IV shall be increased by $2,966,415.51 to a total amount of $18,361,394.51 to reflect prejudgment interest on these claims. Signed by Judge Steven P. Logan on 07/29/2024. (Entered: 07/30/2024) | Appx00025 | Appx00025 |
| 437 | 07/30/2024 | CLERK'S SECOND AMENDED JUDGMENT - IT IS ORDERED AND ADJUDGED that pursuant to the Court's Orders filed 06/05/2024 and 07/01/2024, judgment is entered in favor of Cozy Comfort and against Top Brand as to Claim I, Claim II(1), (2), (4), (5), (6), (7), and (8) in the amount of $15,394,978.00, Claim III, Claim IV in the amount of $1.00, Claim V (1-10), Claim VII(A)(1-3), Claim VIII, Claim IX in the amount of $1,539,497.80, Claim X, Claim IX in the amount of $1,539,497.80, and Claim XIV(A-C). The jury's damage | Appx00026 | Appx00027 |

| | | award for Claims I, II(1), (2), (4), (5), (6), (7), (8), and IV is increased by $2,966,415.51 for a total amount of $18,361,394.51 to reflect prejudgment interest on these claims. Judgment is entered in favor of Defendants Brian Speciale and Michael Speciale as to Claim VI(A)(2) and IV(A)(3). Judgment is entered in favor of Top Brand and against Cozy Comfort as to Claims VI(A)(1) and VI(B)(1) and Claim XII. (Entered: 07/30/2024) | | |
|---|---|---|---|---|
| **Patents** | | | | |
| | | U.S. Patent No. D859,788 | Appx00028 | Appx00037 |
| | | U.S. Patent No. D886,416 | Appx00038 | Appx00048 |
| | | U.S. Patent No. D903,237 | Appx00049 | Appx00072 |
| | | U.S. Patent No. D905,380 | Appx00073 | Appx00084 |
| | | U.S. Patent No. 10,420,431 | Appx00085 | Appx00109 |

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Top Brand, LLC, et al., | No. CV-21-00597-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| Cozy Comfort Company, LLC, et al., | |
| Defendants. | |

Before the Court are Top Brand, LLC, et al.'s ("Plaintiffs") Renewed Motion for Judgment as a Matter of Law (Doc. 406), Motion for New Trial (Doc. 407), and Motion for Findings of Fact and Conclusions of Law (Doc. 408). Defendants filed untimely Responses on June 18, 2024, and thus the Court will not consider them in evaluating Plaintiffs' Motions. *See* LRCiv 7.2(c) (setting a deadline of 14 days to file a response). The Court rules as follows.[1]

## I. **BACKGROUND**

On October 11, 2021, Plaintiffs filed a Third Amended Complaint against Defendants Cozy Comfort Company, LLC, et al., alleging patent and trademark infringement, along with Illinois state law unfair competition claims. (Doc. 122). Defendants Answered on October 25, 2021, filing multiple counterclaims regarding the

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

same intellectual property in dispute. (Doc. 128). On April 26, 2024, following a three-week jury trial, judgment was entered in favor of Defendants. (Doc. 378). The jury found that Plaintiffs infringed on Defendants' exclusive possession of the '788 and '416 patents, awarding $15,394,978.00 and $1.00 respectively. (*Id*.). The jury similarly found for Defendants regarding the '347 and '456 trademarks, awarding $1,539,497.80 for each. (*Id*.). Finally, the jury found that Defendants engaged in unlawful unfair competition under Illinois State Law and awarded $596,520.00 to Plaintiffs, but the Court later vacated that award post-trial on Motion by Defendants. (Doc. 414).

On May 28, 2024, Plaintiffs filed the instant Motions, which the Court will now address in turn.

## II.    <u>DISCUSSION</u>

### A. Renewed Motion for Judgment as a Matter of Law ("JMOL")

A party may *renew* a motion for JMOL no later than 28 days after the entry of judgment in a jury trial.[2] Fed. R. Civ. P. 50(b). "The test [on a Rule 50(b) motion] is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016) (quotations and citation omitted). Mere disagreement with the jury's outcome is insufficient, as JMOL is appropriate only if a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Where there is sufficient conflicting evidence, or if reasonable minds could differ over the verdict, JMOL is improper. *Harper v. City of L.A.*, 533 F.3d 1010, 1021–22 (9th Cir. 2008).

In the present case, Plaintiffs argue that Defendants provided insufficient evidence of infringement on the '788 patent, the trademark infringement claims relating to "THE COMFY," and that the Top Brand Companies are the alter ego of Mr. Ngan. (Doc. 406 at 2)). However, the Court already considered and rejected these arguments in its bench order

---

[2] Here, Defendants' Motion is timely. Judgment was entered on April 26, 2024 (Doc. 378), and Defendants filed their Motion on May 28, 20224 (Doc. 405).

1 ruling on Plaintiffs' original Motion for JMOL. (Doc. 388 at 4–8). Plaintiffs offer no
2 argument which was not already before the Court during its previous ruling. The Court
3 maintains that reasonable minds could differ the regarding the evidence supporting the
4 verdict, and thus JMOL is inappropriate here. For example, it was the jury's decision alone
5 to weigh the credibility of Michael and Brian Speciale's testimony regarding how they
6 originated the idea of Cozy Comfort, and reasonable juries could differ on how they viewed
7 these witnesses. Accordingly, the Court will deny Plaintiff's Motion for JMOL

8          **B. Motion for New Trial**

9          Plaintiffs argue that they are entitled to a new trial because there has been an
10 intervening change in controlling law and because the jury's disgorgement award was
11 based on gross profits instead of net profits. (Doc. 407 at 2).

12          Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial to any
13 party on some or all issues after a jury trial. Fed. R. Civ. P. 59(a)(1). In patent cases, the
14 local Circuit's law on Rule 59 governs the standard for granting a new trial. *Finisar Corp.*
15 *v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008). In the Ninth Circuit, a "district
16 court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage
17 of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842
18 (9th Cir. 2014).

19          In regard to Plaintiffs' argument about the change in controlling law, the Court has
20 reviewed *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280 (Fed. Cir. 2024)
21 ("*LKQ*") but does not find its holding so disruptive as to consider the jury instructions in
22 this case a miscarriage of justice. *LKQ* in effect loosened the standard for obviousness by
23 abolishing the "rigid" threshold similarity or "basically the same" requirement from *In re*
24 *Rosen*, 673 F.2d 388, 391 (C.C.P.A. 1982). 102 F.4th at 1296. However, the jury in this
25 case was not instructed to stop if the initial *Rosen* "basically the same" requirement was
26 not met. 673 F.2d at 391; (Doc. 379 at 33–34). Instead, the jury was instructed to consider
27 seven different factors which included and mirror the four factors from *Graham v. John*
28 *Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). (*Id*.). This is the exact analysis for

3

**Appx00003**

obviousness which *LKQ* commands. 102 F.4th at 1296. Thus, the jury instructions in this case do not constitute a miscarriage of justice, and the intervening change in the law does not warrant a new trial.

Next, Plaintiffs' argument considering gross versus net profits fails because the jury instructions clearly instructed the jury to only consider net profits. (Doc. 379 at 36) ("Profit is determined by deducting certain expenses from gross revenue."). Plaintiffs' competing calculation of Defendants' net profits was a question of fact for the jury which this Court will not now overturn.

**C. Disgorgement of Profits**

Plaintiffs also argues for a new trial, or in the alternative an amendment to the judgment, based on the argument that the damages for trademark infringement here include impermissible double recovery. (Doc. 407 at 10). Specifically, Plaintiffs argue that these damages were already accounted for under the damages for patent infringement. (*Id*.). This argument heavily overlaps with Plaintiffs Motion for Findings of Fact and Conclusions of Law Regarding Disgorgement Remedies. (Doc. 408). Thus, the Court will address both Motions here.

"Generally, the double recovery of damages is impermissible." *Aero Prod. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1017 (Fed. Cir. 2006). The Federal Circuit has instructed that when "determining whether there has been an impermissible double recovery of damages, the inquiry focuses on whether the damages issue arose from the same set of operative facts." *Id*. Under that inquiry, when damages are awarded for patent infringement, they cannot "also be awarded [for] defendants' profits for trademark infringement based on the same sales of the same accused devices." *Id*. at 1019.

Here, Defendants' patent and trademark infringement counterclaims arise largely "from the same set of operative facts," but do not overlap entirely. *Id*. at 1018. For example, Defendants presented evidence of damages for product lines, such as the HD130, which contained the disputed "COMFY" trademark but did not involve any of the disputed patents. This type of evidence distinguishes the damages between the two theories. While

there was some overlap in the factual background on other products, the Court is not persuaded that the jury was unable to distinguish between the two in their calculation of damages. The Court also declines to provide further findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) as the jury was not advisory on the issue of infringement. *See Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1339 (Fed. Cir. 2001) (holding that the Seventh Amendment right to jury trial applies in patent infringement actions for damages).

### III.    CONCLUSION

In sum, the Court declines to grant JMOL or a new trial to Plaintiffs under Rules 50 or 59 for any of the arguments raised in the instant Motion. However, the Court does find that the jury's award of monetary damages for trademark infringement was duplicative of the patent infringement claims.

Accordingly,

**IT IS ORDERED** that Top Brand, LLC, et al.'s Renewed Motion for Judgment as a Matter of Law (Doc. 406), Motion for New Trial (Doc. 407), and Motion for Findings of Fact and Conclusions of Law (Doc. 408) are **denied**.

Dated this 28th day of June, 2024.

Honorable Steven P. Logan
United States District Judge

1
2
3
4
5

6    **IN THE UNITED STATES DISTRICT COURT**

7    **FOR THE DISTRICT OF ARIZONA**

8    Top Brand, LLC, et al.,                      )    No.  CV-21-00597-PHX-SPL
                                                    )
9                                                   )
                       Plaintiffs,                  )
10                                                  )    **ORDER**
      vs.                                           )
11                                                  )
                                                    )
12    Cozy Comfort Company, LLC, et al.,            )
                                                    )
13                     Defendants.                  )
                                                    )
14    _____              )

15          Before the Court are Cozy Comfort Company, LLC, et al.'s ("Defendants") Motion

16    for Permanent Injunction (Doc. 395), Top Brand, LLC, et al.'s ("Plaintiffs") Response

17    (Doc. 411), and Defendants' Reply (Doc. 418). The Court rules as follows.[1]

18    **I.      BACKGROUND**

19          On October 11, 2021, Plaintiffs filed a Third Amended Complaint against

20    Defendants Cozy Comfort Company, LLC, et al., alleging patent and trademark

21    infringement, along with Illinois state law unfair competition claims. (Doc. 122).

22    Defendants Answered on October 25, 2021, filing multiple counterclaims regarding the

23    same intellectual property in dispute. (Doc. 128). On April 26, 2024, following a three-

24    week jury trial, judgment was entered in favor of Defendants. (Doc. 378). The jury found

25    that Plaintiffs infringed on Defendants' exclusive possession of the '788 and '416 patents,

26          _____

27          [1] Because it would not assist in resolution of the instant issues, the Court finds the
      pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed.
28    R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

awarding $15,394,978.00 and $1.00 respectively. (*Id*.). The jury similarly found for Defendants regarding the '347 and '456 trademarks, awarding $1,539,497.80 for each. (*Id*.). Finally, the jury found that Defendants engaged in unlawful unfair competition under Illinois State Law and awarded $596,520.00 to Plaintiffs, but the Court later vacated that award post-trial on Motion by Defendants. (Doc. 414).

On May 13, 2024, Defendants filed the instant Motion seeking the following permanent injunctive relief:

> "2. Mr. John Ngan, on his own or through his companies, is hereby permanently enjoined from advertising, marketing, and using the word 'Comfy' in connection with the infringing product lines HD100, HD100S1, HD110, HD120, HD200, HD201, HD210 and HD250.
>
> 3. Mr. John Ngan, on his own or through his companies, is hereby permanently enjoined from importing, advertising, offering for sale, or selling the infringing product lines HD100, HD100S1, HD110, HD120, HD200, HD201, HD210 and HD250.
>
> 4. The permanent injunction shall apply to Mr. John Ngan, and to: (1) any and all entities for which Mr. Ngan is an owner, shareholder, director, beneficiary, trustee or officer, whether in whole or part, that manufactures, imports, or sells the product lines found to be infringing; and (2) any and all entities that are provided notice of the injunction that are importing, advertising, offering for sale, or selling the HD100, HD100S1, HD110, HD120, HD200, HD201, HD210 and HD250 product lines found to be infringing."

(Doc. 395-2 at 1–2). Plaintiffs Responded by arguing that the requested injunction is premature, unwarranted, and overly broad. (*See* Doc. 411). Defendants Replied by tailoring the scope of their requested relief by (1) removing from the proposed injunction any products related to the "animal garments" reference among the HD200 and 201 product lines, (2) excluding "large third-party companies which Mr. Ngan owns but over which Plaintiffs and Mr. Ngan have no control, such as where Mr. Ngan is a shareholder in a large publicly-traded company," (3) limiting the territorial application of the injunction to the

2

United States, and (4) limiting the application of the injunction on the patent claims to the terms of the '788 and '416 patent. (Doc. 418 at 7).

## II.    **DISCUSSION**

To obtain a permanent injunction in patent and trademark cases, a party must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("eBay" or "eBay factors"). The Court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Id*.

A successful trademark plaintiff "is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the [infringer], which has shown by its conduct that it is not to be trusted." *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532 (1924); *accord Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997).

### A. Irreparable Injury

In the case of trademark infringement, courts may grant injunctions "to prevent the violation of any right of the registrant of a mark registered in the Patent or Trademark Office." 15 U.S.C. § 1116(a). A party seeking injunctive relief "shall be entitled to a rebuttable presumption of irreparable harm upon a finding" of infringement. *Id*.

In the case of patent infringement, courts routinely find irreparable harm, and therefore grant permanent injunctions where, the infringer and the patentee are direct competitors. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2007 WL 869576 at *2 (E.D. Tex. 2007) (granting permanent injunction based on the "high value of intellectual property when it is asserted against a direct competitor in the plaintiff's market"); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F.Supp.2d 592, 613 (D. Del. 2007) (granting permanent injunction and noting the parties "are head-to-head competitors, and [the

3

patentee] has a right, granted by Congress, not to assist its rival with the use of proprietary technology").

Here, the jury's verdict reflects a finding of trademark infringement under the Lanham Act, and thus the presumption of irreparable harm applies. *See* 15 U.S.C. § 1116(a); *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995 (9th Cir. 2023). Plaintiffs make no argument attempting to rebut this presumption, but instead argue that the injunction should be denied as moot following this Court's ruling on their Motion for New Trial (Doc. 407). As the Court has already denied that motion (Doc. 426), Plaintiffs have failed to overcome the statutory presumption of irreparable harm for the trademark infringement claims. Similarly, with regard to the patent claims, Plaintiffs only argue that recent Federal Circuit Precedent warrants a new trial. (Doc. 411 at 2–5). This was also addressed by the Court in denying the Motion for a New Trial. (Doc. 426). Finally, the Court finds that Defendants have independently established a likelihood of irreparable reputational damage for both claims, given their provided evidence that Plaintiffs have continued to sell the disputed product lines post-trial. (Doc. 395 at 6). This satisfies the irreparable harm requirement. *See Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 757 (9th Cir. 2018) ("Evidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm, so long as there is concrete evidence in the record of those things." (internal quotation and citation omitted) (alterations in original)).

### B. Inadequate Remedies at Law

In cases of trademark infringement, "[i]njury to the trademark owner's reputation and good will as well as to consumer expectations is difficult, if not impossible, to adequately compensate for after the fact." *Daimler AG v. A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1292 (quoting 5 McCarthy on Trademarks and Unfair Competition § 30:2 (5th ed. 2020)); *see also Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.").

4

**Appx00009**

In cases of patent infringement, courts have frequently found that "monetary damages are not an adequate remedy against future infringement because 'the principal value of a patent is its statutory right to exclude.'" *Telequip Corp. v. The Change Exchange*, 2006 WL 2385425 at *4-5 (N.D.N.Y. Aug. 15, 2006) (citing *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 397 F.Supp.2d 537, 546 (D. Del. 2005)); *see also Boehringer Ingelheim Vetmedica v. Schering-Plough*, 106 F.Supp.2d 696, 703 (D. N.J. 2000) ("Where there is no question of future infringement and infringement and validity have already been determined, monetary damages are generally considered inadequate in patent cases.") (emphasis added). As one court recently explained: "[i]f plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value." *Muniauction, Inc. v. Thomson Corp.*, 502 F.Supp.2d 477, 482 (W.D. Pa. 2007).

Here, Defendants have demonstrated that Plaintiffs have continued to sell the disputed products which were the subject of the three-week trial. (Doc. 395 at 6). Plaintiff's actions make it nearly impossible for Defendants to control its trademark reputation and exercise exclusive use of their patents. The loss of goodwill, reputation for innovation, and legal right to exclude are all forms of irreparable injury that cannot be easily and readily quantified through a simple monetary award. These applies equally in force to the patent and trademark claims. Accordingly, legal remedies are insufficient to compensate for the injuries that Plaintiffs have caused and continue to cause.

### C. Balance of Hardships

To prevail on the third factor, the harm to a party in the absence of an injunction must outweigh the harm to Defendant as the result of one. *See Anhing Corp. v. Thuan Phong Co. Ltd.*, No. CV1305167BROMANX, 2015 WL 4517846 at *24 (C.D. Cal. July 24, 2015). "There is no indication that [a party] will suffer hardship if a permanent injunction is entered. Rather, an injunction will merely assure [that party's] compliance with the Lanham Act and other laws governing trademarks." *Harman Int'l Indus., Inc. v. Pro Sound Gear, Inc.*, No. 2-17-CV-06650-ODW-FFMX, 2018 WL 1989518, at *8 (C.D. Cal. Apr. 24, 2018); *see also Cadence Design Sys. v. Avant! Corp.,* 125 F.3d 824, 829 (9th

Cir. 1997) ("a defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.").

In the patent context, the balance of hardships assesses the "relative effect of granting or denying an injunction" by considering factors such as the "parties' sizes, products, and revenue sources." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010). "[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief." *Id*. (internal citation and quotations omitted). A party "is not entitled to continue infringing simply because it successfully exploited its infringement." *Id*. (citing *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986)).

Here, Defendants' hardships result from loss of control of their trademark, harm to their reputation, and loss of business their recognition which was built over the years. Conversely, any harm to Plaintiffs is of their own making by knowingly and continually infringing on these rights following the jury verdict. *See Cadence Design Sys.*, 125 F.3d at 829. Similarly in the patent infringement claims, the injunction only applies to the product offerings relate to patents which the jury has already ruled on. Plaintiffs can hardly argue that it would be inequitable to enjoin them from infringing on Defendants' legal rights. Plaintiffs also provide no evidence that an injunction will otherwise cripple their business model. Therefore, the balance of hardships tips strongly in Defendants' favor.

### D. Public Interest

In "trademark infringement cases, the public interest is the right of the public not to be deceived or confused." *Kinsley Tech. Co. v. Ya Ya Creations, Inc.*, 2022 WL 3908831, at *6 (C.D. Cal. Aug. 30, 2022). Where a party's use of a "trademark without authorization is likely to cause confusion, the public interest is damaged by the [ ] use." *Chalon Adventures, Inc. v. Fullerton Lounge, Inc.*, 2019 WL 2896131, at *5 (C.D. Cal. Mar. 7, 2019) (internal citations and quotations omitted).

In general, protecting the rights of patentees and enforcing the patent system serves the public interest. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

1312, 1341 (Fed. Cir. 2012). The exclusive rights protected by patents "represent the public's willingness to sacrifice access to an invention or method . . . to allow the inventor the opportunity to recoup her investment." *Edwards Lifesciences AG v. Core Valve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012).

As discussed above, Plaintiffs have continually used names and designs similar to Defendants trademark and patents without authorization, concurrently with their own use. Continued allowance of this infringement would increase the likelihood of confusion among the public and would degrade Congress' scheme for the use of awarded patents. Therefore, the public's interest is served by imposing a permanent injunction to avoid further confusion.

### III.   <u>CONCLUSION</u>

Having reviewed Plaintiff's motion and supporting documents, and having considered the *eBay* factors for issuance of an injunction, the Court concludes that Defendants' request for a permanent injunction is appropriate. Having reviewed Plaintiffs' argument for overbreadth, the Court finds that Defendants' concessions appropriately tailor the proposed injunction to adequately address these concerns.

Accordingly,

**IT IS ORDERED** that Cozy Comfort Company, LLC, et al.'s ("Defendants") Motion for Permanent Injunction (Doc. 395) is **granted.**

**IT IS FURTHER ORDERED** that Mr. John Ngan, on his own or through his companies, including his agents, servants, employees, and attorneys, and any other person or entity, acting in active concert with him or under his direction, with notice of this Order are hereby permanently enjoined:

1. from advertising, marketing, and using the word 'Comfy' in connection with the infringing product lines HD100, HD100S1, HD110, HD120, HD200, HD201, HD210, and HD250; and

2. from importing, advertising, offering for sale, or selling the infringing product lines HD100, HD100S1, HD110, HD120, HD200, HD201, HD210, and HD250.

7

**IT IS FURTHER ORDERED** that this injunction does not apply to the "animal garments" products among the HD200 and HD 201 product lines which were not accused of infringement. These are encompassed by the following HD products: 200PAN, 200CAT-BK, 200BEA, 200CATDG, 200UNZI, 201UNI, 201PAN, 201CAT-BK, 201CAT-DG, 201BEA.

**IT IS FURTHER ORDERED** that this injunction shall only apply to

1. Mr. John Ngan;
2. any and all entities for which Mr. Ngan is an owner, director, or officer in which he possess control of the entity that manufactures, imports, or sells the product lines found to be infringing; and
3. any and all entities that are provided notice of the injunction that are importing, advertising, offering for sale, or selling the HD100, HD100S1, HD110, HD120, HD200, HD201, HD210 and HD250 product lines found to be infringing.

**IT IS FURTHER ORDERED** that this injunction does not apply to any third-party companies which Mr. Ngan owns but over which Plaintiffs and Mr. Ngan have no control, such as where Mr. Ngan is a shareholder in a large publicly-traded company.

**IT IS FURTHER ORDERED** that this injunction is limited in its territorial application to the United States.

**IT IS FURTHER ORDERED** that for the patent claims only this injunction is limited in length to the terms of the '788 and '416 patent.

Dated this 1st day of July, 2024.

Honorable Steven P. Logan
United States District Judge

8

**Appx00013**

1
2
3
4
5
6       **IN THE UNITED STATES DISTRICT COURT**
7          **FOR THE DISTRICT OF ARIZONA**

8   Top Brand, LLC, et al.,              )    No.  CV-21-00597-PHX-SPL
9                                        )
                    Plaintiffs,          )
10  vs.                                  )    **ORDER**
11                                       )
12  Cozy Comfort Company, LLC, et al.,   )
                                         )
13                  Defendants.          )
                                         )
14  ───────────────────────────────────  )

15          Before the Court are Defendants' Motion for Pre-Judgment and Post Judgment

16  Interest (Doc. 394), Plaintiffs' Response (Doc. 412), and Defendants' Reply (Doc. 416).

17  The Court now rules as follows.

18          **A. Pre-judgment Interest**

19          Upon a finding of infringement, "the [district] court shall award the claimant

20  damages adequate to compensate for the infringement, but in no event less than a

21  reasonable royalty for the use made of the invention by the infringer, together with interest

22  and costs as fixed by the court." 35 U.S.C. § 284. The Supreme Court has instructed that

23  pursuant to § 284, prejudgment interest "should ordinarily be awarded" because it is

24  "necessary to ensure that the patent owner is placed in as good a position as he would have

25  been in had the infringer entered into a reasonable royalty agreement." *General Motors*

26  *Corp. v. Devex Corp.*, 461 U.S. 648, 655, 657 (1983). Pre-judgment interest is not a

27  penalty, but instead "serves to make the patent owner whole, for damages properly include

28  the foregone use of money of which the patentee was wrongly deprived." *Sensonics, Inc.*

*v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996). Awarding "prejudgment interest is the rule, not the exception." *Id*. District courts are afforded a "wide latitude in the selection of interest rates," including the use of statutory rates set by states, U.S. Treasury bill rate, and the prime rate. *See Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed. Cir. 1984) (collecting cases); *see also Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) ("A trial court is afforded wide latitude in the selection of interest rates . . . and may award interest at or above the prime rate." (internal citations omitted)). Courts have typically "conclude[d] that the prime rate is the most accurate estimate of the interest rate" that the patentee would have charged the infringer for a loan, since that is "the rate charged by banks to its most credit-worthy customers." *Atmel Corp. v. Silicon Storage Tech., Inc.*, 202 F. Supp. 2d 1096, 1101 (N.D. Cal. 2002) ("*Atmel*").

In the present case, the Court finds that pre-judgment interest on the patent infringement counterclaims is appropriate given that the damages reflect the profits which Defendants would have derived from exclusive use of the patents. *See Sensonics, Inc*, 81 F.3d at 1574 ("prejudgment interest in patent cases is withheld only under exceptional circumstances."). The Court further finds that the average prime interest rate of 6.75%[1] is appropriate as a measure of making Defendant whole for the relevant time period, utilizing the bank loan analogy from *Atmel*, 202 F. Supp. 2d at 1101. The Court will also compound this interest rate annually in keeping with the bank loan analogy. *See AMP Inc. v. Lantrans Inc.*, 22 U.S.P.Q.2d 1448, 1453 (C.D. Cal. 1991) (holding that "courts have recognized that compounding is necessary to fully compensate the patentee."). Defendants protest this analogy given their individual factual circumstances of allegedly not being unable to obtain a loan during that time (Doc. 416 at 8), but the Court does not find this persuasive. Given that the Court is utilizing its equitable power to provide a remedy for events that, according

---

[1] The average prime rate between the date of issuance in September 2019 and the date of judgment in April of 2024. (Doc. 412 at 6).

to the jury, should not have occurred in the first place, the Court is comfortable in relying on the bank loan analogy for resolving this hypothetical. Furthermore, the Court declines to utilize Plaintiffs' suggested Arizona state statutory interest rate as this case was not a diversity action but was based on federal questions. *See U.S. Fid. & Guar. Co. v. Lee. Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011) ("Prejudgment interest in a diversity action is a substantive matter governed by state law."). Therefore, in applying an interest rate of 6.75% compounded annually on a principal of $15,394,979, and assuming annual payments, the Court finds the total pre-judgment interest on the patent counterclaims in this case to be $2,966,415.51.

Regarding prejudgment interest for Defendants' claims of trademark infringement, 15 U.S.C. § 1117(a) does not specify recovery of pre-judgment interest for general cases of trademark infringement. Conversely, the Lanham Act does explicitly provide for pre-judgment interest for use of a counterfeit mark. 15 U.S.C. § 1117(b). This very strongly suggests that Congress did not intend to provide pre-judgment interest outside of cases involving a counterfeit mark. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). There was no evidence of counterfeiting in this case, and thus the Court declines to award prejudgment interest under this theory.

**B. Post Judgment Interest**

Defendants have also asked for post-judgment interest pursuant to 28 U.S.C. § 1961. (Doc. 394 at 8). Plaintiffs have conceded that post-judgment interest is appropriate in this case. (Doc. 412 at 7).

28 U.S.C. § 1961 provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." The post-judgment interest rate is calculated "at

3

a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a). The Ninth Circuit has held that an award of post-judgment interest under this statute is mandatory. *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

Therefore, Plaintiffs shall pay Defendants post-judgment interest at the statutorily mandated rate. The Court declines to calculate that dollar figure until after the conclusion of the anticipated appellate proceedings.

Accordingly,

**IT IS ORDERED** that Defendants Motion for Pre-judgment and Post-judgment Interest (Doc. 394) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that the jury's damage award for Claims I, II(1), (2), (4), (5), (6), (7), (8), and IV shall be increased by $2,966,415.51 to a total amount of $18,361,394.51 to reflect prejudgment interest on these claims.

Dated this 1st day of July, 2024.

Honorable Steven P. Logan
United States District Judge

4

1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

8
9
10
11
12
13
14

| | |
|---|---|
| Top Brand, LLC, et al., | No. CV-21-00597-PHX-SPL |
| Plaintiffs, | **ORDER** |
| vs. | |
| Cozy Comfort Company, LLC, et al., | |
| Defendants. | |

15
16
17
18
19
20
21
22
23
24
25

    Before the Court are Top Brand, LLC, et al.'s ("Plaintiffs") Motion for Clarification (Doc. 427), and Cozy Comfort Company, LLC, et al.'s Motion for Clarification (Doc. 431). The Court acknowledges that it erroneously stated a finding of duplicative evidence of monetary damages for patent and trademark claims on page 5, lines 13–15 of the Court's June 28, 2024, Order (Doc. 426). The Court will issue an amended Order reflecting a correct summarization of the Court's conclusion. However, the Court's prior legal reasoning on the issue and subsequent ultimate ruling on Plaintiffs' Motions (Docs. 407 and 408) remains unchanged. Plaintiffs' requests for a new trial or alteration of the judgment for money damages remain denied. The Court also notes that Defendants are correct in referring to the stipulated extension of deadlines to file their respective responses (Doc. 405), and thus the Court will consider them in issuing the amended Order.

26

    Accordingly,

27

    **IT IS ORDERED** that Plaintiffs Motion for Clarification (Doc. 427) is **denied**.

28

///

1      **IT IS FURTHER ORDERD** that Defendants Motion for Clarification (Doc. 431)

2 is **granted**. The Court will issue an amended order in due course.

3      Dated this 3rd day of July, 2024.

4

5                                 Honorable Steven P. Logan

6                                 United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Top Brand, LLC, et al., | ) | No.  CV-21-00597-PHX-SPL |
| | ) | |
| Plaintiffs, | ) | **AMENDED ORDER**[1] |
| vs. | ) | |
| | ) | |
| Cozy Comfort Company, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court are Top Brand, LLC, et al.'s ("Plaintiffs") Renewed Motion for Judgment as a Matter of Law (Doc. 406), Motion for New Trial (Doc. 407), and Motion for Findings of Fact and Conclusions of Law (Doc. 408). The matters are fully briefed,[2] and the Court now rules as follows.[3]

## I.    BACKGROUND

On October 11, 2021, Plaintiffs filed a Third Amended Complaint against Defendants Cozy Comfort Company, LLC, et al., alleging patent and trademark

---

[1] This Amended Order reflects the Court's consideration of Defendants' timely Responses to Plaintiffs' Motions, along with Plaintiffs' Replies, and amends the Court's erroneous finding of duplicative evidence of monetary damages for patent and trademark claims on page 5, lines 13–15 of the Court's June 28, 2024, Order (Doc. 426).

[2] Docs. 406, 407, 408, 419, 420, 421, 423, 424, and 425.

[3] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

infringement, along with Illinois state law unfair competition claims. (Doc. 122). Defendants Answered on October 25, 2021, filing multiple counterclaims regarding the same intellectual property in dispute. (Doc. 128). On April 26, 2024, following a three-week jury trial, judgment was entered in favor of Defendants. (Doc. 378). The jury found that Plaintiffs infringed on Defendants' exclusive possession of the '788 and '416 patents, awarding $15,394,978.00 and $1.00 respectively. (*Id.*). The jury similarly found for Defendants regarding the '347 and '456 trademarks, awarding $1,539,497.80 for each. (*Id.*). Finally, the jury found that Defendants engaged in unlawful unfair competition under Illinois State Law and awarded $596,520.00 to Plaintiffs, but the Court later vacated that award post-trial on Motion by Defendants. (Doc. 414).

On May 28, 2024, Plaintiffs filed the instant Motions, which the Court will now address in turn.

**II.** **DISCUSSION**

**A. Renewed Motion for Judgment as a Matter of Law ("JMOL")**

A party may *renew* a motion for JMOL no later than 28 days after the entry of judgment in a jury trial. Fed. R. Civ. P. 50(b). "The test [on a Rule 50(b) motion] is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016) (quotations and citation omitted). Mere disagreement with the jury's outcome is insufficient, as JMOL is appropriate only if a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Where there is sufficient conflicting evidence, or if reasonable minds could differ over the verdict, JMOL is improper. *Harper v. City of L.A.*, 533 F.3d 1010, 1021–22 (9th Cir. 2008).

In the present case, Plaintiffs argue that Defendants provided insufficient evidence of infringement on the '788 patent, the trademark infringement claims relating to "THE COMFY," and that the Top Brand Companies are the alter ego of Mr. Ngan. (Doc. 406 at 2)). However, the Court already considered and rejected these arguments in its bench order

ruling on Plaintiffs' original Motion for JMOL. (Doc. 388 at 4–8). Plaintiffs offer no argument which was not already before the Court during its previous ruling. The Court maintains that reasonable minds could differ the regarding the evidence supporting the verdict, and thus JMOL is inappropriate here. For example, it was the jury's decision alone to weigh the credibility of Michael and Brian Speciale's testimony regarding how they originated the idea of Cozy Comfort, and reasonable juries could differ on how they viewed these witnesses. Accordingly, the Court will deny Plaintiff's Motion for JMOL

**B. Motion for New Trial**

Plaintiffs argue that they are entitled to a new trial because there has been an intervening change in controlling law and because the jury's disgorgement award was based on gross profits instead of net profits. (Doc. 407 at 2).

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial to any party on some or all issues after a jury trial. Fed. R. Civ. P. 59(a)(1). In patent cases, the local Circuit's law on Rule 59 governs the standard for granting a new trial. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008). In the Ninth Circuit, a "district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

In regard to Plaintiffs' argument about the change in controlling law, the Court has reviewed *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280 (Fed. Cir. 2024) ("*LKQ*") but does not find its holding so disruptive as to consider the jury instructions in this case a miscarriage of justice. *LKQ* in effect loosened the standard for obviousness by abolishing the "rigid" threshold similarity or "basically the same" requirement from *In re Rosen*, 673 F.2d 388, 391 (C.C.P.A. 1982). 102 F.4th at 1296. However, the jury in this case was not instructed to stop if the initial *Rosen* "basically the same" requirement was not met. 673 F.2d at 391; (Doc. 379 at 33–34). Instead, the jury was instructed to consider seven different factors which included and mirror the four factors from *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). (*Id.*). This is the exact analysis for

3

obviousness which *LKQ* commands. 102 F.4th at 1296. Thus, the jury instructions in this case do not constitute a miscarriage of justice, and the intervening change in the law does not warrant a new trial.

Next, Plaintiffs' argument considering gross versus net profits fails because the jury instructions clearly instructed the jury to only consider net profits. (Doc. 379 at 36) ("Profit is determined by deducting certain expenses from gross revenue."). Plaintiffs' competing calculation of Defendants' net profits was a question of fact for the jury which this Court will not now overturn.

**C. Disgorgement of Profits**

Plaintiffs also argues for a new trial, or in the alternative an amendment to the judgment, based on the argument that the damages for trademark infringement here include impermissible double recovery. (Doc. 407 at 10). Specifically, Plaintiffs argue that these damages were already accounted for under the damages for patent infringement. (*Id*.). This argument heavily overlaps with Plaintiffs Motion for Findings of Fact and Conclusions of Law Regarding Disgorgement Remedies. (Doc. 408). Thus, the Court will address both Motions here.

"Generally, the double recovery of damages is impermissible." *Aero Prod. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1017 (Fed. Cir. 2006). The Federal Circuit has instructed that when "determining whether there has been an impermissible double recovery of damages, the inquiry focuses on whether the damages issue arose from the same set of operative facts." *Id*. Under that inquiry, when damages are awarded for patent infringement, they cannot "also be awarded [for] defendants' profits for trademark infringement based on the same sales of the same accused devices." *Id*. at 1019.

Here, Defendants' patent and trademark infringement counterclaims arise largely "from the same set of operative facts," but do not overlap entirely. *Id*. at 1018. For example, Defendants presented evidence of damages for product lines, such as the HD130, which contained the disputed "COMFY" trademark but did not involve any of the disputed patents. This type of evidence distinguishes the damages between the two theories. While

4

there was some overlap in the factual background on other products, the Court is not persuaded that the jury was unable to distinguish between the two in their calculation of damages. The Court also declines to provide further findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) as the jury was not advisory on the issue of infringement. *See Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1339 (Fed. Cir. 2001) (holding that the Seventh Amendment right to jury trial applies in patent infringement actions for damages).

### III.    CONCLUSION

In sum, the Court declines to grant JMOL or a new trial to Plaintiffs under Rules 50 or 59 for any of the arguments raised in the instant Motion. Additionally, the Court does not find that the jury's award of monetary damages for trademark infringement was sufficiently duplicative with the patent infringement claims.

Accordingly,

**IT IS ORDERED** that Top Brand, LLC, et al.'s Renewed Motion for Judgment as a Matter of Law (Doc. 406), Motion for New Trial (Doc. 407), and Motion for Findings of Fact and Conclusions of Law (Doc. 408) are **denied**.

Dated this 3rd day of July, 2024.

Honorable Steven P. Logan
United States District Judge

1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8

Top Brand, LLC, et al.,                    )    No.  CV-21-00597-PHX-SPL

9                                                          )

10                    Plaintiffs,              )    **ORDER**

    vs.                                             )

11                                                          )

12    Cozy Comfort Company, LLC, et al.,    )

13                    Defendants.             )

14    ─────────────────────────────────)

15        Before the Court is the parties' Joint Motion for Entry of Amended Judgment (Doc.

16    435). Pursuant to Fed. R. Civ. P. 58(a), the Clerk of Court shall set out in a separate

17    document a reflection of the Court's previous amended judgment. (Doc. 429).

18        **IT IS ORDERED** that the Joint Motion for Entry of Amended Judgment (Doc. 435)

19    is **granted**.

20        **IT IS FURTHER ORDERED** that the Clerk shall enter an Amended Judgement

21    to reflect the Court's July 1, 2024 Order (Doc. 429) awarding Defendants Pre-judgment

22    and Post-judgment interest. Specifically the jury's damage award for Claims I, II(1), (2),

23    (4), (5), (6), (7), (8), and IV shall be increased by $2,966,415.51 to a total amount of

24    $18,361,394.51 to reflect prejudgment interest on these claims.

25        Dated this 29th day of July, 2024.

26
27                                                  Honorable Steven P. Logan

28

**Appx00025**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| Top Brand, LLC, et al., | **NO. CV-21-00597-PHX-SPL** |
| Plaintiffs, | |
| v. | **SECOND AMENDED JUDGMENT IN A CIVIL CASE** |
| Cozy Comfort Company, LLC, et al., | |
| Defendants. | |

Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED that pursuant to the Court's Orders filed June 5, 2024, and July 1, 2024, judgment is entered in favor of Defendants and against Plaintiffs as to Claim I, Claim II(1), (2), (4), (5), (6), (7), and (8) in the amount of $15,394,978.00, Claim III, Claim IV in the amount of $1.00, Claim V (1-10), Claim VII(A)(1-3), Claim VIII, Claim IX in the amount of $1,539,497.80, Claim X, Claim IX in the amount of $1,539,497.80, and Claim XIV(A-C). The jury's damage award for Claims I, II(1), (2), (4), (5), (6), (7), (8), and IV is increased by $2,966,415.51 for a total amount of $18,361,394.51 to reflect prejudgment interest on these claims.

Judgment is entered in favor of Defendants Brian Speciale and Michael Speciale as to Claim VI(A)(2) and IV(A)(3).

1    Judgment is entered in favor of Plaintiffs and against Defendant Cozy Comfort

2   Company as to Claims VI(A)(1) and VI(B)(1) and Claim XII.

3                                        Debra D. Lucas
                                         District Court Executive/Clerk of Court
4

5   July 30, 2024

6                                        s/ K. Gray
                              By    Deputy Clerk

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

US00D859788S

## (12) United States Design Patent
### Speciale et al.

(10) Patent No.: **US D859,788 S**

(45) Date of Patent: ** **Sep. 17, 2019**

(54) **ENLARGED OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET**

(71) Applicant: **Cozy Comfort Copmany LLC**, Cave Creek, AZ (US)

(72) Inventors: **Brian Speciale**, Cave Creek, AZ (US); **Michael Speciale**, Cave Creek, AZ (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/617,421**

(22) Filed: **Sep. 13, 2017**

(51) **LOC (12) Cl.** ............................................... **02-02**

(52) **U.S. Cl.**
USPC ...................................................... **D2/828**

(58) **Field of Classification Search**
USPC ........ D2/828, 839, 731, 742, 750, 724, 728, D2/840, 847, 999, 771, 782, 791, 829, D2/831, 857, 706–708, 732, 751–753, D2/830, 832–838, 848, 853; D5/53, 55, D5/59, 61; D29/101.3; 2/77, 84–86, 93, 2/108, 115; D3/285
CPC ........... A41C 3/0057; A41C 3/08; A41C 3/12; A41D 1/18; A41D 13/0007; A41D 13/0015; A41D 13/0017; A41D 3/00; A41D 3/02; A41D 3/04
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,837,006 A      9/1974   Laseman
D728,900 S  *   5/2015   White ............................. D2/750
(Continued)

*Primary Examiner* — Wan Laymon

*Assistant Examiner* — Mark Booker

(74) *Attorney, Agent, or Firm* — Thomas W. Galvani, P.C.; Thomas W. Galvani

(57)          **CLAIM**

The ornamental design for an enlarged over-garment with an elevated marsupial pocket, as shown and described.

### DESCRIPTION

FIG. **1** is a front elevation view of an enlarged over-garment with an elevated marsupial pocket shown in accordance with our new design, as worn by a person shown in broken line in a standing position;

FIG. **2** is a top perspective view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **3** is a bottom perspective view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **4** is a front elevation view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **5** is a rear elevation view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **6** is a left side elevation view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **7** is a right side elevation view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **8** is a top plan view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **9** is a bottom plan view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1**; and,

FIG. **10** is a front perspective view of the enlarged over-garment with an elevated marsupial pocket shown in FIG. **1** as worn by a person, partially hidden, shown in broken line in a sitting fetal position.

The features shown in broken lines are for the purposes of showing environmental structure and form no part of the claimed design.

**1 Claim, 8 Drawing Sheets**



**US D859,788 S**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D770,136 | S | * | 11/2016 | Darmour ........................ D2/828 |
| D784,659 | S | * | 4/2017 | Darmour ........................ D2/840 |
| D785,906 | S | * | 5/2017 | Darmour ........................ D2/731 |
| D787,160 | S | * | 5/2017 | Crowe ........................... D2/750 |
| D790,809 | S | * | 7/2017 | Lomax ........................... D2/828 |
| D810,401 | S | * | 2/2018 | Darmour ........................ D2/828 |
| D810,402 | S | * | 2/2018 | Darmour ........................ D2/828 |
| D811,051 | S | * | 2/2018 | Darmour ........................ D2/828 |
| D820,560 | S | * | 6/2018 | Reynolds ....................... D2/829 |
| D827,249 | S | * | 9/2018 | Darmour ........................ D2/728 |
| 2012/0005802 | A1 | * | 1/2012 | Claeys ................... A41D 27/20 |
| | | | | 2/84 |
| 2014/0317824 | A1 | | 10/2014 | Browning et al. |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6          FIG. 7

Case: 24-2191    Document: 13    Page: 128    Filed: 10/04/2024



*FIG. 8*

*FIG. 9*



*FIG.* 10

US00D886416S

(12) **United States Design Patent** (10) Patent No.: **US D886,416 S**

Speciale et al. (45) Date of Patent: ✱✱ *Jun. 9, 2020

(54) **OVER-GARMENT WITH A MARSUPIAL POCKET**

(71) Applicant: **Cozy Comfort Copmany LLC**, Cave Creek, AZ (US)

(72) Inventors: **Brian Speciale**, Cave Creek, AZ (US); **Michael Speciale**, Cave Creek, AZ (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(**) Term: **15 Years**

(21) Appl. No.: **29/645,978**

(22) Filed: **Apr. 30, 2018**

(51) **LOC (12) Cl.** ............................................. **02-02**
(52) **U.S. Cl.**
USPC .......................................... **D2/828**
(58) **Field of Classification Search**
USPC ......... D2/823–826, 830–831, 860, 828; 2/87
CPC .................................... A41D 3/00; A41D 3/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D41,930 S | 11/1911 | Kingsbttry |
| 1,739,433 A | 12/1929 | Young |
| D105,075 S | 6/1937 | Richards |
| D105,681 S | 8/1937 | Zimmerman |
| D106,949 S | 11/1937 | Rosenblatt |
| D108,039 S | 1/1938 | Silvermaii |
| D117,438 S | 10/1939 | Yanofsky |
| D121,044 S | 6/1940 | Berkman |

(Continued)

OTHER PUBLICATIONS

The Comfy, posted unknown [online], (retrieved Jan. 9, 2020), Retrieved from the internet, https://thecomfy.com/products/the-comfy.*

(Continued)

Primary Examiner — Barbara Fox
Assistant Examiner — J. Thorn, Sr.
(74) *Attorney, Agent, or Firm* — Thomas W. Galvani, P.C.; Thomas W. Galvani

(57) **CLAIM**

The ornamental design for an over-garment with a marsupial pocket, as shown and described.

**DESCRIPTION**

FIG. **1** is a front elevation view of an over-garment with a marsupial pocket shown in accordance with our new design, as worn by a person shown in broken line in a standing position;

FIG. **2** is a front perspective view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **3** is a rear perspective view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **4** is a front elevation view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **5** is a rear elevation view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **6** is a left side elevation view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **7** is a right side elevation view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **8** is a top plan view of the over-garment with a marsupial pocket shown in FIG. **1**;

FIG. **9** is a bottom plan view of the over-garment with a marsupial pocket shown in FIG. **1**; and,

FIG. **10** is a front perspective view of the over-garment with a marsupial pocket shown in FIG. **1** as worn by a person, partially hidden, shown in broken line in a sitting fetal position.

The features shown in broken lines are for the purposes of showing environmental structure and form no part of the claimed design.

**1 Claim, 8 Drawing Sheets**



**US D886,416 S**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D128,543 | S | 7/1941 | Manna |
| D132,340 | S | 5/1942 | Schwartz |
| D139,136 | S | 10/1944 | Gerstman |
| D139,535 | S | 11/1944 | Bauer |
| 3,837,006 | A | 9/1974 | Laseman |
| D261,070 | A | 10/1981 | Pettibone |
| D266,880 | S | 11/1982 | Luhtala |
| D277,049 | S | 1/1985 | Peyser |
| D294,535 | S | 3/1988 | Stricklin |
| D296,605 | S  * | 7/1988 | Asher ................................ 2/69 |
| D298,680 | S | 11/1988 | Chou |
| 4,791,681 | A | 12/1988 | Dean |
| D300,280 | S | 3/1989 | Gurrola |
| D338,773 | S | 8/1993 | Wilde |
| D385,088 | S | 10/1997 | Handysides |
| D385,688 | S | 11/1997 | Clausell |
| D430,721 | S  * | 9/2000 | Beauchan ...................... D2/823 |
| D433,787 | S | 11/2000 | Bellon |
| D439,029 | S | 3/2001 | Goldman |
| D477,126 | S | 7/2003 | Dunning et al. |
| D479,902 | S | 9/2003 | Brown |
| D504,800 | S | 5/2005 | Garcia |
| D512,204 | S | 12/2005 | Thomas et al. |
| D541,011 | S | 4/2007 | Day et al. |
| D561,430 | S | 2/2008 | Vincenzo |
| D563,628 | S | 3/2008 | Corbin et al. |
| D566,927 | S | 4/2008 | Graham |
| D568,581 | S | 5/2008 | Wager |
| D570,577 | S | 6/2008 | Keppler |
| D584,482 | S | 1/2009 | Marsh |
| D588,338 | S | 3/2009 | Self |
| D590,131 | S | 4/2009 | Rogondino |
| D590,132 | S | 4/2009 | Rogondino |
| D590,134 | S | 4/2009 | Rogondino |
| D600,884 | S  * | 9/2009 | Patton ........................... D2/825 |
| D603,140 | S | 11/2009 | Amador |
| D604,479 | S | 11/2009 | Roe et al. |
| D615,731 | S | 5/2010 | Oneto |
| D619,333 | S  * | 7/2010 | Stowell ....................... D2/823 |
| D621,132 | S | 8/2010 | Crisp |
| D627,540 | S | 11/2010 | Claeys |
| D629,590 | S | 12/2010 | Freedman et al. |
| D630,002 | S | 1/2011 | Brown |
| D633,691 | S | 3/2011 | Tronvold |
| D633,692 | S | 3/2011 | Lawrence et al. |
| D637,377 | S | 5/2011 | Hertzen |
| D638,200 | S | 5/2011 | Gorson |
| D638,201 | S | 5/2011 | Gosse |
| D638,202 | S | 5/2011 | Gosse |
| D653,836 | S | 2/2012 | Woyshner et al. |
| D655,894 | S | 3/2012 | Crye |
| D665,152 | S | 8/2012 | Morales |
| D672,531 | S | 12/2012 | Kelfer |
| D685,160 | S | 7/2013 | Savage |
| D689,669 | S | 9/2013 | Williams |
| D692,212 | S | 10/2013 | Coward |
| 8,566,963 | B2 | 10/2013 | Ryan |
| D693,543 | S | 11/2013 | Rao |
| D695,491 | S | 12/2013 | Hawkins et al. |
| D700,418 | S | 3/2014 | Borovicka et al. |
| D701,368 | S | 3/2014 | Borovicka et al. |
| D707,923 | S | 7/2014 | Borovicka et al. |
| D717,524 | S | 11/2014 | Allen et al. |
| D719,722 | S | 12/2014 | Bublak |
| D721,467 | S | 1/2015 | Tref |
| D728,900 | S | 5/2015 | White |
| D732,799 | S | 6/2015 | Smith |
| D736,496 | S | 8/2015 | Gonzalez |
| D736,497 | S | 8/2015 | Harris |
| D741,576 | S | 10/2015 | Sakosits |
| D744,725 | S | 12/2015 | Judge et al. |
| D747,075 | S | 1/2016 | Ingram |
| D751,272 | S | 3/2016 | Moehring |
| 9,295,292 | B2 | 3/2016 | Sachs |
| D754,947 | S | 5/2016 | Borovicka |

| | | | |
|---|---|---|---|
| D758,047 | S | 6/2016 | Burlo |
| D758,699 | S | 6/2016 | Darmour |
| D762,048 | S | 7/2016 | Lomax |
| D762,346 | S | 8/2016 | Lomax |
| 9,414,631 | B2 | 8/2016 | Schrimpf |
| D765,351 | S | 9/2016 | Shaw |
| D767,256 | S | 9/2016 | Adrovic |
| D767,856 | S | 10/2016 | Adrovic |
| D770,136 | S | 11/2016 | Darmour |
| D775,788 | S | 1/2017 | Darmour |
| 9,554,601 | B2 | 1/2017 | Arajakis |
| D778,033 | S | 2/2017 | Darmour |
| D782,783 | S | 4/2017 | Douglas et al. |
| D783,233 | S | 4/2017 | Steel |
| D783,944 | S | 4/2017 | Lomax |
| D783,945 | S | 4/2017 | Sisseren |
| D784,193 | S | 4/2017 | Freddi et al. |
| D784,659 | S | 4/2017 | Darmour |
| D785,906 | S | 5/2017 | Darmour |
| D786,537 | S | 5/2017 | Ingram |
| D787,160 | S | 5/2017 | Crowe et al. |
| D787,161 | S | 5/2017 | Darmour |
| D789,042 | S | 6/2017 | Lomax |
| D790,177 | S | 7/2017 | Darmour |
| D790,808 | S | 7/2017 | Blackford et al. |
| D790,809 | S | 7/2017 | Lomax |
| 9,713,352 | B2 | 7/2017 | Demarest |
| D802,886 | S  * | 11/2017 | Salce, Jr. ...................... D2/831 |
| D810,401 | S | 2/2018 | Darmour |
| D810,402 | S | 2/2018 | Darmour |
| D811,051 | S | 2/2018 | Darmour et al. |
| D820,560 | S | 6/2018 | Reynolds et al. |
| D827,249 | S | 9/2018 | Darmour et al. |
| 10,130,126 | B2 | 11/2018 | Blauser et al. |
| D855,940 | S | 8/2019 | Lomax |
| D859,788 | S | 9/2019 | Speciale et al. |
| 10,420,431 | B1 | 9/2019 | Speciale et al. |
| 2007/0074329 | A1* | 4/2007 | Marshall ................. A41D 3/08 |
| | | | 2/69 |
| 2008/0196140 | A1 | 8/2008 | Mayerson et al. |
| 2009/0229034 | A1 | 9/2009 | Zmigrosky |
| 2011/0185471 | A1 | 8/2011 | Buczkowski et al. |
| 2012/0005802 | A1 | 1/2012 | Claeys |
| 2013/0219581 | A1 | 8/2013 | Schrimpf |
| 2013/0269082 | A1* | 10/2013 | Bramblet ........... A41D 1/215 |
| | | | 2/104 |
| 2014/0310848 | A1 | 10/2014 | Ulriksen et al. |
| 2014/0317824 | A1 | 10/2014 | Browning et al. |
| 2014/0331381 | A1 | 11/2014 | Arajakis |
| 2015/0189924 | A1* | 7/2015 | Desbrow ................. A41D 3/04 |
| | | | 2/87 |
| 2016/0242474 | A1 | 8/2016 | Baschak et al. |
| 2017/0020215 | A1 | 1/2017 | Merritt |
| 2017/0079350 | A1 | 3/2017 | Hourani |
| 2018/0092410 | A1* | 4/2018 | Rundle ............... A41D 3/08 |
| 2020/0008500 | A1 | 1/2020 | Speciale et al. |

OTHER PUBLICATIONS

2018 Kangaroo Pocket Oversized Hoodie, https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html.

Trefoil Oversize Hoodie, https://www.asos.com/us/trefoil-oversize-hoodie/CW1248.html.

Stone Island Shadow Project Men zipped pocket sweatshirt, http://www.caribbeanmicrofinanceforum.com/stone-island-shadow-project-men-zipped-pocket-sweatshirt-boutique-high-quality-681960107-qacglom.html.

U.S. Appl. No. 16/576,125, filed Sep. 9, 2019, Speciale.

U.S. Appl. No. 29/617,421, filed Sep. 13, 2017, Brian Speciale.

U.S. Appl. No. 29/645,978, filed Apr. 30, 2018, Brian Speciale.

U.S. Appl. No. 29/705,878, filed Sep. 16, 2019, Brian Speciale.

[32% Off] 2020 Kangaroo Pocket Oversized Hoodie in Apricot _ Zaful (https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html).

adidas Trefoil Hoodie—Blue _ adidas US (https://www.adidas.com/us/trefoil-hoodie/FM3784.html).

**US D886,416 S**

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Front Solid Full Regular Hoodie Half Zip Kangaroo Pocket Fluffy
Hoodie  (https://www.daydaychic.com/Half-Zip-Kangaroo-Pocket-
Fluffy-Hoodie-p-1000025963).
Indigo Indigo Suede Hoodie Dress with Kangaroo Pocket—Toetally
You (https://www.toetallyyou.com/indigo-suede-hoodie-dress-with-
kangaroo-pocket.html).
Popular Color Block Drawstring Hooded Sweatshirt with Kangaroo
Pocket—Beautifulhalo.com (https://www.beautifulhalo.com/popular-
color-block-drawstring-hooded-sweatshirt-with-kangaroo-pocket-p-
260687.html).
Stone Island Shadow Project Contrast Panel Drawstring Hoodie—
Farfetch  (https://www.farfetch.com/shopping/men/stone-island-
shadow-project-contrast-panel-drawstring-hoodie-item-15264001.
aspx?storeid=10).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6          FIG. 7



FIG. 8

FIG. 9



FIG. 10

US00D903237S

(12) **United States Design Patent**     (10) Patent No.:     **US D903,237 S**
Speciale et al.     (45) Date of Patent:   ★★   *Dec. 1, 2020

(54) **OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET**

(71) Applicant: **Cozy Comfort Company LLC**, Cave Creek, AZ (US)

(72) Inventors: **Brian Speciale**, Cave Creek, AZ (US); **Michael Speciale**, Cave Creek, AZ (US)

( * ) Notice:  This patent is subject to a terminal disclaimer.

(**) Term: **15 Years**

(21) Appl. No.: **29/705,878**

(22) Filed: **Sep. 16, 2019**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 29/617,421, filed on Sep. 13, 2017, now Pat. No. Des. 859,788, and a continuation-in-part of application No. 29/645,978, filed on Apr. 30, 2018.

(51) **LOC (12) Cl.** ............................................. **02-02**
(52) **U.S. Cl.**
   USPC ......................................................... **D2/828**
(58) **Field of Classification Search**
   USPC ......... D2/823–826, 830–831, 860, 828; 2/87
   CPC ................................. A41D 3/00; A41D 3/08
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D41,930 S | 11/1911 | Kingsbttry |
| 1,739,433 A | 12/1929 | Young |
| D105,075 S | 6/1937 | Richards |
| D105,681 S | 8/1937 | Zimmerman |
| D106,949 S | 11/1937 | Rosenblatt |
| D108,039 S | 1/1938 | Silvermaii |
| D117,438 S | 10/1939 | Yanofsky |
| D121,044 S | 6/1940 | Berkman |
| D128,543 S | 7/1941 | Manna |
| D132,340 S | 5/1942 | Schwartz |

| | | |
|---|---|---|
| D139,136 S | 10/1944 | Gerstman |
| D139,535 S | 11/1944 | Bauer |
| 3,837,006 A | 9/1974 | Laseman |
| D261,070 S | 10/1981 | Pettibone |
| D266,880 S | 11/1982 | Luhtala |
| D277,049 S | 1/1985 | Peyser |
| D294,535 S | 3/1988 | Stricklin |
| D296,605 S | 7/1988 | Asher |
| D298,680 S | 11/1988 | Chou |
| 4,791,681 A | 12/1988 | Dean |
| D300,280 S | 3/1989 | Gurrola |
| D338,773 S | 8/1993 | Wilde |
| D385,088 S | 10/1997 | Handysides |
| D385,688 S | 11/1997 | Clausell |
| D430,721 S | 9/2000 | Beauchan |
| D433,787 S | 11/2000 | Bellon |
| 6,185,743 B1 | 2/2001 | Mick |
| D439,029 S | 3/2001 | Goldman |
| D477,126 S | 7/2003 | Dunning et al. |
| D479,902 S | 9/2003 | Brown |
| D504,800 S | 5/2005 | Garcia |
| D512,204 S | 12/2005 | Thomas et al. |
| D539,509 S | 4/2007 | Fugazzi |
| D541,011 S | 4/2007 | Day et al. |
| D561,430 S | 2/2008 | Vincenzo |
| D563,628 S | 3/2008 | Corbin et al. |
| D566,927 S | 4/2008 | Graham |
| D568,581 S | 5/2008 | Wager |
| D570,577 S | 6/2008 | Keppler |
| D584,482 S | 1/2009 | Marsh |
| D588,338 S | 3/2009 | Self |
| D590,131 S | 4/2009 | Rogondino |
| D590,132 S | 4/2009 | Rogondino |
| D590,134 S | 4/2009 | Rogondino |
| D600,884 S | * 9/2009 | Patton ........................... D2/825 |
| D603,140 S | 11/2009 | Amador |
| D604,479 S | 11/2009 | Roe et al. |
| D615,731 S | 5/2010 | Oneto |
| D619,333 S | 7/2010 | Stowell |
| D621,132 S | 8/2010 | Crisp |
| D627,540 S | 11/2010 | Claeys |
| D629,590 S | 12/2010 | Freedman et al. |
| D630,002 S | 1/2011 | Brown |
| D633,691 S | 3/2011 | Tronvold |
| D633,692 S | 3/2011 | Lawrence et al. |
| D637,377 S | 5/2011 | Hertzen |
| D638,200 S | 5/2011 | Gorson |
| D638,201 S | 5/2011 | Gosse |
| D638,202 S | 5/2011 | Gosse |
| D653,836 S | 2/2012 | Woyshner et al. |
| D655,894 S | 3/2012 | Crye |
| D665,152 S | 8/2012 | Morales |
| D672,531 S | 12/2012 | Kelfer |



**Appx00049**

| | | | | |
|---|---|---|---|---|
| D679,484 | S | * | 4/2013 | Brown .......................... D2/823 |
| D685,160 | S | | 7/2013 | Savage |
| D689,669 | S | | 9/2013 | Williams |
| D692,212 | S | | 10/2013 | Coward |
| 8,566,963 | B2 | | 10/2013 | Ryan |
| D693,543 | S | | 11/2013 | Rao |
| D695,491 | S | | 12/2013 | Hawkins et al. |
| D700,418 | S | | 3/2014 | Borovicka et al. |
| D701,368 | S | | 3/2014 | Borovicka et al. |
| D707,923 | S | | 7/2014 | Borovicka et al. |
| D717,524 | S | | 11/2014 | Allen et al. |
| D719,722 | S | | 12/2014 | Bublak |
| 8,910,317 | B2 | | 12/2014 | Decker |
| D721,467 | S | | 1/2015 | Tref |
| D728,900 | S | | 5/2015 | White |
| D732,799 | S | | 6/2015 | Smith |
| D736,496 | S | | 8/2015 | Gonzalez |
| D736,497 | S | | 8/2015 | Harris |
| D741,576 | S | | 10/2015 | Sakosits |
| D744,725 | S | | 12/2015 | Judge et al. |
| D747,075 | S | | 1/2016 | Ingram |
| D751,272 | S | | 3/2016 | Moehring |
| 9,295,292 | B2 | | 3/2016 | Sachs |
| D754,947 | S | | 5/2016 | Borovicka |
| D758,047 | S | | 6/2016 | Burlo |
| D758,699 | S | | 6/2016 | Darmour |
| D762,048 | S | | 7/2016 | Lomax |
| D762,346 | S | | 8/2016 | Lomax |
| 9,414,631 | B2 | | 8/2016 | Schrimpf |
| D765,351 | S | | 9/2016 | Shaw |
| D767,256 | S | | 9/2016 | Adrovic |
| D767,856 | S | | 10/2016 | Adrovic |
| D770,136 | S | | 11/2016 | Darmour |
| D775,788 | S | | 1/2017 | Darmour |
| 9,554,601 | B2 | | 1/2017 | Arajakis |
| D778,033 | S | | 2/2017 | Darmour |
| D782,783 | S | | 4/2017 | Douglas et al. |
| D783,233 | S | | 4/2017 | Steel |
| D783,944 | S | | 4/2017 | Lomax |
| D783,945 | S | | 4/2017 | Sisseren |
| D784,193 | S | | 4/2017 | Freddi et al. |
| D784,659 | S | | 4/2017 | Darmour |
| D785,906 | S | | 5/2017 | Darmour |
| D786,537 | S | | 5/2017 | Ingram |
| D787,160 | S | | 5/2017 | Crowe et al. |
| D787,161 | S | | 5/2017 | Darmour |
| D789,042 | S | | 6/2017 | Lomax |
| D790,807 | S | | 7/2017 | Darmour |
| D790,808 | S | | 7/2017 | Blackford et al. |
| D790,809 | S | | 7/2017 | Lomax |
| 9,713,352 | B2 | | 7/2017 | Demarest |
| D802,886 | S | | 11/2017 | Salce et al. |
| D810,401 | S | | 2/2018 | Darmour |
| D810,402 | S | | 2/2018 | Darmour |
| D811,051 | S | | 2/2018 | Darmour |
| D820,560 | S | | 6/2018 | Reynolds et al. |
| D827,249 | S | | 9/2018 | Darmour et al. |
| 10,130,126 | B2 | | 11/2018 | Blauser et al. |
| D854,787 | S | * | 7/2019 | Ngan ........................... D2/825 |
| D855,940 | S | | 8/2019 | Lomax |
| D859,788 | S | | 9/2019 | Speciale et al. |
| 10,420,431 | B1 | | 9/2019 | Speciale et al. |
| D877,461 | S | * | 3/2020 | Mieszczak ..................... D2/860 |
| 2003/0046748 | A1 | | 3/2003 | Tanenbaum |
| 2007/0000030 | A1 | | 1/2007 | Toomey et al. |
| 2007/0074329 | A1 | | 4/2007 | Marshall et al. |
| 2008/0196140 | A1 | | 8/2008 | Mayerson et al. |
| 2009/0229034 | A1 | | 9/2009 | Zmigrosky |
| 2011/0185471 | A1 | | 8/2011 | Buczkowski et al. |
| 2012/0005801 | A1* | | 1/2012 | Parr ........................ A41D 3/00 |
| | | | | 2/84 |
| 2012/0005802 | A1 | | 1/2012 | Claeys |
| 2012/0144550 | A1* | | 6/2012 | Nejad ...................... A41D 3/08 |
| | | | | 2/84 |
| 2013/0219581 | A1 | | 8/2013 | Schrimpf |
| 2013/0269082 | A1 | | 10/2013 | Bramblett |
| 2013/0318679 | A1* | | 12/2013 | Esquer ...................... A41D 3/08 |
| | | | | 2/84 |
| 2014/0310848 | A1 | | 10/2014 | Ulriksen et al. |

| | | | | |
|---|---|---|---|---|
| 2014/0317824 | A1 | | 10/2014 | Browning et al. |
| 2014/0331381 | A1 | | 11/2014 | Arajakis |
| 2015/0189924 | A1 | | 7/2015 | Desbrow |
| 2015/0296909 | A1* | | 10/2015 | Sachs ..................... A41B 1/08 |
| | | | | 2/84 |
| 2016/0242474 | A1 | | 8/2016 | Baschak et al. |
| 2016/0324236 | A1 | | 11/2016 | Schrimpf |
| 2017/0020215 | A1 | | 1/2017 | Merritt |
| 2017/0079350 | A1 | | 3/2017 | Hourani |
| 2018/0092410 | A1 | | 4/2018 | Rundle |
| 2020/0008500 | A1 | | 1/2020 | Speciale et al. |

OTHER PUBLICATIONS

U.S. Appl. No. 16/576,125, filed Sep. 19, 2019, Brian Speciale.
U.S. Appl. No. 29/617,421, filed Sep. 13, 2017, Brian Speciale.
U.S. Appl. No. 29/645,978, filed Apr. 30, 2018, Brian Speciale.
U.S. Appl. No. 29/705,878, filed Sep. 16, 2019, Brian Speciale.
2018 Kangaroo Pocket Oversize Hoodie, https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html.
Stone Island Shadow Project Men zipped pocket sweatshirt, http://caribbeanmicrofinanceforum.com/stone-island-shadow-project-men-zipped-pocket-sweatshirt-boutique-high-quality-681960107-qacglom.html.
Trefoil Oversize Hoodie, https://www.adidas/com/us/trefoil-oversize-hoodie/CW1248.html.
[32% Off] 2020 Kangaroo Pocket Oversized Hoodie in Apricot _ ZAFUL (https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html).
Adidas Trefoil Hoodie—Blue _ adidas US (https://www.adidas.com/us/trefoil-hoodie/FM3784.html).
Front Solid Full Regular Hoodie Half Zip Kangaroo Pocket Fluffy Hoodie (https://www.daydaychic.com/Half-Zip-Kangaroo-Pocket-Fluffy-Hoodie-p-1000025963).
Indigo Indigo Suede Hoodie Dress with Kangaroo Pocket—Toetally You (https://www.toetallyyou.com/indigo-suede-hoodie-dress-with-kangaroo-pocket.html).
Popular Color Block Drawstring Hooded Sweatshirt with Kangaroo Pocket—Beautifulhalo.com (https://www.beautifulhalo.com/popular-color-block-drawstring-hooded-sweatshirt-with-kangaroo-pocket-p-260687.html).
Stone Island Shadow Project Contrast Panel Drawstring Hoodie—Farfetch (https://www.farfetch.com/shopping/men/stone-island-shadow-project-contrast-panel-drawstring-hoodie-item-15264001.aspx?storeid=10).
ASOS NYTT Long Sleeve Hoodie Dress, web page (https://www.asos.com/nytt/nytt-long-sleeve-hoodie-dress/prd/6860969) retrieved from Internet Archive Wayback Machine (https://web.archive.org/web/20170307145645/https://www.asos.com/nytt/nytt-long-sleeve-hoodie-dress/prd/6860969).
Chesterford Children's Lab Coats, web page (http://chesterford.co.uk/acatalog/Children_s_lab_coats.html) retrieved from Internet Archive Wayback Machine (https://www.archive.org/web/20160322191704/http://chesterford.co.uk/acatalog/Children_s_lab_coats.html).

* cited by examiner

*Primary Examiner* — Manpreet S Matharu
*Assistant Examiner* — J. Thorn, Sr.

(74) *Attorney, Agent, or Firm* — Thomas W. Galvini, P.C.; Thomas W. Galvini

(57)    **CLAIM**

The ornamental design for an over-garment with an elevated marsupial pocket, as shown and described.

DESCRIPTION

FIG. **1** is a front elevation view of an over-garment with an elevated marsupial pocket shown in accordance with our new design, and shown worn by a person having a height of

approximately six feet two inches, said person being shown in broken line in a standing position;

FIG. **2** is a top perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **3** is a bottom perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **4** is a front elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **5** is a rear elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **6** is a left side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **7** is a right side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **8** is a top plan view of the over-garment with an elevated marsupial pocket shown in FIG. **1**; and

FIG. **9** is a bottom plan view of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **10** is a front elevation view of an over-garment with an elevated marsupial pocket shown in accordance with our new design, and shown worn by a person having a height of approximately six feet two inches, said person being shown in broken line in a standing position;

FIG. **11** is a top perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **12** is a bottom perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **13** is a front elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **14** is a rear elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **15** is a left side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **16** is a right side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **17** is a top plan view of the over-garment with an elevated marsupial pocket shown in FIG. **10**; and

FIG. **18** is a bottom plan view of the over-garment with an elevated marsupial pocket shown in FIG. **10**;

FIG. **19** is a front elevation view of an over-garment with an elevated marsupial pocket shown in accordance with our new design, and shown worn by a person having a height of approximately six feet two inches, said person being shown in broken line in a standing position;

FIG. **20** is a top perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **21** is a bottom perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **22** is a front elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **23** is a rear elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **24** is a left side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **25** is a right side elevation view of the over-garment with an elevated marsupial pocket shown in FIG. **19**;

FIG. **26** is a top plan view of the over-garment with an elevated marsupial pocket shown in FIG. **19**; and,

FIG. **27** is a bottom plan view of the over-garment with an elevated marsupial pocket shown in FIG. **19**.

The features shown in broken lines are for the purposes of showing environmental structure and boundaries that form no part of the claimed design.

**1 Claim, 21 Drawing Sheets**



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5





FIG. 6          FIG. 7



FIG. 8

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15          FIG. 16



FIG. 17

FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22

FIG. 23



FIG. 24          FIG. 25

Case: 24-2191    Document: 13    Page: 164    Filed: 10/04/2024

FIG. 26

FIG. 27

US00D905380S

(12) **United States Design Patent** (10) Patent No.: **US D905,380 S**

Speciale et al. (45) Date of Patent: ** **\*Dec. 22, 2020**

(54) **WHOLE BODY BLANKET**

(71) Applicant: **Cozy Comfort Company LLC**,
Pleasanton, CA (US)

(72) Inventors: **Brian Speciale**, Pleasanton, CA (US);
**Michael Speciale**, Cave Creek, AZ
(US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(**) Term: **15 Years**

(21) Appl. No.: **29/731,083**

(22) Filed: **Apr. 11, 2020**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 29/705,878,
filed on Sep. 16, 2019, which is a continuation-in-part
of application No. 29/645,978, filed on Apr. 30, 2018,
now Pat. No. Des. 886,416, and a continuation-in-part
of application No. 29/617,421, filed on Sep. 13, 2017,
now Pat. No. Des. 859,788.

(51) **LOC (12) Cl.** ............................................... 02-02

(52) **U.S. Cl.**
USPC ......................................................... **D2/828**

(58) **Field of Classification Search**
USPC ......... D2/823–826, 830–831, 860, 828; 2/87
CPC ................................... A41D 3/00; A41D 3/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D41,930 S | 11/1911 | Kingsbury |
| 1,739,433 A | 12/1929 | Young |
| D105,075 S | 6/1937 | Richards |
| D105,681 S | 8/1937 | Zimmerman |
| D106,949 S | 11/1937 | Rosenblatt |
| D108,039 S | 1/1938 | Silvermaii |
| D117,438 S | 10/1939 | Yanofsky |
| D121,044 S | 6/1940 | Berkman |
| D128,543 S | 7/1941 | Manna |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 16/576,125, filed Sep. 19, 2019, Brian Speciale,
Entire Document.

(Continued)

*Primary Examiner* — Manpreet S Matharu
*Assistant Examiner* — J. Thorn, Sr.
(74) *Attorney, Agent, or Firm* — Thomas W. Galvani,
P.C.; Thomas W. Galvani

(57) **CLAIM**

The ornamental design for a whole body blanket, as shown
and described.

**DESCRIPTION**

FIG. **1** is a top front perspective view of a whole body
blanket shown in accordance with our new design;
FIG. **2** is a bottom front perspective view of the whole body
blanket shown in FIG. **1**;
FIG. **3** is a rear elevation view of the whole body blanket
shown in FIG. **1**;
FIG. **4** is a top front perspective view of a whole body
blanket shown in accordance with our new design;
FIG. **5** is a bottom front perspective view of the whole body
blanket shown in FIG. **4**; and
FIG. **6** is a rear elevation view of the whole body blanket
shown in FIG. **4**;
FIG. **7** is a top front perspective view of a whole body
blanket shown in accordance with our new design;
FIG. **8** is a bottom front perspective view of the whole body
blanket shown in FIG. **7**; and,
FIG. **9** is a rear elevation view of the whole body blanket
shown in FIG. **7**.
The features shown in broken lines illustrate portions of the
article which form no part of the claimed design.

**1 Claim, 9 Drawing Sheets**



**Appx00073**

**US D905,380 S**

Page 2

(56)　　　　　　References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D132,340 | S | 5/1942 | Schwartz |
| D139,136 | S | 10/1944 | Gerstman |
| D139,535 | S | 11/1944 | Bauer |
| 3,837,006 | A | 9/1974 | Laseman |
| D261,070 | S | 10/1981 | Pettibone |
| D266,880 | S | 11/1982 | Luhtala |
| D277,049 | S | 1/1985 | Peyser |
| D294,535 | S | 3/1988 | Stricklin |
| D296,605 | S | 7/1988 | Asher |
| D298,680 | S | 11/1988 | Chou |
| 4,791,681 | A | 12/1988 | Dean |
| D300,280 | S | 3/1989 | Gurrola |
| D338,773 | S | 8/1993 | Wilde |
| D385,088 | S | 10/1997 | Handysides |
| D385,688 | S | 11/1997 | Clausell |
| D430,721 | S | 9/2000 | Beauchan |
| D433,787 | S | 11/2000 | Bellon |
| 6,185,743 | B1 | 2/2001 | Mick |
| D439,029 | S | 3/2001 | Goldman |
| D477,126 | S | 7/2003 | Dunning et al. |
| D479,902 | S | 9/2003 | Brown |
| D504,800 | S | 5/2005 | Garcia |
| D512,204 | S | 12/2005 | Thomas et al. |
| D539,509 | S | 4/2007 | Fugazzi |
| D541,011 | S | 4/2007 | Day et al. |
| D561,430 | S | 2/2008 | Vincenzo |
| D563,628 | S | 3/2008 | Corbin et al. |
| D566,927 | S | 4/2008 | Graham |
| D568,581 | S | 5/2008 | Wager |
| D570,577 | S | 6/2008 | Keppler |
| D584,482 | S | 1/2009 | Marsh |
| D588,338 | S | 3/2009 | Self |
| D590,131 | S | 4/2009 | Rogondino |
| D590,132 | S | 4/2009 | Rogondino |
| D590,134 | S | 4/2009 | Rogondino |
| D600,884 | S | 9/2009 | Patton |
| D603,140 | S | 11/2009 | Amador |
| D604,479 | S | 11/2009 | Roe et al. |
| D615,731 | S | 5/2010 | Oneto |
| D619,333 | S | 7/2010 | Stowell |
| D621,132 | S | 8/2010 | Crisp |
| D627,540 | S | 11/2010 | Claeys |
| D629,590 | S | 12/2010 | Freedman et al. |
| D630,002 | S | 1/2011 | Brown |
| D633,691 | S | 3/2011 | Tronvold |
| D633,692 | S | 3/2011 | Lawrence et al. |
| D637,377 | S | 5/2011 | Hertzen |
| D638,200 | S | 5/2011 | Gorson |
| D638,201 | S | 5/2011 | Gosse |
| D638,202 | S | 5/2011 | Gosse |
| D653,836 | S | 2/2012 | Woyshner et al. |
| D655,894 | S | 3/2012 | Crye |
| D665,152 | S | 8/2012 | Morales |
| D672,531 | S | 12/2012 | Kelfer |
| D679,484 | S | * 4/2013 | Brown .......................... D2/823 |
| D685,160 | S | 7/2013 | Savage |
| D689,669 | S | 9/2013 | Williams |
| D692,212 | S | 10/2013 | Coward |
| 8,566,963 | B2 | 10/2013 | Ryan |
| D693,543 | S | 11/2013 | Rao |
| D695,491 | S | 12/2013 | Hawkins et al. |
| D700,418 | S | 3/2014 | Borovicka et al. |
| D701,368 | S | 3/2014 | Borovicka et al. |
| D707,923 | S | 7/2014 | Borovicka et al. |
| D717,524 | S | 11/2014 | Allen et al. |
| D719,722 | S | 12/2014 | Bublak |
| 8,910,317 | B2 | 12/2014 | Decker |
| D721,467 | S | 1/2015 | Tref |
| D728,900 | S | 5/2015 | White |
| D732,799 | S | 6/2015 | Smith |
| D736,496 | S | 8/2015 | Gonzalez |
| D736,497 | S | 8/2015 | Harris |
| D741,576 | S | 10/2015 | Sakosits |
| D744,725 | S | 12/2015 | Judge et al. |
| D747,075 | S | 1/2016 | Ingram |

| | | | |
|---|---|---|---|
| D751,272 | S | 3/2016 | Moehring |
| 9,295,292 | B2 | 3/2016 | Sachs |
| D754,947 | S | 5/2016 | Borovicka |
| D758,047 | S | 6/2016 | Burlo |
| D758,699 | S | 6/2016 | Darmour |
| D762,048 | S | 7/2016 | Lomax |
| D762,346 | S | 8/2016 | Lomax |
| 9,414,631 | B2 | 8/2016 | Schrimpf |
| D765,351 | S | 9/2016 | Shaw |
| D767,256 | S | 9/2016 | Adrovic |
| D767,856 | S | 10/2016 | Adrovic |
| D770,136 | S | 11/2016 | Darmour |
| D775,788 | S | 1/2017 | Darmour |
| 9,554,601 | B2 | 1/2017 | Arajakis |
| D778,033 | S | 2/2017 | Darmour |
| D782,783 | S | 4/2017 | Douglas et al. |
| D783,233 | S | 4/2017 | Steel |
| D783,944 | S | 4/2017 | Lomax |
| D783,945 | S | 4/2017 | Sisseren |
| D784,193 | S | 4/2017 | Freddi et al. |
| D784,659 | S | 4/2017 | Darmour |
| D785,906 | S | 5/2017 | Darmour |
| D786,537 | S | 5/2017 | Ingram |
| D787,160 | S | 5/2017 | Crowe et al. |
| D787,161 | S | 5/2017 | Darmour |
| D789,042 | S | 6/2017 | Lomax |
| D790,807 | S | 7/2017 | Darmour |
| D790,808 | S | 7/2017 | Blackford et al. |
| D790,809 | S | 7/2017 | Lomax |
| 9,713,352 | B2 | 7/2017 | Demarest |
| D802,886 | S | 11/2017 | Salce et al. |
| D810,401 | S | 2/2018 | Darmour |
| D810,402 | S | 2/2018 | Darmour |
| D811,051 | S | 2/2018 | Darmour et al. |
| D820,560 | S | 6/2018 | Reynolds et al. |
| D827,249 | S | 9/2018 | Darmour et al. |
| 10,130,126 | B2 | 11/2018 | Blauser et al. |
| D854,787 | S | * 7/2019 | Ngan ...................... D2/825 |
| D855,940 | S | 8/2019 | Lomax |
| D859,788 | S | 9/2019 | Speciale et al. |
| 10,420,431 | B1 | 9/2019 | Speciale et al. |
| D877,461 | S | * 3/2020 | Mieszczak .................. D2/860 |
| 2003/0046748 | A1 | 3/2003 | Tanenbaum |
| 2007/0000030 | A1 | 1/2007 | Toomey et al. |
| 2007/0074329 | A1 | 4/2007 | Marshall et al. |
| 2008/0196140 | A1 | 8/2008 | Mayerson et al. |
| 2009/0229034 | A1 | 9/2009 | Zmigrosky |
| 2011/0185471 | A1 | 8/2011 | Buczkowski et al. |
| 2012/0005801 | A1* | 1/2012 | Parr ..................... A41D 3/00 |
| | | | 2/84 |
| 2012/0005802 | A1 | 1/2012 | Claeys |
| 2012/0144550 | A1* | 6/2012 | Nejad ..................... A41D 3/08 |
| | | | 2/84 |
| 2013/0219581 | A1 | 8/2013 | Schrimpf |
| 2013/0269082 | A1 | 10/2013 | Bramblet |
| 2013/0318679 | A1* | 12/2013 | Esquer ................... A41D 3/08 |
| | | | 2/84 |
| 2014/0310848 | A1 | 10/2014 | Ulriksen et al. |
| 2014/0317824 | A1 | 10/2014 | Browning et al. |
| 2014/0331381 | A1 | 11/2014 | Arajakis |
| 2015/0189924 | A1 | 7/2015 | Desbrow |
| 2015/0296909 | A1* | 10/2015 | Sachs ..................... A41B 1/08 |
| | | | 2/84 |
| 2016/0242474 | A1 | 8/2016 | Baschak et al. |
| 2016/0324236 | A1 | 11/2016 | Schrimpf |
| 2017/0020215 | A1 | 1/2017 | Merritt |
| 2017/0079350 | A1 | 3/2017 | Hourani |
| 2018/0092410 | A1 | 4/2018 | Rundle |
| 2020/0008502 | A1 | 1/2020 | Speciale et al. |

OTHER PUBLICATIONS

U.S. Appl. No. 29/617,421, filed Sep. 13, 2017, Brian Speciale, Entire Document.

U.S. Appl. No. 29/645,978, filed Apr. 30, 2018, Brian Speciale, Entire Document.

U.S. Appl. No. 29/705,878, filed Sep. 16, 2019, Brian Speciale, Entire Document.

(56)            **References Cited**

OTHER PUBLICATIONS

[32% Off] 2020 Kangaroo Pocket Oversized Hoodie in Apricot _ Zaful (https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_ 487027.html).

2018 Kangaroo Pocket Oversize Hoodie (https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html).

Adidas Trefoil Hoodie—Blue _ adidas US (https://www.adidas.com/us/trefoil-hoodie/FM3784.html).

Front Solid Full Regular Hoodie Half Zip Kangaroo Pocket Fluffy Hoodie (https://www.daydaychic.com/Half-Zip-Kangaroo-Pocket-Fluffy-Hoodie-p-1000025963).

Indigo Indigo Suede Hoodie Dress with Kangaroo Pocket—Toetally You (https://www.toetallyyou.com/indigo-suede-hoodie-dress-with-kangaroo-pocket.html).

Popular Color Block Drawstring Hooded Sweatshirt with Kangaroo Pocket—Beautifulhalo.com (https://www.beautifulhalo.com/popular-color-block-drawstring-hooded-sweatshirt-with-kangaroo-pocket-p-260687.html).

Stone Island Shadow Project Contrast Panel Drawstring Hoodie—Farfetch (https://www.farfetch.com/shopping/men/stone-island-shadow-project-contrast-panel-drawstring-hoodie-item-15264001.aspx?storeid=10).

Stone Island Shadow Project Men zipped pocket sweatshirt (http://www.caribbeanmicrofinanceforum.com/stone-island-shadow-project-men-zipped-pocket-sweatshirt-boutique-high-quality-681960107-qacglom.html).

Trefoil Oversize Hoodie (https://www.adidas.com/us/trefoil-oversize-hoodie/CW1248.html).

U.S. Appl. No. 29/731,083, filed Apr. 11, 2020, Brian Speciale, Entire Document.

U.S. Appl. No. 29/731,086, filed Apr. 11, 2020, Brian Speciale, Entire Document.

ASOS NYTT Long Sleeve Hoodie Dress, web page (https://www.asos.com/nytt/nytt-long-sleeve-hoodie-dress/prd/6860969) retrieved from Internet Archive Wayback Machine (https://web.archive.org/web/20170307145645/https://www.asos.com/nytt/nytt-long-sleeve-hoodie-dress/prd/6860969).

Chesterford Children's Lab Coats, web page (http://chesterford.co.uk/acatalog/Children_s_lab_coats.html) retrieved from Internet Archive Wayback Machine (https://www.archive.org/web/20160322191704/http://chesterford.co.uk/acatalog/Children_s_lab_coats.html).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9

US010420431B1

## (12) United States Patent
### Speciale et al.

(10) Patent No.: **US 10,420,431 B1**
(45) Date of Patent: **Sep. 24, 2019**

(54) **OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET**

(71) Applicant: **Cozy Comfort Company LLC**, Cave Creek, AZ (US)

(72) Inventors: **Brian Speciale**, Cave Creek, AZ (US); **Michael Speciale**, Cave Creek, AZ (US)

(73) Assignee: **Cozy Comfort Company LLC**, Cave Creek

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/130,502**

(22) Filed: **Sep. 13, 2018**

### Related U.S. Application Data

(60) Provisional application No. 62/558,136, filed on Sep. 13, 2017, provisional application No. 62/671,417, filed on May 14, 2018.

(51) **Int. Cl.**
| | |
|---|---|
| *A41D 27/00* | (2006.01) |
| *A47G 9/06* | (2006.01) |
| *A41D 27/10* | (2006.01) |
| *A41D 31/02* | (2019.01) |
| *A41D 27/20* | (2006.01) |
| *A41D 3/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *A47G 9/064* (2013.01); *A41D 3/005* (2013.01); *A41D 27/10* (2013.01); *A41D 27/20* (2013.01); *A41D 31/02* (2013.01)

(58) **Field of Classification Search**
CPC ......... A41D 3/005; A41D 27/10; A41D 31/02
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,837,006 A | 9/1974 | Laseman | |
| 4,791,681 A * | 12/1988 | Dean | .................... A41D 13/012 2/102 |
| 8,566,963 B2 * | 10/2013 | Ryan | .................... A41D 27/201 2/252 |
| 9,295,292 B2 * | 3/2016 | Sachs | .................... A41D 27/205 |
| 9,414,631 B2 * | 8/2016 | Schrimpf | ............ A41D 27/20 |
| 9,554,601 B2 * | 1/2017 | Arajakis | ............. A41D 3/005 |
| 9,713,352 B2 * | 7/2017 | Demarest | ............. A41D 3/00 |
| 10,130,126 B2 * | 11/2018 | Blauser | ................ A41D 1/002 |
| 2008/0196140 A1 * | 8/2008 | Mayerson | ............... A41D 1/04 2/84 |
| 2009/0229034 A1 * | 9/2009 | Zmigrosky | ............. A41D 1/08 2/79 |

(Continued)

OTHER PUBLICATIONS

2018 Kangaroo Pocket Oversized Hoodie, https://www.zaful.com/kangaroo-pocket-oversized-hoodie-p_487027.html.

(Continued)

*Primary Examiner* — Richale L Quinn
(74) *Attorney, Agent, or Firm* — Thomas W. Galvani, P.C.; Thomas W. Galvani

(57) **ABSTRACT**

An overgarment includes a single body constructed from two soft, woven fabric plies and a torso in the body. Opposed sleeves are attached to the torso at sleeve openings, and the sleeves each have a top, an opposed bottom, and a length. A marsupial pocket on a front of the torso has a top and opposed bottom, the top of the marsupial pocket is above the bottom of each sleeve, and the bottom of the marsupial pocket is below the bottom of each sleeve.

**16 Claims, 16 Drawing Sheets**



US 10,420,431 B1

Page 2

(56)　　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| 2011/0185471 A1* | 8/2011 | Buczkowski .......... A41D 27/20 |
| | | 2/84 |
| 2012/0005802 A1* | 1/2012 | Claeys ................... A41D 27/20 |
| | | 2/84 |
| 2013/0219581 A1* | 8/2013 | Schrimpf ............... A41D 27/20 |
| | | 2/69 |
| 2014/0310848 A1* | 10/2014 | Ulriksen .............. A41D 27/285 |
| | | 2/69 |
| 2014/0317824 A1 | 10/2014 | Browning et al. |
| 2014/0331381 A1* | 11/2014 | Arajakis ................. A41D 3/005 |
| | | 2/84 |
| 2016/0242474 A1* | 8/2016 | Baschak ........... A41D 13/0015 |
| 2017/0020215 A1* | 1/2017 | Merritt ................. A41D 27/201 |
| 2017/0079350 A1* | 3/2017 | Hourani ............... A41D 27/201 |

OTHER PUBLICATIONS

Trefoil Oversize Hoodie, https://www.adidas.com/us/trefoil-oversize-hoodie/CW1248.html.
Stone Island Shadow Project Men zipped pocket sweatshirt, http://www.caribbeanmicrofinanceforum.com/stone-island-shadow-project-men-zipped-pocket-sweatshirt-boutique-high-quality-681960107-qacglom.html.

\* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6    FIG. 7



FIG. 8

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16          FIG. 17



FIG. 18

FIG. 19



FIG. 20

**1**

# OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 62/558,136, filed Sep. 13, 2017, and also of U.S. Provisional Application No. 62/671,417, filed May 14, 2018, both of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates generally to blankets, and more particularly to large, wearable blankets.

## BACKGROUND OF THE INVENTION

Throw blankets are great at keeping a person warm and comfortable on the couch. Light blankets keep one comfortable on cool nights, and heavy blankets are wonderful for warming oneself on especially cold nights. But sadly, eventually, one must get up from the couch, whether to grab a hot chocolate, adjust the fire, or go to bed. When one gets up, they must leave the warm blanket behind and venture through their home a little colder.

Layering is often the answer when the question is how to stay warm inside a cool building. Layering is the process of wearing many layers of clothing on top of each other. One might wear a thin pair of polyester socks and a thick pair of wool socks, or an undershirt, a t-shirt, and a sweater, or even long underwear and jeans. But, layering is not always the most comfortable. Layering clothes can be constrictive in feeling and restrictive in movement. Children especially dislike layering, their response being to just "turn up the heat!"

However, turning up the heat is not always the answer. Sometimes, it feels good to be warmed by a blanket when the house is a little cold. But blankets simply are not practically portable when worn on the body. An improved, cozy, comfortable blanket is needed.

## SUMMARY OF THE INVENTION

An overgarment includes a single body constructed from two soft, woven fabric plies and a torso in the body. Opposed sleeves are attached to the torso at sleeve openings, and the sleeves each have a top, an opposed bottom, and a length. A marsupial pocket on a front of the torso has a top and opposed bottom, the top of the marsupial pocket is above the bottom of each sleeve, and the bottom of the marsupial pocket is below the bottom of each sleeve.

The above provides the reader with a very brief summary of some embodiments discussed below. Simplifications and omissions are made, and the summary is not intended to limit or define in any way the scope of the invention or key aspects thereof. Rather, this brief summary merely introduces the reader to some aspects of the invention in preparation for the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

Referring to the drawings:

FIG. **1** is a front elevation view of an over-garment with an elevated marsupial pocket, as worn by a person shown in broken line in a standing position;

**2**

FIGS. **2** and **3** are top and bottom perspective views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIGS. **4** and **5** are front and rear elevation views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIGS. **6** and **7** are left and right side elevation views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIGS. **8** and **9** are top and bottom plan views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **1**;

FIG. **10** is a front perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **1** as worn by a person, partially hidden, shown in broken line in a sitting fetal position;

FIG. **11** is a front elevation view of another embodiment of an over-garment with an elevated marsupial pocket, as worn by a person shown in broken line in a standing position;

FIGS. **12** and **13** are front and rear perspective views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **11**;

FIGS. **14** and **15** are front and rear elevation views of the over-garment with an elevated marsupial pocket shown in FIG. **11**;

FIGS. **16** and **17** are left and right side elevation views of the over-garment with an elevated marsupial pocket shown in FIG. **11**;

FIGS. **18** and **19** are top and bottom plan views, respectively, of the over-garment with an elevated marsupial pocket shown in FIG. **11**; and

FIG. **20** is a front perspective view of the over-garment with an elevated marsupial pocket shown in FIG. **11** as worn by a person, partially hidden, shown in broken line in a sitting fetal position.

## DETAILED DESCRIPTION

Reference now is made to the drawings, in which the same reference characters are used throughout the different figures to designate the same elements. FIG. **1** illustrates an enlarged over-garment with an elevated marsupial pocket (hereinafter, the "garment **10**"), as worn by a person **11**, shown in broken line, in a standing position. As can be seen clearly, the garment **10** is quite large, and its lengths, widths, proportions, and material construction are sufficiently different from conventional garments, thereby enabling the garment **10** to be used in different and unexpected ways. Indeed, the product shown in the drawings has experienced tremendous sales volume and copying by competitors since the year that the first provisional application disclosing the garment **10** was filed. The garment **10** uniquely provides a cozy, comfortable, warm, and spacious covering which can be worn in a reclining position, in a sitting position, in a fetal position, in a standing position, and even while walking.

The garment **10** includes a single body **12** generally having a front **13** and an opposed back **14**, a top **15** and an opposed bottom **16**, as well as left and right sides **20** and **21** extending from the top **15** to the bottom **16**. The body **12** has a torso **22** to which opposed left and right sleeves **23** and **24** are attached at the left and right sides **20** and **21**, respectively. A hood **25** is attached to the torso **22** at the top **15**, and a marsupial pocket **26** is attached to the front **13** of the garment **10**. For perspective, the person **11** is approximately six feet in height and one hundred sixty pounds in weight.

US 10,420,431 B1

3

The body **12** of the garment **10** is preferably constructed from two plies of a soft, woven, flexible fabric material, defining an inner ply and an outer ply. An outer ply **30** is on the outside of the body **12**. The outer ply **30** is constructed from a soft yet tough and slightly elastic material with a low-pile knit, such as fleece or microfiber. The finish on the outer ply **30** is smooth. An inner ply **31** of the material is also constructed from a soft yet tough material, but has a rougher, high-pile knit, which produces a large and fuzzy fur-like finish.

The torso **22** is formed by the outer and inner plies **30** and **31** sewn together at various points or along seams. The torso **22** generally extends between shoulder seams **32** proximate the top **15** of the garment **10** and a bottom hem or edge **33** of both the front **13** and back **14** of the garment **10**. The outer and inner plies **30** and **31** form a front panel at the front **13** of the torso **22** and a back panel at the back **14** of the torso **22**. The front panel is a single and continuous sheet extending from the shoulder seams **32** to the bottom edge **33** and between the left and right sides **20** and **21**, at the front **13** of the body **12**. Similarly, the back panel is a single and continuous sheet extending from the shoulder seams **32** to the bottom edge **33** and between the left and right sides **20** and **21**, at the back **14** of the body **12**. The front and back panels are sewn to each other to form the body **12** and are held loosely near each other but not necessarily bonded, fastened, or attached to either continuously or intermittently between the left and right sides **20** and **21** or between the top **15** and bottom **16**. The outer and inner plies **30** and **31** are sewn to each other along the shoulder seams **32**, which extend from the hood **25** to each of the left and right sleeves **23** and **24**. They are sewn to each other along two side seams, which extend vertically down the left and side sides **20** and **21** between the left and right sleeves **23** and **24** to the bottom edge **33**. Although the word "sewn" is used to describe the manner of fastening the front and back panels herein, it should be understood that the outer and inner plies **30** and **31** are not necessarily attached by stitching or sewing; they may be fixed or attached to each by fabric welding, adhesive, buttons, slide fasteners, or other similar fastening means and methods. Indeed, all structures of the garment **10** which are attached to each other may be fastened in one of these ways, unless this description specifically states otherwise.

The bottom edge **33** is open. The bottom edge **33** is a roughly annular or oval-shaped hem piece (as shown in FIG. **9**) attached to the torso **22** with stitching through the outer and inner plies **30** and **31** so that the front and back panels do not fray or develop loose ends. The bottom edge **33** is constructed from a soft and flexible—yet inelastic—fabric material, so that while the material of the torso **22** may elastically stretch, the bottom edge **33** does not.

Shown in FIGS. **1** and **8**, opposite the bottom edge **33** is the hood **25** attached to the top **15** of the garment **10**. The hood **25** is formed from two generally rectangular sheets of material which are also constructed from the outer and inner plies **30** and **31**. The two sheets are sewn together along two edges to form the hood **25**, which is then sewn onto a neck opening **50** in the body **12**. The neck opening **50** is circular, having a semi-circular seam extending across the front **13** between the shoulder seams **32** and a semi-circular seam extending across the back **14** between the shoulder seams **32**. Thus, nearly defining a circular hole, the neck opening **50** has a neck diameter D between the opposed shoulder seams **32** of approximately five inches. The forward free edges of the hood **25** are hemmed. In some embodiments, a drawstring cord is inserted and threaded through the hem so

4

that the person **11** may adjust the size of the opening of the hood **25**. The cord is shown in broken line in FIG. **1**, but in most embodiments, the hood **25** does not have a drawstring.

With the combination of the shoulder seams **32**, the sewn left and right sides **20** and **21** from the left and right sleeves **23** and **24** down, and the inelastic bottom edge **33**, the torso **22** is defined roughly as an inverted "pocket" with a lower opening at the bottom edge **33**. This inverted pocket is quite large, and is capable of receiving and covering an entire person when that person is sitting in a fetal position. For smaller children, such as under ten years old, the large torso **22** will completely cover them even when standing. The torso **22** has a width T between the left and right sides **20** and **21** at the bottoms **41** and **41'** of the opposed left and right sleeves **23** and **24** which is approximately thirty-seven inches. The width T is approximately 7.4 times the neck diameter D of the neck opening **50**. The torso **22** has a height A between the neck opening **50** and the bottom edge **33** of the torso **22**, wherein the height A is approximately thirty-three inches. The torso also measures approximately forty-one inches between the neck opening **50** and the bottom edge **33** of the back **14** of the torso **22**.

To ensure that the torso **22** covers a person when sitting in the fetal position, the bottom edge **33** extends further downward at the back **14** of the garment **10** than it does on the front **13**. In other words, the back **14** of the garment **10** is longer than the front **13**. As shown in FIGS. **1-7**, the bottom edge **33** at the back **14** of the garment has a tail **34**. The tail **34** is located centrally between the opposed left and right sides **20** and **21** and is an arcuate projection downward. It is a convex extension of the back **14**; the bottom edge **33** slopes in a convex fashion between the left and right sides **20** and **21** to form the tail on the back **14**. In contrast, the bottom edge **33** is nearly straight across between the left and right sides **20** and **21** at the front **13** of the garment **10**.

This unique construction allows the garment **10** to be pulled over a person's knees when the person **11** is in a sitting or fetal position, as in FIG. **10**, without exposing the person's front or back. The left and right sleeves **23** and **24** further allow a person to cocoon or maximize their comfort within the garment. Referring to FIG. **1**, the left and right sleeves **23** and **24** are opposite and identical. As such, description herein will be limited to the left sleeve **23**, with the understanding that the description applies equally to the right sleeve **24**. Nevertheless, throughout this description and the drawings, the same reference characters are used for identical structural elements and features of the left and right sleeves **23** and **24**, but those of the right sleeve **24** are marked with a prime ("'") symbol to distinguish them from those of the left sleeve **23**. The left sleeve **23** is fashioned from a single sheet of two-ply material, which, like the body **12**, is also constructed from the outer and inner plies **30** and **31**. The left sleeve **23** has a top **40** and an opposed underside bottom **41**. A sewn seam extends along the bottom **41** of the left sleeve **23**, forming the sheet into the conical sleeve shape seen in the drawings. The left sleeve **23** has a length L (shown in FIG. **2**) which terminates distally from the torso **22** at a highly-elastic cuff **42**. In FIG. **1**, the left sleeve **23** is bunched up, such that the full length L is not shown relative to the length of the arm of the person **11**. However, FIG. **2** shows the extended (but not stretched) length L. This length L is greater than the arm length of the person **11**. Indeed, the length L is quite large; it is approximately twenty-five inches, and is approximately five times the neck diameter D. The cuff **42** constricts to tightly conform to the wrist of the

US 10,420,431 B1

**5**

person **11**. The cuff **42** has a length C which is approximately two inches. The length C of the cuff **42** is approximately 0.6 times the neck diameter D.

The left sleeve **23** is sewn to the body **12** at a sleeve hole or opening **43** which is extremely large. The sleeve opening **43** is disproportionately large with respect to the person **11**, which causes the left sleeve **23** to be disproportionately large as well. The sleeve opening **43** has a height H (shown in FIG. **2**) between the top **40** and bottom **41** of the left sleeve **23** which is approximately fifteen inches. The neck diameter D of the neck opening **50** is approximately one-third of the height H of the sleeve opening **43**. This allows the person **11** to move his or her arm into and out of the left sleeve **23** easily and to bend, fold, or hide his or her arm within the left sleeve **23** without getting caught by or even stretching the left sleeve **23**. This also allows the person **11** to extend his or her arms through the left sleeve **23**, pull them in through the left sleeve **23**, or even fold them inside the left sleeve **23** comfortably. The sleeve opening **43** extends vertically from its top **40** at the shoulder seam **32** to its bottom **41**. The bottom **41** of the sleeve opening **43** is approximately level with a middle of the marsupial pocket **26**, as is explained more below.

The marsupial pocket **26** is carried on the outer ply **30** of the garment **10**, at the front **13** thereof. The pocket **26** has a top **60**, opposed diagonal sides **61** and **62**, opposed short sides **63** and **64**, and a bottom **65**. The top **60**, short sides **63** and **64**, and the bottom **65** are sewn to the outer ply **30** of the garment **10**, leaving the diagonal sides **61** and **62** free and open. This allows the marsupial pocket **26** to carry items therein or to receive the hands for warmth.

The marsupial pocket **26** is disposed in a relatively high position on the garment **10** relative to the top **15** and bottom **16**. As seen in FIG. **1**, the top **60** of the marsupial pocket **26** is well above halfway between the neck opening **50** and the bottom edge **33** at the bottom **16** of the garment **10**. And the bottom **65** of the marsupial pocket **26** is spaced approximately one-quarter the height of the garment **10** from the bottom **16**. Further, the top **60** of the marsupial pocket **26** is above the bottom **41** of each of the left and right sleeves **23** and **24**, and the bottom **65** of the marsupial pocket **26** is below the bottom **41** of each of the left and right sleeves **23** and **24**. This is a raised position of the marsupial pocket **26** with respect to conventional "hoodie"-style sweatshirts and provides unique features as described later. The top **60** of the marsupial pocket **26** is approximately nine inches from the bottom of the neck opening **50**, and the bottom **65** of the marsupial pocket **26** is approximately thirteen inches from the bottom edge **33** of the front **13** of the garment **10**, and the marsupial pocket **26** has a height P which is approximately eleven inches. This height P is approximately 1.2 times the distance between the neck opening **50** and the top **60** of the marsupial pocket **26**. Further, the height A between the neck opening **50** and the bottom edge **33** is approximately three times the height P of the marsupial pocket **26**, and a distance between the neck opening **50** and the bottom edge **33** of the back **14** of the torso **22** is approximately 3.7 times the height P of the marsupial pocket **26**.

As should now be clear, the garment **10** is quite large, and as shown in FIGS. **1** and **10**, is useful both as an over-garment similar to a jacket and as a blanket, under which the body can be curled up for warmth and coziness. The disproportionate sizes of the various parts of the garment **10** allow it to be worn, placed, or draped over one's whole body for full-body comfort and coziness. The garment **10** is worn on the body of the person **11** like an article of clothing: the torso **22** is placed over the person's torso, their left arm is

**6**

extended through the left sleeve **23**, their right arm is extended through the right sleeve **24**, and the hood **25** is placed over the person's head.

Even though the garment **10** is worn like a typical article of clothing, it is much different. The body **12** is considerably wider than a conventional article of clothing, being approximately three to four times wider and approximately one-and-a-half times longer. The sleeve openings **43** and **43'** are at least twice as large as those on a typical article of clothing. This, in part, allows the person **11** to drape the garment **10** like a blanket when worn, and to even cover the person **11** when in a fetal position, as shown in FIG. **10**, or to bring his or her arms into and out of the left and right sleeves **23** and **24** easily and without stretching the left and right sleeves **23** and **24**.

The person **11** can also bunch up the left and right sleeves **23** and **24** and place his or her hands into the marsupial pocket **26** for warmth without stretching his or her arms far down, since the marsupial pocket **26** is disposed at an elevated position with respect to the bottom edge **33** of the garment **10**. And, when the person **11** is crouched in the fetal position as in FIG. **10**, the marsupial pocket **26** is disposed in front of the person's knees, rather than at his or her shins or feet, so that the person **11** can easily reach around the knees and place his or her hands within the marsupial pocket **26**, even holding the knees at the same time. In other words, when the garment **10** is worn and the person **11** is in a fetal position, the marsupial pocket **26** is disposed in front of the knees of the person **11**. Further, the tail **34** of the garment **10**, because it is elongated and extends further down than the bottom edge **33** does at the front **13**, does not expose the buttocks or back of the person **11**, but rather covers the rear of the person **11** fully. As such, when the person **11** is in the fetal position, the bottom edge **33** extends fully to cover the person **11** entirely around. It is the particular sizes, arrangements, and proportions of the garment **10** and its constituent structural elements and features, as described above, which create these features and advantages that are not available in the prior art. Indeed, because of the differences in structural elements and features described in the many paragraphs above, the product disclosed here has experienced tremendous first-year global sales and has been copied across the world. Consumers and the competition have adopted this garment **10** as one which is different, which is different in unique ways, and which offers unique features not available in other garments or blankets.

FIG. **11** illustrates another embodiment of an enlarged over-garment with an elevated marsupial pocket (hereinafter, the "garment **110**"), as worn by a person **111**, shown in broken line, in a standing position. This garment **110** is also quite large, and its lengths, widths, proportions, and material construction are sufficiently different from conventional garments, enabling the garment **110** to be used in different and unexpected ways, as described below. The garment **110** uniquely provides a cozy, comfortable, warm, and spacious covering which can be worn in a reclining position, in a sitting position, in a fetal position, in a standing position, and even while walking.

The garment **110** includes a single body **112** generally having a front **113** and an opposed back **114**, a top **115** and an opposed bottom **116**, as well as left and right sides **120** and **121** extending from the top **115** to the bottom **116**. The body **112** has a torso **122** to which opposed left and right sleeves **123** and **124** are attached at the left and right sides **120** and **121**, respectively. A hood **125** is attached to the torso **122** at the top **115**, and a marsupial pocket **126** is attached to the front **113** of the garment **110**. For perspective,

7

the person 111 is approximately six feet in height and one hundred sixty pounds in weight.

The body 112 of the garment 110 is preferably constructed from two plies of a soft, woven, flexible fabric material, defining an inner and an outer layer. An outer ply 130 is on the outside of the body 112. The outer ply 130 is constructed from a soft yet tough and slightly elastic material with a low-pile knit, such as fleece or microfiber. The finish on the outer ply 130 is smooth. An inner ply 131 of the material is also constructed from a soft yet tough material, but has a rougher, high-pile knit, which produces a large and fuzzy fur-like finish.

The torso 122 is formed by the outer and inner plies 130 and 131 sewn together at various points or along seams. The torso 122 generally extends between shoulder seams 132 proximate the top 115 of the garment 110 and a bottom hem or edge 133 of both the front 113 and back 114 of the garment 110. The outer and inner plies 130 and 131 form a front panel at the front 113 of the torso 122 and a back panel at the back 114 of the torso 122. The front panel is a single and continuous sheet extending from the shoulder seams 132 to the bottom edge 133 and between the left and right sides 120 and 121, at the front 113 of the body 112. Similarly, the back panel is a single and continuous sheet extending from the shoulder seams 132 to the bottom edge 133 and between the left and right sides 120 and 121, at the back 114 of the body 112. The front and back panels are sewn to each other to form the body 112 and are held loosely near each other but not necessarily bonded, fastened, or attached to either continuously or intermittently between the left and right sides 120 and 121 or between the top 115 and bottom 116. The outer and inner plies 130 and 131 are sewn to each other along the shoulder seams 132, which extend from the hood 125 to each of the left and right sleeves 123 and 124. They are sewn to each other along two side seams, which extend vertically down the left and side sides 120 and 121 between the left and right sleeves 123 and 124 to the bottom edge 133. Although the word "sewn" is used to describe the manner of fastening the front and back panels herein, it should be understood that the outer and inner plies 130 and 131 are not necessarily attached by stitching; they may be fixed or attached to each by fabric welding, adhesive, buttons, slide fasteners, or other similar fastening means and methods. Indeed, all structures of the garment 10 which are attached to each other may be fastened in one of these ways, unless this description specifically states otherwise.

The bottom edge 133 is open. The bottom edge 133 is a roughly annular or oval-shaped hem piece (as shown in FIG. 19) attached to the torso 122 with stitching through the outer and inner plies 130 and 131 so that the front and back panels do not fray or develop loose ends. The bottom edge 133 is constructed from a soft and flexible—yet inelastic—fabric material, so that while the material of the torso 122 may elastically stretch, the bottom edge 133 does not.

Opposite the bottom edge 133 is the hood 125 attached to the top 115 of the garment 110. The hood 125 is formed from two generally rectangular sheets of material which are also constructed from the outer and inner plies 130 and 131. The two sheets are sewn together along two edges to form the hood 125, which is then sewn onto a neck opening 150 in the body 112. The neck opening 150 is circular, having a semi-circular seam extending across the front 113 between the shoulder seams 132 and a semi-circular seam extending across the back 114 between the shoulder seams 132. Thus, nearly forming a circular hole, the neck opening 150 has a neck diameter D between the opposed shoulder seams 132 which is approximately five inches. The forward free edges

8

of the hood 125 are hemmed. In some embodiments, a drawstring cord is inserted and threaded through the hem so that the person 111 may adjust the size of the opening of the hood 125, but in most embodiments, the hood 125 does not have a drawstring.

With the combination of the shoulder seams 132, the sewn left and right sides 120 and 121 from the left and right sleeves 123 and 124 down, and the inelastic bottom edge 133, the torso 122 is defined roughly as an inverted "pocket" with a lower opening at the bottom edge 133. This inverted pocket is quite large, and is capable of receiving and covering an entire person when that person is sitting in a fetal position, and is nearly capable of receiving and entirely covering a six-foot man in a standing position. For smaller children, such as under ten years old, the large torso 122 will easily completely cover them even when standing. The torso 122 has a width T between the bottoms 141 and 141' of the opposed left and right sleeves 123 and 124 which is approximately thirty-seven inches. The width T is approximately 7.4 times the neck diameter D of the neck opening 150. The torso 122 has a height B between the neck opening 150 and the bottom edge 133 of the torso 122, wherein the height B is fifty-nine inches. The torso also measures approximately fifty-nine inches between the neck opening 150 and the bottom edge 133 of the back 114 of the torso 122.

To ensure that the torso 122 covers a person when sitting in the fetal position, the bottom edge 133 extends further downward at the back 114 of the garment 110 than it does on the front 113. In other words, the back 114 of the garment 110 is longer than the front 113. As shown in FIGS. 11-17, the bottom edge 133 at the back 114 of the garment has a tail 134. The tail 134 is located centrally between the opposed left and right sides 120 and 121 and is an arcuate projection downward. The bottom edge 133 slopes in a convex fashion between the left and right sides 120 and 121 to form the tail on the back 114. In contrast, the bottom edge 133 is nearly straight across between the left and right sides 120 and 121 at the front 113 of the garment 110.

This unique construction allows the garment 110 to be pulled over a person's knees when the person 111 is in a sitting or fetal position, as in FIG. 20, without exposing the person's front or back. The left and right sleeves 123 and 124 further allow a person to cocoon or maximize their comfort within the garment. The left and right sleeves 123 and 124 are opposite and identical. As such, description herein will be limited to the left sleeve 123, with the understanding that the description applies equally to the right sleeve 124. Nevertheless, throughout this description and the drawings, the same reference characters are used for identical structural elements and features of the left and right sleeves 123 and 124, but those of the right sleeve 124 are marked with a prime ("'") symbol to distinguish them from those of the left sleeve 123. Referring to FIG. 11, the left sleeve 123 is fashioned from a single sheet of two-ply material, which, like the body 112, is also constructed from the outer and inner plies 130 and 131. The left sleeve 123 has a top 140 and an opposed underside bottom 141. A sewn seam extends along the bottom 141 of the left sleeve 123, forming the sheet into the conical sleeve shape seen in the drawings. The left sleeve 123 has a length L (shown in FIG. 12) which terminates distally from the torso 122 at a highly-elastic cuff 142. In FIG. 11, the left sleeve 123 is bunched up, such that the full length L is not shown relative to the length of the arm of the person 111. However, FIG. 12 shows the extended (but not stretched) length L. This length L is greater than the arm length of the person 111. Indeed, the length L is quite large; it is approximately twenty-five

US 10,420,431 B1

9

inches and is approximately five times the neck diameter D. The cuff **142** constricts to tightly conform to the wrist of the person **111**. The cuff **142** has a length C which is approximately two inches. The length C of the cuff **142** is approximately 0.6 times the neck diameter D.

The left sleeve **123** is sewn to the body **112** at a sleeve hole or opening **143** which is extremely large. The sleeve opening **143** is disproportionately large with respect to the person **111**, which causes the left sleeve **123** to be disproportionately large as well. The sleeve opening **143** has a height H (shown in FIG. **12**) between the top **140** and bottom **141** of the left sleeve **123** which is approximately fifteen inches. The diameter D of the neck opening **150** is approximately one-third of the height H of the sleeve opening **143**. This allows the person **111** to move his or her arm into and out of the left sleeve **123** easily and to bend, fold, or hide his or her arm within the left sleeve **123** without getting caught by or even stretching the left sleeve **123**. This also allows the person **111** to extend his or her arms through the left sleeve **123**, pull them in through the left sleeve **123**, or even fold them inside the left sleeve **123** comfortably. The sleeve opening **143** extends vertically from its top **140** at the shoulder seam **132** to its bottom **141**. The bottom **141** of the sleeve opening **143** is approximately level with a middle of the marsupial pocket **126**, as is explained more below.

The marsupial pocket **126** is carried on the outer ply **130** of the garment **110**, at the front **113** thereof. The pocket **126** has a top **160**, opposed diagonal sides **161** and **162**, opposed short sides **163** and **164**, and a bottom **165**. The top **160**, short sides **163** and **164**, and the bottom **165** are sewn to the outer ply **130** of the garment **110**, leaving the diagonal sides **161** and **162** free and open. This allows the marsupial pocket **126** to carry items therein or to receive the hands for warmth.

The marsupial pocket **126** is disposed in a relatively high position on the garment **110** relative to the top **115** and bottom **116**. As seen in FIG. **11**, the top **160** of the marsupial pocket **126** is well above halfway between the neck opening **150** and the bottom edge **133** at the bottom **116** of the garment **110**. And the bottom **165** of the marsupial pocket **126** is spaced approximately one-quarter the height of the garment **110** from the bottom **116**. Further, the top **160** of the marsupial pocket **126** is above the bottom **141** of each of the left and right sleeves **123** and **124**, and the bottom **165** of the marsupial pocket **126** is below the bottom **141** of each of the left and right sleeves **123** and **124**. This is a raised position of the marsupial pocket **126** with respect to conventional "hoodie"-style sweatshirts and provides unique features as described later. The top **160** of the marsupial pocket **126** is approximately nine inches from the bottom of the neck opening **150**, and the bottom **165** of the marsupial pocket **126** is approximately thirty-one inches from the bottom edge **133** of the front **113** of the garment **110**, and the marsupial pocket **126** has a height P which is approximately eleven inches. This height P is approximately 1.2 times the distance between the neck opening **150** and the top **160** of the marsupial pocket **126**. Further, the height B between the neck opening **150** and the bottom edge **133** is approximately 4.6 times the height P of the marsupial pocket **126**, and a distance between the neck opening **150** and the bottom edge **133** of the back **114** of the torso **122** is approximately 5.4 times the height P of the marsupial pocket **126**.

As should now be clear, the garment **110** is quite large, and as shown in FIGS. **11** and **20**, is useful both as an over-garment similar to a jacket and as a blanket, under which the body can be curled up for warmth and coziness. The disproportionate sizes of the various parts of the garment **110** allow it to be worn, placed, or draped over one's

10

whole body for full-body comfort and coziness. The garment **110** is worn on the body of the person **111** like an article of clothing: the torso **22** is placed over the person's torso, their left arm is extended through the left sleeve **123**, their right arm is extended through the right sleeve **124**, and the hood **125** is placed over the person's head.

Even though the garment **110** is worn like a typical article of clothing, it is much different. The body **112** is considerably wider than a conventional article of clothing, being approximately three to four times wider and approximately two to three times longer. The sleeve openings **143** and **143'** are at least twice as large as those on a typical article of clothing. This, in part, allows the person **111** to drape the garment **110** like a blanket when worn, and to even cover the person **111** when in a fetal position, as shown in FIG. **20**, or to bring his or her arms into and out of the left and right sleeves **123** and **124** easily and without stretching the left and right sleeves **123** and **124**.

The person **111** can also bunch up the left and right sleeves **123** and **124** and place his or her hands into the marsupial pocket **126** for warmth without stretching his or her arms far down, since the marsupial pocket **126** is disposed at an elevated position with respect to the bottom edge **133** of the garment **110**. And, when the person **111** is crouched in the fetal position as in FIG. **20**, the marsupial pocket **126** is disposed in front of the person's knees, rather than at his or her shins or feet, so that the person **111** can easily reach around the knees and place his or her hands within the marsupial pocket **126**, even holding the knees at the same time. In other words, when the garment **110** is worn and the person **111** is in a fetal position, the marsupial pocket **126** is disposed in front of the knees of the person **111**. Further, the tail **134** of the garment **110**, because it is elongated and extends further down than the bottom edge **133** at the front **113**, does not expose the buttocks or back of the person **111**, but rather covers the rear of the person **111** fully. As such, when the person **111** is in the fetal position, the bottom edge **133** does extend fully to cover the person **111** entirely around. It is the particular sizes, arrangements, and proportions of the garment **110** and its constituent structural elements and features, as described above, which create these features and advantages that are not available in the prior art. Indeed, because of the differences in structural elements and features described in the many paragraphs above, the product disclosed here has experienced tremendous first-year global sales and has been copied across the world. Consumers and the competition have adopted this garment **110** as one which is different, which is different in unique ways, and which offers unique features not available in other garments or blankets.

In some embodiments of the garment **110**, an interior pocket **170** is attached to the inner ply **131**. As seen in FIG. **20**, the pocket **170** has a top **171**, an opposed bottom **172**, and opposed sides **173** and **174**. The bottom **172** is sewn along and into the bottom edge **133** between the sides **173** and **174**. The sides **173** and **174** are sewn in parallel fashion, extending upwardly from the bottom edge **133** to the top **171**. In this way, the bottom **172** and the sides **173** and **174** define closed edges of the interior pocket **170**. The top **171** is not sewn onto the inner ply **131**, so that the top **171** defines an opening into the interior pocket **170**. The opening at the top **171** receives the feet of the person **11**, as shown in FIG. **20**, when the person is in a fetal or crouched position. This keeps his or her feet extra warm.

A preferred embodiment is fully and clearly described above so as to enable one having skill in the art to understand, make, and use the same. Those skilled in the art will

US 10,420,431 B1

**11**

recognize that modifications may be made to the description above without departing from the spirit of the invention, and that some embodiments include only those elements and features described, or a subset thereof, and no other elements or features. To the extent that modifications do not depart from the spirit of the invention, they are intended to be included within the scope thereof.

The invention claimed is:

**1**. An overgarment comprising:

a single body constructed from two soft, woven fabric plies;

a torso in the body, the torso having a neck opening;

opposed sleeves attached to the torso at sleeve openings, the sleeves each having a top, an opposed bottom, and a length;

a marsupial pocket having a top and opposed bottom, wherein the top of the marsupial pocket is above the bottom of each sleeve at the respective sleeve opening, and the bottom of the marsupial pocket is below the bottom of each sleeve at the respective sleeve opening;

wherein the marsupial pocket has a height between its top and bottom which is 1.2 times the distance between the neck opening and the top of the marsupial pocket.

**2**. The overgarment of claim **1**, further comprising:

the torso has a neck opening with a neck diameter which is one-third of a height of one of the sleeve openings, wherein the height of the one of the sleeve openings is measured between the top and bottom of the one of the sleeves at the respective sleeve opening;

the torso has a width measured between the sleeve openings at the bottoms of the opposed sleeves, wherein the width is 7.4 times the neck diameter; and

the length of each of the sleeves is five times the neck diameter.

**3**. The overgarment of claim **2**, wherein each opposed sleeve terminates in a cuff having a length which is 0.6 times the neck diameter.

**4**. The overgarment of claim **1**, further comprising:

the torso has a front and an opposed back, each having a bottom edge;

the marsupial pocket is attached to the front of the torso; and

the bottom edge of the back of the torso is a convex extension below the bottom edge of the front of the torso.

**5**. The overgarment of claim **1**, wherein:

the two fabric plies of the body define inner and outer plies of the body;

the outer ply is constructed from a low-pile knit;

the inner ply is constructed from a high-pile knit; and

the two fabric plies of the body are elastic, and an edge along a bottom of the body is inelastic.

**6**. An overgarment comprising:

a single body constructed from two fabric plies defining inner and outer plies of the body;

a torso in the body, the torso having a neck opening;

opposed sleeves extending from the torso at sleeve openings, the sleeves each having a top and an opposed bottom;

a marsupial pocket on the outer ply, the marsupial pocket having a top and an opposed bottom, wherein the top of the marsupial pocket is above the bottom of each sleeve at the respective sleeve opening, and the bottom of the marsupial pocket is below the bottom of each sleeve at the respective sleeve opening;

**12**

wherein the marsupial pocket has a height between its top and bottom which is 1.2 times the distance between the neck opening and the top of the marsupial pocket.

**7**. The overgarment of claim **6**, further comprising:

the torso has a neck opening with a neck diameter which is one third of a height of one of the sleeve openings, wherein the height of the one of the sleeve openings is measured between the top and bottom of the one of the sleeves at the respective sleeve opening;

the torso has a width measured between the sleeve openings at the bottoms of the opposed sleeves, wherein the width is 7.4 times the neck diameter; and

the length of each of the sleeves is five times the neck diameter.

**8**. The overgarment of claim **7**, wherein each opposed sleeve terminates in a cuff having a length which is 0.6 times the neck diameter.

**9**. The overgarment of claim **6**, further comprising:

the torso has a front and an opposed back, each having a bottom edge;

the marsupial pocket is attached to the front of the torso; and

the bottom edge of the back of the torso is convex extension below the bottom edge of the front of the torso.

**10**. The overgarment of claim **6**, wherein:

the outer ply is constructed from a low-pile knit;

the inner ply is constructed from a high-pile knit; and

the two fabric plies of the body are elastic, and an edge along a bottom of the body is inelastic.

**11**. An overgarment comprising:

a single body constructed from two fabric plies defining inner and outer plies of the body;

a torso in the body, the torso including a neck opening having a neck diameter;

opposed sleeves extending from the torso at sleeve openings, the sleeves each having a top, an opposed bottom, and a length;

the torso has a width measured between the sleeve openings at the bottoms of the opposed sleeves; and

a marsupial pocket on the outer ply, the marsupial pocket having a top and an opposed bottom, wherein the top of the marsupial pocket is above the bottom of each sleeve at the respective sleeve opening, and the bottom of the marsupial pocket is below the bottom of each sleeve at the respective sleeve opening;

wherein the neck diameter is one third of a height of the one of the sleeve openings, wherein the height of the one of the sleeve openings is measured between the top and bottom of the one of the sleeves at the respective sleeve opening;

the marsupial pocket has a height between its top and bottom which is 1.2 times the distance between the neck opening and the top of the marsupial pocket;

the width of the torso is 7.4 times the neck diameter; and

the length of each of the sleeves is five times the neck diameter.

**12**. The overgarment of claim **11**, wherein each opposed sleeve terminates in a cuff having a length which is 0.6 times the neck diameter.

**13**. The overgarment of claim **11**, further comprising:

the torso has a front and an opposed back, each having a bottom edge;

the marsupial pocket is attached to the front of the torso; and

the bottom edge of the back of the torso is a convex below the bottom edge of the front of the torso.

**Appx00108**

US 10,420,431 B1

13

14

**14**. The overgarment of claim **11**, wherein:

the outer ply is constructed from a low-pile knit;

the inner ply is constructed from a high-pile knit; and

the two fabric plies of the body are elastic, and an edge along a bottom of the body is inelastic.

**15**. The overgarment of claim **11**, wherein:

the torso has a front and an opposed back, each having a bottom edge;

a distance between the neck opening and the bottom edge of the front of the torso is three times a height of the marsupial pocket between the top and bottom thereof; and

a distance between the neck opening and the bottom edge of the back of the torso is 3.7 times a height of the marsupial pocket between the top and bottom thereof.

**16**. The overgarment of claim **11**, wherein:

the torso has a front and an opposed back, each having a bottom edge;

a distance between the neck opening and the bottom edge of the front of the torso is 4.6 times a height of the marsupial pocket between the top and bottom thereof; and

a distance between the neck opening and the bottom edge of the back of the torso is 5.4 times a height of the marsupial pocket between the top and bottom thereof.

*   *   *   *   *

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,981 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  October 4, 2024            */s/ Gregory A. Castanias*
                                   Gregory A. Castanias

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2024, I caused the foregoing OPENING BRIEF FOR APPELLANTS to be electronically filed via CM/ECF with the U.S. Court of Appeals for the Federal Circuit, which electronically served the brief on all counsel of record.

*/s/ Gregory A. Castanias*
Gregory A. Castanias
